**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-23181-Civ-WILLIAMS/TORRES

RANDALL NOON, as Personal
Representative of the Estate of
KAREN NOON, deceased,

Plaintiff,

v.

CARNIVAL CORPORATION,
a Panamanian Corporation d/b/a
CARNIVAL CRUISE LINES,

Defendant.

_______________________________________/

**AMENDED REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO DISMISS**

This matter is before the Court on Carnival Corporation's d/b/a Carnival Cruise Lines ("Defendant" or "Carnival") motion to dismiss Randall Noon's ("Mr. Noon" or "Plaintiff") complaint or, in the alternative, to strike Plaintiff's claim for punitive damages. [D.E. 30]. Plaintiff responded on March 7, 2019 [D.E. 33] to which Defendant replied on March 14, 2019. [D.E. 34]. Therefore, Defendant's motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant authority, and for the reasons discussed below, Defendant's motion to dismiss should be **DENIED**.[1]

---

[1] On February 28, 2019, the Honorable Kathleen Williams referred Defendant's motion to the undersigned Magistrate Judge for disposition. [D.E. 32].

## *I. BACKGROUND*

Plaintiff filed this wrongful death action on behalf of his wife, Mrs. Noon, on August 3, 2018 because of the negligence of Defendant's medical and non-medical personnel. [D.E. 1]. Plaintiff alleges that, on July 7, 2017, Mrs. Noon started to experience shortness of breath and respiratory distress. Mrs. Noon was then taken to her stateroom in a wheelchair that Carnival provided. Once Mrs. Noon was back in her stateroom, her family members called the ship's medical center and informed them that Mrs. Noon was having difficulty breathing. The medical staff informed the family that an oxygen tank could be provided at a cost of $300.00. The medical center provided the tank but without an examination of Mrs. Noon, either in the medical center or in her stateroom. Instead, Mr. Noon picked up the oxygen tank[2] and took it back to the stateroom.

Mrs. Noon used the oxygen tank during the remainder of the evening of July 7, 2017 until the early morning of July 8, 2017. At approximately 7:00 a.m. on July 8, 2017 (when the ship was docked in Miami, Florida), the ship's medical center staff contacted Mr. and Mrs. Noon in their stateroom and informed them that they had to return the oxygen tank because it was time to disembark the ship. Plaintiff alleges that, shortly thereafter, two crewmembers came to the stateroom and retrieved the oxygen tank without any examination of Mrs. Noon or any notification to the ship's medical personnel that a professional medical examination may be necessary.

[2] The oxygen tank required connection to an electric outlet to be used and therefore was not portable off the ship or outside of the stateroom.

After the ship was docked in port, Mr. Noon and his family members expressed a desire to keep the oxygen tank until they were transported to a land-based hospital. Plaintiff alleges that Carnival's non-medical crewmembers supervising the disembarkation procedures refused to allow Mrs. Noon to keep the oxygen tank or to provide a substitute tank. Mrs. Noon's family then requested that Carnival's crewmembers arrange for transportation to a land-based hospital or medical facility. But, Plaintiff claims that Carnival's crewmembers failed to contact any emergency service providers. Plaintiff further alleges that crewmembers refused to allow Mrs. Noon or her husband to contact any emergency service providers on their own.

After Mrs. Noon disembarked the ship – unaccompanied by any of Carnival's crewmembers or any other medical personnel – she went into respiratory arrest. Emergency responders arrived and found Mrs. Noon unresponsive in cardiopulmonary arrest with no respirations. The Miami-Dade Fire Rescue Department transported Mrs. Noon to Jackson Memorial Hospital, where she was pronounced dead on July 9, 2017.

In Plaintiff's initial complaint, Plaintiff asserted one claim of vicarious liability against Defendant. Specifically, Plaintiff alleged that Defendant's medical crewmembers were negligent because they failed to (1) diagnose, evaluate, or treat Mrs. Noon's medical condition, (2) provide basic treatment to Mrs. Noon, (3) contact emergency services in a timely manner after the vessel reached port in accordance with the wishes of Mr. and Mrs. Noon, (4) follow basic medical treatment applicable

in light of Mrs. Noon's observable condition, (5) request an emergency responder transport for Mrs. Noon in a timely manner, and (6) delayed disembarkation procedures for Mrs. Noon. In addition to seeking compensatory damages under Florida's Wrongful Death statute Plaintiff sought punitive damages because "[t]he conduct of [Defendant] referenced above was willful, wanton, and reckless in light of the knowledge of [Defendant's] medical crewmembers regarding [Mrs. Noon's] condition and the limitations known to them on the capabilities of the onboard medical crew and facilities." [D.E. 1].

On October 10, 2018, the undersigned issued a Report and Recommendation (the "R&R") that Defendant's motion to dismiss be granted without prejudice. We determined that Plaintiff's complaint failed for at least two reasons. First, the undersigned found that Plaintiff's complaint failed because it violated Rule 8 in that it constituted a shotgun pleading with conclusory allegations that failed to provide Defendant with adequate notice of the claims against it and the grounds upon which those claims rested. That is, we held that the complaint improperly commingled multiple claims into a single count and that it was unclear which of Plaintiff's factual allegations related to his multiple theories of vicarious liability. Second, we found that the complaint lacked the necessary factual support to state a claim for relief. On October 26, 2018, the Court adopted the undersigned's R&R and dismissed Plaintiff's complaint without prejudice. [D.E. 14].

In Plaintiff's amended complaint, Plaintiff asserted three claims against Defendant: (1) negligent breach of duty to provide aid or assistance to sick or

injured passengers in count one, (2) negligent breach of assumed or undertaken duty to obtain medical care as to the nonmedical crew in count two, and (3) negligent breach of assumed or undertaken duty to obtain medical care with respect to the medical crew in count three. [D.E. 16]. Plaintiff also limited his allegations of negligence against Defendant to the time period after the ship reached port in Miami, Florida. In addition to seeking compensatory damages under the Florida Wrongful Death Act, Plaintiff reasserted a claim for punitive damages against Defendant in each count because the conduct of Defendant crewmembers was "willful, wanton, and reckless," and amounted to "an intentional deprivation of Mrs. [Noon's] rights." [D.E. 16].

On February 1, 2019, the undersigned issued another R&R recommending that Defendant's motion to dismiss be granted without prejudice. [D.E. 23]. We determined, for a second time, that Plaintiff's complaint constituted a shotgun pleading and cautioned Plaintiff that any second amended complaint should include the necessary factual support to survive any other challenges that Defendant may argue on another motion to dismiss. The Court adopted the undersigned's R&R on February 19, 2019 and dismissed Plaintiff's complaint without prejudice. [D.E. 28].

In Plaintiff's second amended complaint, Plaintiff asserts four vicarious liability claims against Carnival: (1) vicarious liability for negligence breach of a nonmedical crewmember's duty to provide aid or assistance to a sick or injured passenger, (2) negligent breach of an assumed or undertaken duty to obtain medical care by nonmedical crewmembers, (3) negligent breach of an assumed or

undertaken duty to obtain medical care by medical crewmembers with actual authority, and (4) negligent breach of an assumed or undertaken duty to obtain medical care by the medical crew with apparent authority. Plaintiff limits the negligence allegations against Defendant to the time period after the ship reached port in Miami, Florida. And Plaintiff seeks compensatory damages under the Florida Wrongful Death Act (and alternatively under Michigan's wrongful death and survival statutes), including punitive damages in each count.

## *II. APPLICABLE PRINCIPLES AND LAW*

In ruling on Defendant's motion to dismiss, the Court takes the allegations in the complaint as true and construes the allegations "in the light most favorable to the plaintiffs." *Rivell v. Private Health Care Systems, Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (citing *Hoffman–Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002)). "When considering a motion to dismiss, all facts set forth in [Plaintiff's] complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)). A motion to dismiss under Rule 12(b)(6) "is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions . . . ." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted) (alteration in original). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original). Factual content gives a claim facial plausibility. *Id.* "[A] court's duty to liberally construe a plaintiff's complaint in the face of a motion to dismiss is not the equivalent of a duty to re-write it for [the plaintiff]." *Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 912 (11th Cir. 1993).

## *III. ANALYSIS*

Defendant's motion seeks to dismiss Plaintiff's complaint because Plaintiff fails to allege (1) sufficient facts to support the duties alleged as to the non-medical crewmembers on the ship and (2) any facts indicating that any crewmembers voluntarily assumed or undertook any duty with respect to Mrs. Noon. Alternatively, Defendant argues that Plaintiff's request for punitive damages must be stricken because Plaintiff fails to allege any facts indicating intentional misconduct. Plaintiff opposes Defendant's motion because the allegations presented are clear, substantive, and must be taken as true at this stage of the case.

### *A. Principles of General Maritime Law*

Claims arising from alleged tort actions aboard ships sailing in navigable waters are governed by general maritime law. *See Keefe v. Bahama Cruise Line, Inc.*, 861 F.2d 1318, 1320 (11th Cir. 1989). Absent an applicable statute, general maritime law is "an amalgam of traditional common-law rules, modifications of those rules and newly created rules" drawn from state and federal sources. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864-65 (1986). Maritime law may be supplemented by state law principles so long as application of the state law does not place "substantive admiralty principles" at risk. *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. on Sept. 22, 1993*, 121 F.3d 1421, 1426 (11th Cir. 1997); *see also Yamaha Motor Corp., U.S.A., v. Calhoun*, 516 U.S. 199, 210 (1996); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409 (1953). Given these general maritime principles, we will consider the parties' arguments in turn.

### *B. Claim for Failure to Provide Assistance*

Plaintiff alleges in Count one that Carnival's non-medical crewmembers failed to provide aid or assistance to Mrs. Noon as an injured passenger within a reasonable amount of time. More specifically, Plaintiff claims that the non-medical personnel who picked up the oxygen tank and the personnel who supervised the disembarkation procedures owed a duty to Mrs. Noon to seek medical assistance upon observing her condition. Plaintiff concludes that Carnival is vicariously liable for the breach of those duties and, as a result, the non-medical personnel are the proximate cause of Mrs. Noon's respiratory failure that led to her death. This

Count differs from the remaining counts that are premised on the affirmative undertaking of duties by nonmedical and medical personnel that lead or contributed to Mrs. Noon's death.

Defendant argues that Count one is defective because the alleged knowledge of the non-medical personnel that Mrs. Noon had a condition that required an oxygen tank – without more – did not create a duty to seek medical assistance. Defendant relies on Plaintiff's allegation that the personnel who retrieved the oxygen tank were not medically trained and the absence of any claim that Mrs. Noon requested that crewmembers to obtain medical assistance for her. Defendant suggests, for example, that Plaintiff failed to allege that Mrs. Noon was incapable of, or prevented from, going to the medical center. Moreover, Defendant states that mere requests to the non-medical personnel to transport Mrs. Noon from the ship to the nearest available hospital did not impose any individual duty on Carnival's personnel. Therefore, Defendant requests that Count one be dismissed because the fact that Mrs. Noon may have preferred to receive medical care at a land-based facility does not create a duty on the part of the ship's non-medical crewmembers.

After due consideration of the allegations in the amended complaint and the current state of the law, Defendant's argument is ultimately unpersuasive on a motion to dismiss. At its core, Plaintiff's amended complaint now alleges all the required elements of a vicarious liability claim based on negligence against Carnival's non-medical personnel for failure to provide aid or assistance to Mrs. Noon.

That is not to say that Defendant's primary argument – that the crewmembers had no medical training and therefore no duty to Mrs. Noon while they retrieved the oxygen tank – does not have persuasive resonance. It does. But we must at this point assign all inferences in Plaintiff's favor. Upon doing so, a trier of fact could plausibly conclude that, while the non-medical personnel may not have been able to personally assist Mrs. Noon, the crewmembers arguably had a duty to notify, obtain, or seek medical care for Mrs. Noon because they had knowledge that she was in respiratory distress. According to the amended complaint, the porters robotically retrieved the oxygen tank and went on their way. Mrs. Noon, in the meantime, was suffering respiratory distress, made all the worse by the delayed medical treatment "between the time the porters retrieved the oxygen tank and the time she was finally allowed to disembark." [D.E. 24 ¶45]. This then resulted in "respiratory failure leading to cardiac arrest" and ultimately death. [D.E. 24 ¶46].

Defendant's response is that Mrs. Noon never requested medical assistance, but that position is belied by the allegations of the amended complaint that make clear that the passenger was in obvious distress. [D.E. 24 ¶40 ("Mrs. Noon was suffering from respiratory distress to an extent obvious even to lay crewmembers, including CARNIVAL's non-medical crew such as the porters. Indeed, the porters actually observed and commented upon Mrs. Noon's distressed state.")]. Because these crewmembers are specifically alleged to have knowledge of the serious health condition, it is immaterial that an injured passenger does not affirmatively request

assistance. Indeed, we have observed no case, and Defendant fails to reference any, where an affirmative request to seek medical care is required for a negligence claim based on vicarious liability.

Defendant then points out that there are no allegations that Mrs. Noon was incapable of visiting the medical center on her own. Yet, Defendant again sidesteps the weight of Plaintiff's allegation which is that non-medical personnel allegedly observed a seriously ill patient and failed to do anything to obtain medical care. This means that Mrs. Noon's ill-advised failure to visit the medical center is inconsequential (on a motion to dismiss) because Plaintiff's complaint contains sufficient factual allegations to make a negligence claim plausible on its face. Whether or not the evidence borne out in discovery supports that claim is a matter that will have to be addressed at summary judgment or at trial. The claim pleaded in Count one is plausible beyond a speculative level. Hence, it should not be dismissed.

Here, Plaintiff alleges that Carnival – via its non-medical personnel – owed a duty of reasonable care under the circumstances and that their breach caused Mrs. Noon's death. Plaintiff then imputes the negligence of the non-medical personnel to Carnival based on vicarious liability. We are mindful that important facets of this case are unresolved; however, we are also "mindful that parties are not required to demonstrate that they can prove their allegations at the pleading stage." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012); *see also Mitchell v. Beverly Enterprises, Inc.*, 248 F. App'x 73, 75 (11th

Cir. 2007) ("Plaintiffs need not prove their allegations in the complaint"). Because the allegations, when taken as true, are sufficient to state a negligence claim based on vicarious liability, Defendant's motion to dismiss count one should be **DENIED**.

We add here that we determined that dismissal was not appropriate even before the Eleventh Circuit's recent decision in *K.T. v. Royal Caribbean Cruises, Ltd.,* 2019 WL 3312530 (11th Cir. July 24, 2019). After reading that published decision, reversing a dismissal of a complaint premised on the fundamental tenet that carriers are not insurers of all its passengers, it is now plainly clear that this complaint cannot possibly be dismissed at this stage. In *K.T.*, the panel decision found plausible that a negligence claim could be found where a young passenger alleged she was served excessive amounts of alcohol by the carrier's crew, which then contributed to her being gang raped by other passengers who took advantage of her condition. As many a Judge in this district would have concluded, Chief Judge Moore found that complaint to be wanting because no allegation was made that a crew member actually saw the passengers abusing the plaintiff in a public area that could have given the defendant notice of foreseeable harm.

On appeal, however, the panel decision – written by Chief Judge Carnes – concluded otherwise because the crew members had a duty to "intervene" simply because they saw other drunk passengers "steering" the plaintiff to a private cabin. "[N]o crewmember did anything to help K.T. as she was led away." 2019 WL 3312530, at *3.

Here, the alleged facts are far more compelling, and daresay plausible, than those at issue in *K.T.* because the alleged wrongdoers, the crew members, actually saw her distress and failed to intervene. They also knew, unlike the crew members in *K.T.,* that Plaintiff had requested an oxygen tank to help her. That is, after all, why they were there retrieving the oxygen tank at the end of the voyage. If the crew members in *K.T.* could be negligent and breached their duty of care to that plaintiff, the crew members here were equally negligent, if not more so, based on the plausible allegations of this complaint. "[W]e are not talking about strict liability. We are talking about negligence in failing to act to prevent a foreseeable or known danger. If [Plaintiff] can prove the allegations in her complaint, [Defendant] is liable for its negligence and that of its crew." *Id.*

### *C. **The Negligent Undertaking Claims***

Plaintiff next alleges in Count two that, at the time non-medical rewmembers retrieved Mrs. Noon's oxygen tank, she was suffering from respiratory distress. Plaintiff claims that this was obvious even to non-medical crewmembers because they commented on her condition. Plaintiff also alleges that Carnival's non-medical crewmembers failed to fulfill their undertaken or assumed duty to support Mrs. Noon's respiration efforts pending transportation to a land-based medical facility and that this constituted negligence.

Defendant argues that this Count should be dismissed for several reasons premised on Plaintiff's inability to allege any facts showing that any non-medical crewmember voluntarily assumed or undertook any duty to Mrs. Noon or that any

of those duties were breached. First, Defendant claims that there is no allegation that any of Carnival's non-medical crewmembers promised anything in return to Mrs. Noon such as (1) monitoring her condition, (2) obtaining medical assistance on her behalf, or (3) ensuring that she received emergency services. Second, Defendant contends that there is no allegation as to how any non-medical crewmembers undertook or assumed a duty to support Mrs. Noon's respiration efforts pending transportation to a land-based facility. The only facts in the second amended complaint as to the non-medical personnel supervising the ship's disembarkation procedures are (1) that Mr. and Mrs. Noon requested prompt transportation to the nearest land-based hospital, and (2) that non-medical personnel failed to do so because passengers must arrange transportation for themselves and follow standard disembarkation procedures. As such, Defendant insists that there is no allegation that any non-medical personnel supervising the disembarkation promised anything to Mrs. Noon, let alone that they would support Mrs. Noon's respiration efforts.[3] Because no promise or representation was ever made to Mrs. Noon to provide any respiratory support, Defendant concludes that Count two must be dismissed for failure to state a claim.

The same goes for the two remaining counts on related theories of liability. In Counts three and four, Plaintiff alleges that crewmembers working as physicians, nurses, and other medical personnel in the ship's medical center undertook a duty

---

[3] There are no allegations, for example, that any non-medical personnel supported Mrs. Noon's respiration efforts, summoned emergency services, or provided Mrs. Noon with supplemental oxygen pending transport to a land-based hospital.

to provide respiratory support to Mrs. Noon with knowledge that they provided her with an oxygen tank and knew the reason for the request. They thus operated with actual authority (Count three) or apparent authority (Count four) conferred by Defendant, which authority gave rise to vicarious liability against Defendant for their negligent acts and omissions.

Defendant again argues, however, that the mere fact that Mrs. Noon rented an oxygen tank from the medical center for the duration of the cruise did not, without more, create a voluntarily assumed duty for any member of the medical staff to provide respiratory support. Defendant highlights, for example, that there are no allegations (1) that Mrs. Noon ever went to the medical center, (2) that any member of the medical staff visited Mrs. Noon's stateroom, (3) that Mrs. Noon requested medical assistance, (4) that the medical staff promised to monitor, observe, examine, or evaluate Mrs. Noon's condition, (5) that medical personnel offered or agreed to provide Mrs. Noon with a substitute oxygen tank, or (6) that crewmembers contacted emergency responders to transport Mrs. Noon to a land-based medical facility. For these reasons, Defendant concludes that the assumption of duty doctrine cannot apply, either to the porters in Count two or the medical crew members in Counts three and four (whether based on actual or apparent authority).

Federal courts have recognized that the "assumption of duty" doctrine, as set forth in § 323 of the Second Restatement of Torts, "is applicable in maritime cases." *Dunaway v. United States*, 2000 WL 64291, at *3 (E.D. La. Jan. 26, 2000) (citing *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955)). Section 323 of the

Second Restatement of Torts, which pertains to the negligent performance of undertaking to render services, provides that:

> One who undertakes gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Disler v. Royal Caribbean Cruise, Ltd.*, 2018 WL 1916614, *4 (S.D. Fla. April 23, 2018) (quoting Restatement (Second) of Torts § 323); *Rojas v. Carnival Corp.*, 2015 WL 7736475, *6 (S.D. Fla. Nov. 30, 2015).

This means that one who voluntarily assumes a duty and then breaches that duty becomes liable to one who is injured because of the breach. *See Stauffer Chem. Co. v. Brunson*, 380 F.2d 174, 182 (5th Cir. 1967) ("When one voluntarily assumes a duty he is bound to perform it with care and if done negligently, he is liable for damage resulting from such negligence."); *Union Park Memorial Chapel v. Hutt,* 670 So. 2d 64, 67 (Fla. 1996) ("Voluntarily undertaking to do an act that if not accomplished with due care might increase the risk of harm to others or might result in harm to others due to their reliance upon the undertaking confers a duty of reasonable care, because it thereby 'creates a foreseeable zone of risk.'"). This doctrine is sometimes referred to as the undertaker's doctrine because it comes into play when a defendant voluntarily undertakes an action and must to do so carefully as to *not* put others at an undue risk of harm.

Plaintiff alleges that the non-medical crewmembers assumed a duty when they retrieved Ms. Noon's oxygen tank without providing her with a substitute, despite observing and commenting on Ms. Noon's distressed state. Plaintiff claims that the non-medical personnel should have provided a substitute tank, medical monitoring, prompt transportation off the ship, and the convenience of allowing Mrs. Noon to take the oxygen tank off the ship until she was stabilized on land. Because Carnival's non-medical crewmembers failed to do any of the above, Plaintiff concludes that they assumed a duty and acted negligently.

The same holds true, Plaintiff posits, for the medical crew members. As the amended complaint alleges, "Crewmembers working as physicians, nurses, and other medical personnel in the medical center onboard the CARNIVAL SENSATION at the material times undertook a duty to provide respiratory support to Mrs. NOON, and to exercise reasonable care in doing so, when the medical center crewmembers center provided Mrs. NOON with an oxygen tank at the explicit request of the NOON family and after the NOON family had advised the medical center of the reason for their request." [D.E. 24 ¶77]. As a result, "[n]otwithstanding their actual or constructive knowledge of Mrs. NOON's condition of respiratory distress and of her reliance on supplemental oxygen, the medical center crewmembers sent only non-medically trained porters to retrieve the oxygen tank . . . No nurse, physician or other medically trained crewmember accompanied the porters to Mrs. NOON's stateroom to observe her condition, to examine her, or to provide her medical care pending her disembarkation and transfer to a land based

facility." [D.E. 24 ¶79]. This negligent undertaking proximately caused Plaintiff's injury and death.

Ordinarily, Defendant's position would be well taken. Plaintiff's allegations in this complaint are premised on the non-medical and medical crewmembers' *failure* to render aid or assistance to Mrs. Noon – not truly a voluntarily undertaking. This undercuts the relevancy of the undertaker doctrine because – by Plaintiff's own allegations – the non-medical personnel refused to undertake any duty. So by definition no legal duty arose and no negligence would follow under this doctrine. *See* Restatement (2d) of Torts, § 324A; *see, e.g., L.A. Fitness Int'l, LLC v. Mayer,* 980 So. 2d 550, 561 (Fla. 4th DCA 2008) (rejecting application of undertaker doctrine where "appellee did not allege or establish that [defendant] worsened [victim's] condition or caused him any affirmative injury. Appellee also failed to assert or establish that [defendant's] assessment . . . caused others to 'rest on their oars' and refrain from rendering aid in reliance on [that] undertaking.").

Defendant forgets, however, that cruise line cases often present unique circumstances that are beyond the run-of-the-mill case. This is an admiralty action between the cruise line, a common carrier, and its passenger. The Eleventh Circuit, like many other courts, has decreed that under these circumstances a "special relationship" exists between the carrier and its passengers. "A ship, as a common carrier, owes a special duty to its passengers." *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1334 (11th Cir. 1984); *see Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 908, 913 (11th Cir. 2004) (citing Restatement (Second) of Agency and

holding cruise line strictly liable for crew member intentional assaults on passengers; "The case precedent establishes that, due to the special carrier-passenger relationship, the defendants had a non-delegable duty to protect and safely transport Doe during the cruise."); *Tullis v. Fid. & Cas. Co. of New York,* 397 F.2d 22, 23 (5th Cir. 1968) (negligence was the applicable liability standard for slip and fall cases; "The liability basis is negligence with the only apparent exception being the unconditional responsibility of the carrier for the misconduct of the crew toward the passengers.").

In the ordinary course, that special duty does not create more than a duty to prevent injury under a reasonable care standard. *See, e.g., Keefe v. Bahama Cruise Line, Inc.,* 867 F.2d at 1322; *Kadylak v. Royal Caribbean Cruises, Ltd.,* 679 F. App'x 788, 791 (11th Cir. 2017). Most injuries that befall passengers on cruise vessels are governed by that standard. But based on the peculiar nature of cruise line transportation, vicarious liability for the wrongful acts of a vessel's employees or agents may arise, especially where (like here) the complaint accuses the vessel's employees of negligent conduct of their duties.

The most recently-recognized example for the application of vicarious liability principles is in the area of medical care for passengers. As the Eleventh Circuit found in 2014, "applying the standard principles of agency, we are compelled to hold that [plaintiff's] complaint sets out a plausible basis for imputing to Royal Caribbean the allegedly negligent conduct of its onboard medical employees." *Franza v. Royal Caribbean Cruises, Ltd.,* 772 F.3d 1225, 1238 (11th Cir. 2014). And

the special circumstances posed by the need for onboard medical care were front and center in the Court's analysis:

> With no land on the horizon, a passenger who falls ill aboard a cruise ship has precious little choice but to submit to onboard care. The hard reality is that, at least in the short term, he may have literally nowhere else to go. . . . The long and the short of it is that, outside the maritime realm, the doctor-patient relationship no longer ineluctably, and as a matter of law, bars application of respondeat superior. One by one, American common law courts have responded to seismic shifts in the medical industry by holding principals responsible for the medical negligence of their agents. Given the "wholesale abandonment of the rule in most of the area where it once held sway," . . . we are reluctant to cling to these arguments under the general maritime law.

*Id.* at 1242-43.

*Franza* proceeded to hold that a complaint alleging medical negligence, on actual and apparent authority agency principles, stated a cause of action where it alleged that a duty existed to prove prompt medical care upon notice of an injury, which duty was breached by the medical personnel's failure to assess the plaintiff's condition and failing to order appropriate testing, by failing to monitor the plaintiff, and failing to evacuate the plaintiff in a timely manner. *Id.* at 1254. Because all inferences had to be drawn in plaintiff's favor, the Court held that "[i]f proven, these allegations could establish a breach of even a modest duty of care, framed by the particular circumstances of the case" and based on vicarious liability for medical negligence of onboard nurses and doctors. *Id.*

This case is simply a logical extension of this application of vicarious liability doctrine where a plaintiff is alleging that onboard personnel undertook to provide some medical care to the plaintiff (by selling her use of an oxygen tank) but negligently denying her any other care or monitoring. The duty to do so arises

expressly from a different section of the Restatement that has specific application to a case like this. Restatement (Second) of Torts § 314A, which concerns certain "special relations giving rise to a duty to aid or protect," provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> . . .
>
> (4) One who is required by law or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

The comments to the Restatement shed light on the extent of a common carrier's liability to undertake a duty of care such as this one:

> The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.

The amended complaint in this case is alleging that the ship's personnel, with the direction and/or control of the medical staff, provided supplemental oxygen to the Plaintiff when she complained of a respiratory distress. That action amounted to an actual undertaking of care, minimal though it may have been. Plaintiff further alleges that this knowledge firmly placed the medical personnel on notice of the potential need to further treat and/or at least monitor Plaintiff's

condition. That allegation plausibly supports an actual undertaking of a duty owed to a passenger of a common carrier.

The amended complaint then posits that, at least by the point when the non-medical crewmembers retrieved the oxygen tank, the ship's personnel knew or should have known that Plaintiff was in continued need of further medical care. So, not only had they already undertaken care of her, but this actual knowledge also gave rise to the affirmative duty to undertake further care.

Specifically,

> At all material times, including the time the medical center crewmembers requested retrieval of the oxygen tank they had provided Mrs. NOON, the medical center crewmembers knew or should have known that Mrs. NOON was relying on the supplemental oxygen they had provided her to assist her in her breathing, particularly since she or her family members had expressly requested supplemental oxygen and had expressly made Mrs. NOON's condition of respiratory distress known to crewmembers in the ship's medical center when requesting the tank.
>
> . . . Notwithstanding their actual or constructive knowledge of Mrs. NOON's condition of respiratory distress and of her reliance on supplemental oxygen, the medical center crewmembers sent only non-medically trained porters to retrieve the oxygen tank. . . . No nurse, physician or other medically trained crewmember accompanied the porters to Mrs. NOON's stateroom to observe her condition, to examine her, or to provide her medical care pending her disembarkation and transfer to a land based facility. No nurse, physician or other medically trained crewmember inquired of the NOON family at that time whether Mrs. NOON required further medical assistance from ship's medical personnel or required emergency responder assistance or transfer to a land based medical facility.

[D.E. 24 ¶¶ 78-79].

These additional allegations, which support the vicarious liability theories in Counts two through four, squarely fall within the contemplated cause of action

recognized in section 314A of the Restatement. And they are the type of allegations that flow from the principles recognized in *Franza* that a shipowner may be vicariously liable for the actions *and* inactions of the medical personnel onboard the ship. The complaint in *Franza* was itself premised in part on a failure to undertake measures required by the duty of care owed to the passengers. The complaint here similarly raises the same theory – that through misfeasance and nonfeasance Plaintiff was injured as a proximate result of the negligence (through the negligent rendering of medical assistance) of the vessel's employees against an ill passenger. This claim is viable under the Restatement, which federal common law and Florida tort law both follow.[4] *See Disler v. Royal Caribbean Cruise Ltd.,* 2018 WL 1916614, at *4 (denying motion to dismiss negligence claim that alleged carrier failed to exercise reasonable care and breached its assumed duty of providing medical care by refusing to arrange air ambulance services to airlift plaintiff after he suffered a stroke; following *Franza,* court rejected argument that assumption of duty theory did not apply "because it did not actually begin to perform a medical evacuation

[4] Torts committed onboard a ship sailing in navigable waters are governed by general maritime law, the rules of which are developed by federal courts based on federal common law, subject to the authority of Congress to legislate otherwise. *See Exxon Shipping Co. v. Baker,* 554 U.S. 471, 490 (2008). Maritime law is supplemented by either general common law principles or non-conflicting state law. *See Keefe v. Bahama Cruise Line,* 867 F.2d at 1321. Federal common law and state law both recognize and follow section 314A so there is no conflict analysis required here. *See, e.g., United States v. Stevens,* 994 So. 2d 1062, 1068 (Fla. 2008) (citing § 314A of Restatement of Torts (Second) favorably in context of duties arising out of special relationships).

that it subsequently ceased. . . Having advertised its onboard medical services, [defendant] must at the very least defend its refusal to provide them in this case.").[5]

---

[5] *See also Rolle v. Brevard County,* 2007 WL 328682, at 11 (M.D. Fla. Jan. 31, 2007) (denying motion to dismiss negligence/wrongful death claims against non-medical detention center officials that had duty of reasonable care to mentally ill detainees (under Restatement § 314A) and yet removed plaintiff from watch list without consulting with medical personnel); *Leader v. Harvard Univ. Bd. of Overseers,* 2017 WL 1064160, at *5 (D. Mass. Mar. 17, 2017) (denying dismissal where special relationship existed between university and student who lived and worked on campus; duty breached under state law and section 314A when university failed to intervene to prevent sexual harassment by fellow student); *Doe v. O.C. Seacrets, Inc.,* 2012 WL 3257581, at *9 (D. Md. Aug. 7, 2012) (denying motion for summary judgment where court "concludes that [defendant] clearly had a duty to use reasonable care not to place Plaintiff in a position of foreseeable risk when it ejected her from its premises. That duty arose both from Plaintiff's status as a business invitee on . . . premises and from . . . affirmative conduct that potentially worsened her situation."); *Schieszler v. Ferrum Coll.,* 236 F. Supp. 2d 602, 609 (W.D. Va. 2002) (denying motion to dismiss under Restatement § 314A where college had special relationship with student housed on campus; "The defendants were aware that [victim] had had emotional problems; they had required him to seek anger management counseling before permitting him to return to school for a second semester."); *Delk v. Columbia/HCA Healthcare Corp.,* 259 Va. 125, 132, 523 S.E.2d 826, 830-31 (2000) (complaint survived dismissal where medical facility created de facto special relationship with its patient when it determined that she was in need of constant supervision and surveillance); *Southland Corp. v. Griffith,* 332 Md. 704, 633 A.2d 84, 91 (Md. 1993) ("we adopt § 314A of the Restatement, and in particular embrace the proposition that an employee of a business has a legal duty to take affirmative action for the aid or protection of a business invitee who is in danger while on the business's premises, provided that the employee has knowledge of the injured invitee and the employee is not in the path of danger"); *cf. Glade ex rel. Lundskow v. United States,* 692 F.3d 718, 723 (7th Cir. 2012) (Posner, J.) (applying Restatement § 314A under federal common law, which means that "[i]f you are sitting on a beach and see a person struggling in the water and you're a strong swimmer and could save him but you do nothing and he drowns, you bear no tort liability for his death. . . . But it would be different if you had invited him to go sailing with you and he fell off the boat and you refused to toss him a life jacket; having placed him in a situation of potential danger you are held to have assumed a duty to take reasonable care for his safety."); (affirming dismissal due to lack of evidence of custodial relationship between plaintiff and hospital necessary to support special relationship theory); *Abramson v. Ritz Carlton Hotel Co., LLC,* 480 F. App'x 158, 161-62 (3d Cir. 2012) (affirming summary judgment of claim that oxygen tank was negligently used/maintained

Like the *K.T.* case, we cannot ignore these allegations in light of the inferences that we must draw in Plaintiff's favor. All we need to hold is that the factual allegations, and the legal theory underpinning them, are plausible and could lead a reasonable juror to find in Plaintiff's favor. We readily reach that conclusion because, to paraphrase Judge Carnes, " 'A carrier by sea' is liable to its passengers 'for its negligence,' and [plaintiff's] allegations are 'more than a mere recitation of the elements of the cause of action.' Her allegations 'are plausible and raise a reasonable expectation that discovery could supply additional proof of [Defendant's] liability.' As a result, 'the district court [would be erring] in dismissing [the] negligence claim[s]." *K.T.,* 2019 WL 3312530, at *4 (citations omitted).

Perhaps, a full record in this action will ultimately support Defendant's theory of defense. For now, the motion to dismiss the vicarious liability counts in Counts Two through Four should be **DENIED**.

---

which caused further injury to plaintiff who suffered heart attack; hotel innkeeper had no obligation to administer oxygen under section 314A).

### *D. Whether Plaintiff's Punitive Damages Should be Stricken*

Carnival's final argument is that Plaintiff's demand for punitive damages should be stricken because they are unavailable in personal injury actions brought under general maritime law absent a showing of intentional misconduct. *See Crusan v. Carnival Corp.*, 2015 U.S. Dist. LEXIS 191522, *17 (S.D. Fla. 2015) ("[T]he Court finds that *Amtrak* is controlling on this issue, and Plaintiffs in this action may recover punitive damages only upon a showing of intentional misconduct.") (citing *Terry v. Carnival Corp.*, 3 F. Supp. 3d 1363, 1371-72 (S.D. Fla. 2014); *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. On Sept. 22, 1993*, 121 F.3d 1421 (11th Cir. 1997)).

Plaintiff's response is that punitive damages are available under general maritime law where a tortfeasor's conduct is willful, wanton, or reckless and not merely where there is intentional misconduct. Plaintiff concedes that the Eleventh Circuit previously held that punitive damages are unavailable in personal injury actions brought under general maritime law "except in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman, intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of intentional wrongdoing." *In re Amtrak*, 121 F.3d at 1429. But, Plaintiff maintains that, twelve years later, the U.S. Supreme Court overruled *Amtrak* when the Court held that punitive damages are available under general maritime law for a shipowner's willful breach of the obligation to pay maintenance and cure to an injured seaman. *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404,

424 (2009). The Court found (1) that punitive damages were traditionally available at common law, (2) that the common law tradition of punitive damages extends to maritime claim, and (3) that there is no evidence that claims for maintenance and cure were excluded from the general maritime rule by the Jones Act (or otherwise). *See id*. at 414-15.

There has been a split among district courts in the Eleventh Circuit as to whether *Atlantic Sounding* abrogated *Amtrak*. *Compare Lobegeiger v. Celebrity Cruises, Inc*., 2012 A.M.C. 202, 214 (S.D. Fla. 2011) and *Doe v. Royal Caribbean Cruises, Ltd*., 2012 WL 920675, at *4 (S.D. Fla. Mar. 19, 2012) (finding that *Atlantic Sounding* abrogated Amtrak and that punitive damages are available in maritime personal injury actions for willful, wanton, or outrageous conduct), *with Bonnell v. Carnival Corp*., 2014 WL 12580433, at *3 (S.D. Fla. Oct. 23, 2014) and *Gener*, 2011 WL 13223518, at *2 (finding that while *Atlantic Sounding's* "reasoning may be at odds with *Amtrack* [sic], its holding is not, and the mere reasoning of the Supreme Court is no basis for this Court to depart from clear circuit precedent").

We begin with the familiar principle that the Eleventh Circuit's decisions are binding upon the district courts within this circuit. *See* 11th Cir. R. 36, I.O.P. (2) ("Under the law of this circuit, published opinions are binding precedent."); *see also Martin v. Singletary*, 965 F.2d 944, 945 n.1 (11th Cir. 1992) (holding that "the courts in this circuit" have a duty to apply the binding precedent established by published opinions even before a mandate issues). Under the Eleventh Circuit's prior panel precedent rule, a "panel's holding is binding on all subsequent panels"—

and, by extension, all district courts within the Eleventh Circuit – "unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citing *Smith v. GTE Corp.*, 236 F.3d 1292, 1300 n.8 (11th Cir. 2001); *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998)); *see also United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (observing that courts "may disregard the holding of a prior [Eleventh Circuit] opinion only where that 'holding is overruled by the Court sitting en banc or by the Supreme Court.'"). Importantly, there is a difference between the holding in a case and its underlying reasons – meaning that, "[e]ven if the reasoning of an intervening high court decision is at odds with a prior appellate court decision, that does not provide the appellate court with a basis for departing from its prior decision." *United States v. Vega-Castillo*, 540 F.3d 1235, 1237 (11th Cir. 2008).

We acknowledge that the reasoning in *Atlantic Sounding* – that punitive damages have traditionally been available at common law for wanton, willful, or outrageous conduct and that this tradition extends to federal maritime law – appears at first blush to be inconsistent with the Eleventh Circuit holding in *Amtrak* that punitive damage are unavailable in maritime personal injury cases absent intentional wrongdoing. But a closer reading of the decision shows that the holding in *Atlantic Sounding* did not overrule or cast any doubt on the holding in *Amtrak*. As Judge Williams explained in *Bonnell v. Carnival Corp.*, 2014 WL 12580433, at *3 (S.D. Fla. Oct. 23, 2014), the issue is not whether punitive damages

are available under general maritime law, but what standard of liability should apply in determining whether they may be recovered:

> The real issue, it appears, is not whether punitive damages are available under general maritime law—they are—but what standard of liability should apply in determining whether punitive damages may be recovered for a particular maritime claim. Plaintiff argues that, under the "broad reasoning" of *Atlantic Sounding*, punitive damages should be available in this action even in the absence of a showing of intentional misconduct. However, the Court believes that *Atlantic Sounding's* statement that "[p]unitive damages have long been an available remedy at common law for wanton, willful or outrageous conduct" was simply a general description of the circumstances in which such damages are available at common law, and was not intended to announce a bright-line standard of liability governing recovery of punitive damages in all maritime tort claims. Again, the Court notes that *Atlantic Sounding* addressed only the availability of punitive damages in a cause of action for maintenance and cure, and did not specifically discuss personal injury claims brought by ship passengers. Given the relatively narrow scope of the issues presented in *Atlantic Sounding*, the Court does not believe that holding should be read so broadly as to find it in conflict with *Amtrak*.

2014 WL 12580433, at *3 (footnote in original).

We agree with the reasoning in *Bonnell* because *Amtrak* did not foreclose the availability of punitive damages – only that they should be available in "exceptional circumstances," such as "those very rare situations of intentional wrongdoing." *Amtrak*, 121 F.3d at 1429. That analysis remains sound after *Atlantic Sounding*, where the Supreme Court addressed a narrower issue as to whether punitive damages were available as a remedy for a breach of the maritime duty of maintenance and cure. And in answering this question, the Court concluded that, because punitive damages were available under general maritime law, they are available for a maintenance and cure claim. *Atlantic Sounding*, 557 at 418-24. This

means that *Atlantic Sounding* did not overrule *Amtrak* because (1) the former focused exclusively on the availability of punitive damages in a cause of action for maintenance and cure, and (2) the former merely announced a generic description as to how punitive damages have been available at common law – *i.e.* for wanton, willful, or outrageous conduct. Nothing in *Atlantic Sounding* delineated a bright-line rule as to how that standard should be applied in all maritime tort claims. Therefore, "*Atlantic Sounding's* holding that punitive damages are available under general maritime law for the arbitrary withholding of maintenance and cure did not overrule, and is not in direct conflict with, *Amtrak's* holding that punitive damages are precluded in maritime personal injury claims 'except in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman, intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of intentional wrongdoing.'" *Bodner v. Royal Caribbean Cruises, Ltd.*, 2018 WL 4047119, at *5 (S.D. Fla. May 8, 2018) (citing *In re Amtrak,* 121 F.3d at 1429).

Defendant's position also overstates the effect of *Amtrak* in the context of general maritime tort principles. After all, the Supreme Court in other contexts has repeatedly recognized that punitive damages are generally available as a remedy in maritime tort cases. *See Exxon Shipping Co. v. Baker*, 554 U.S. at 489-490 (remitting punitive damages award in maritime tort action but rejecting argument that no punitive damages should be recoverable under maritime law). The only exception is if a particular cause of action (i.e. maintenance and cure or

unseaworthiness) calls for a different application when viewed in its proper historical context. *See Atlantic Sounding*, 557 U.S. at 423 ("[R]emedies for negligence, unseaworthiness, and maintenance and cure have different origins and may on occasion call for application of slightly different principles and procedures."). For example, we now know, from the Supreme Court's most recent maritime case, that punitive damages are available for maintenance and cure claims but not for claims of unseaworthiness. *Compare The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2287 (2019) ("[A] plaintiff may not recover punitive damages on a claim of unseaworthiness."), *with Atlantic Sounding*, 557 U.S. at 412 ("[A] seaman denied maintenance and cure has a free option to claim damages (including punitive damages) under a general maritime law count") (citation and quotation marks omitted). We need not focus on other maritime causes of action, however, because the Supreme Court has repeatedly recognized that punitive damages are available for traditional negligence claims that arise in the maritime context. *See id.* 422 ("Like negligence, '[t]he general maritime law has recognized . . . for more than a century' the duty of maintenance and cure and the general availability of punitive damages.") (citing *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 820 (2001)). The recent decision in *Batterton* underscores that view. *Batterton*, 139 S. Ct. at 2283 ("In *Atlantic Sounding,* we allowed recovery of punitive damages, but . . . based on the established history of awarding punitive damages for certain maritime torts, including maintenance and cure."). Therefore, the only question in this traditional maritime tort case is what standard of liability should apply.

With these principles in mind, Plaintiff may only recover punitive damages upon a showing of intentional misconduct. To demonstrate "intentional misconduct," a plaintiff must show that "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Mee Indus. v. Dow Chemical* Co., 608 F.3d 1202, 1220 (11th Cir. 2010) (citing Fla. Stat. § 768.72(2)(a)). The Eleventh Circuit has described instances of intentional misconduct as "very rare." *In re Amtrak* 121 F.3d at 1429. That is consistent with how the Supreme Court itself interpreted that standard in *Exxon*, where the Court defined the threshold for awarding punitive damages as being necessary for retribution and deterrence based on the "enormity" and "outrageousness" of the conduct "owing to 'gross negligence,' 'willful, wanton and reckless indifference for the rights of others,' or behavior even more deplorable . . . ." 554 U.S. at 493 (citations omitted).

Here, Plaintiff's demand for punitive damages is well taken because Plaintiff alleges that Carnival's non-medical crewmembers had actual knowledge of Mrs. Noon's medical condition and did nothing to aid her. Plaintiff claims, for example, that Mrs. Noon's family members requested that crewmembers arrange for emergency transportation services to a land-based medical facility, but that Carnival's personnel refused and intentionally prevented the family from arranging their own transportation.

Defendant takes issue with Plaintiff's position because punitive damages are purportedly not recoverable under general maritime law where only simple negligence is alleged. But, Plaintiff's allegations, in the light most favorable to Plaintiff, include gross recklessness tantamount to intentional misconduct because the crewmembers not only refused to assist Mrs. Noon, but they even prevented her family members from contacting emergency service providers in a timely basis after Mrs. Noon's oxygen had been cut off. In other words, Plaintiff's allegations go well beyond a simple negligence claim because they rely on knowledge and intent to deny Mrs. Noon life-saving services (as tenuous as those allegations may be).

Defendant relies on several cases to support its position that negligence claims cannot trigger demands for punitive damages. We take no issue with those cases but they are inapposite; they merely require that demands for punitive damages require intentional misconduct and that most cases fail to meet that standard given the underlying allegations. In fact, the cases that Defendant relies upon contemplate the possibility of a gross negligence claim with a demand for punitive damages as opposed to a bright-line rule that intentional misconduct can never be available in negligence cases. *See, e.g.*, *Butler v. Carnival Corp.*, 2014 WL 5430313, at *5 (S.D. Fla. Oct. 24, 2014) ("Plaintiff has not pled specific facts that support the claim for punitive damages . . . Plaintiff may replead but must allege the actions Defendant, as an ordinarily prudent person, could have taken yet did not, and that the failure to take those actions was willful, wanton, or outrageous.").

After all, if Defendant's microscopically narrow definition of intentional misconduct was the law, the Supreme Court in *Exxon* would never have upheld any punitive damages for the Valdez disaster. The captain of that ship did not intentionally ground his vessel for the precise purpose of damaging the water and wildlife off the coast of Alaska. He was drunk in piloting the vessel, an act so reckless and wanton that warranted a $507.5 million punitive award enforceable under maritime law.

This case is not on par with that disaster to most of us. But for Mrs. Noon's family, it exceeds it. Because the facts of this case are unique in that there are allegations that Carnival's crewmembers were grossly reckless and acted with an intent to deprive Mrs. Noon of life-saving emergency services, with knowledge of her condition, Defendant's motion to dismiss Plaintiff's demand for punitive damages should be **DENIED**.[6]

## *IV. CONCLUSION*

For the foregoing reasons, the Court **RECOMMENDS** that Defendant's motion to dismiss [D.E. 30] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have **until August 23, 2019,** within which to file written objections, if any, with the District Judge. Failure to timely file objections shall bar the parties from *de novo*

---

[6] While Plaintiff's demand for punitive damages should be denied at this stage of the case, the matter will have to be revisited at summary judgment. Our recitation of the facts grants all inferences in Plaintiff's favor. We suspect that there is another side to this story. But that is what litigation is for. We cannot upend the process in this case by striking plausible allegations of gross misconduct at the dismissal stage.

determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 12th day of August, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge