UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

RANDALL NOON, as Personal Representative of the Estate of KAREN NOON, deceased,

Plaintiffs,

v.

CASE NO. 18-cv-23181-Williams/Torres

CARNIVAL CORPORATION, a Panamanian Corporation d/b/a CARNIVAL CRUISE LINES,

Defendant.

**DEFENDANT CARNIVAL CORPORATION'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant, CARNIVAL CORPORATION d/b/a CARNIVAL CRUISE LINES (hereinafter "CCL"), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L. R. 56.1, hereby files this Statement of Material Facts as to which it is contended that there do not exist genuine issues to be tried, in support of its Motion for Final Summary Judgment, and states:

1. Randall and Karen Noon took a cruise on the CCL ship *Sensation* from July 3, 2017 to July 8, 2017. [D.E. 24 at ¶¶ 10-12]. They were accompanied by their daughters, Juanita Noon and Melissa Lenard, as well as their grandchildren, Makayla Noon, Sage May Lenard, and Elijah Randall Lenard. [Dep. R. Noon at 20:14-25].

2. At the time of the cruise, Mrs. Noon was a smoker and had chronic obstructive pulmonary disease (COPD), which she had been dealing with for approximately thirty (30) years. [Dep. R. Noon at 27:1-28:7]. Mrs. Noon was using an inhaler for her condition. [*Id.* at 28:21-23].

3. At the time of the cruise, Juanita Noon was a caregiver/aide at one assisted living facility and a resident aide/medical technician at another assisted living facility. [Dep. J. Noon at 10:1-14; 11:5-23]. In addition to having taken nursing courses, Juanita was a certified home health aide and certified in CPR. [*Id.* at 9:18-23; 10:15-11:4].

4. At the time of the cruise, Melissa Lenard was a medical technician and home health aide. [Dep. M. Lenard at 10:20-11:4].

5. Neither Mr. Noon, Juanita Noon, nor Melissa Lenard looked on CCL's website regarding the medical care provided on the ship prior to departing on the July 2017 cruise. [Dep. R. Noon at 25:4-9; Dep. J. Noon at 27:5-8; Dep. M. Lenard at 17:10-12]. Mr. Noon did not know whether Mrs. Noon had looked on CCL's website prior to the cruise. [Dep. R. Noon at 25:10-12].

6. Juanita Noon was not concerned about the medical care that was offered on the ship prior to departing on the July 2017 cruise. [Dep. J. Noon at 27:9-12].

7. On July 5, 2017, Mrs. Noon felt ill and tired, and her breathing was belabored. [Dep. M. Lenard at 40:13-41:22]. Mrs. Noon did not tell anyone that she wanted to go to the medical center to be seen. [*Id.* at 49:14-16].

8. During the morning of July 6, 2017, Mrs. Noon was having difficulty breathing, worse than the day before. [Dep. M. Lenard at 54:20-24; 55:2-14]. After Melissa Lenard returned from an excursion, she noted that Mrs. Noon looked even worse. [*Id.* at 57:1-2]. Mrs. Noon did not think that it was serious enough to go to the medical center, particularly given that the cruise was almost over. [*Id.* at 57:3-15].

9. Prior to dinner on July 6, 2017, Mrs. Noon was still having difficulty breathing and was otherwise feeling sick. [Dep. M. Lenard at 58:21-25; 59:1-10]. Mrs. Noon did not want to go to the medical center at that point because she believed that she would be fine. [*Id.* at 59:22-25].

10. At dinner on July 6, 2017, Melissa Lenard asked Mrs. Noon whether she would be going to see a doctor on the ship, but she said that she would be fine. [Dep. M. Lenard at 62:6-13].

11. Mrs. Noon did not say that she wanted to go to the medical center at any point on July 6, 2017. [Dep. J. Noon at 53:11-13].

12. During the morning of July 7, 2017, Mrs. Noon's breathing was as bad as the evening before. [Dep. M. Lenard at 64:5-12]. None of Mrs. Noon's family members suggested that Mrs. Noon go to the medical center that morning. [*Id.* at 64:21-23].

13. Mrs. Noon stayed in her cabin, resting, for the majority of July 7, 2017. [Dep. M. Lenard at 65:10-66:1]. Mrs. Noon did not say anything about wanting to go to the medical center. [*Id.* at 66:22-24].

14. At dinner on July 7, 2017, Mrs. Noon had problems breathing. [Dep. M. Lenard at 67:17-21]. None of Mrs. Noon's family members suggested at dinner that Mrs. Noon go to the medical center, nor did Mrs. Noon make any mention of wanting to go see a doctor in the medical

center. [*Id.* at 67:22-68:2].

15. During the evening of July 7, 2017, Melissa Lenard requested and obtained a wheelchair for Mrs. Noon because she was having trouble walking. [Dep. M. Lenard at 71:19-72:6]. Melissa asked Mrs. Noon whether she wanted to go to the medical center, but Mrs. Noon said that she did not want to go. [*Id.* at 72:7-15].

16. Mrs. Noon struggled to breathe in the wheelchair on the way back to the cabin after returning from the casino during the evening of July 7, 2017. [Dep. M. Lenard at 74:17-23]. Melissa Lenard asked Mrs. Noon again whether she wanted to go to the medical center, but Mrs. Noon did not want to, saying that she would be fine and would be getting off of the ship the next day. [*Id.* at 74:24-75:1]. Mr. Noon also testified that he did not consider taking Mrs. Noon to the medical center because she said that she would be fine. [Dep. R. Noon at 48:19-25].

17. At approximately 9:30 or 10:00 p.m. on July 7, 2017, Mrs. Noon sat on the bed in her cabin, unable to catch her breath and having vomited. [Dep. J. Noon at 67:6-19]. Juanita Noon asked Mrs. Noon if she wanted to go to the medical center, but Mrs. Noon said that she did not want to go, that she would be fine and would be home the next day. [*Id.* at 67:20-68:9].

18. When Mrs. Noon was having trouble breathing a little later in the evening on July 7, 2017, Juanita Noon decided to call to see if she could get oxygen for Mrs. Noon. [Dep. J. Noon at 68:18-24]. Juanita testified that she spoke to a man at the "med station," told him that Mrs. Noon was having problems breathing, and asked if the ship had oxygen or anything that could be given to her. [*Id.* at 69:17-22]. Juanita testified that she was told that the medical center had an oxygen concentrator which could be picked up. [*Id.* at 69:23-24].

19. At approximately 11:00 p.m. on July 7, 2017, Mr. Noon and Juanita Noon went to the medical center to pick up the oxygen concentrator. [Dep. J. Noon at 70:12-71:8; Dep. R. Noon at 43:2-3, 13-23; medical interaction log, attached as Ex. 1, at p. 1].

20. When they went to the medical center, Mr. Noon and Juanita Noon met with Rosel Ursua, R.N. [Dep. R. Ursua at 24:4-13; medical interaction log, p. 1]. They did not see a doctor at the medical center. [Dep. R. Noon at 47:23-25].

21. Nurse Ursua advised Mr. Noon and Juanita Noon to bring Mrs. Noon to the medical center "to have a doctor's consultation for proper medical assessment and evaluation." [Medical interaction log, p. 1; Dep. R. Ursua at 28:10-21]. Mr. Noon and Juanita did not agree to bring Mrs. Noon to the medical center, stating that they only needed an oxygen concentrator for Mrs. Noon, and that this had happened before. [Medical interaction log, p. 1; Dep. R. Ursua at 28:22-29:5].

Mr. Noon and Juanita opted to borrow an oxygen concentrator and purchased a nasal cannula for Mrs. Noon. [Medical interaction log, p. 1; Dep. R. Ursua at 26:3-27:16]. A deposit was left for the concentrator so that the equipment would be returned. [Dep. R. Ursua at 27:25-28:1-5; Dep. S. Vazquez at 27:18-28:6]. Nurse Ursua advised Mr. Noon and Juanita that if they needed medical assistance, they should call 911. [Medical interaction log, p. 2; Dep. R. Ursua at 36:23-37:25].

22. After Mr. Noon and Juanita Noon obtained the oxygen concentrator and brought it back to Mrs. Noon's cabin late on July 7, 2017, Mrs. Noon began to use the concentrator. [Dep. J. Noon at 72:9-25]. The concentrator was not portable, but rather required needed to be plugged into an electrical outlet in order to be used. [*Id.* at 72:2-5; Dep. S. Vazquez at 100:22-25].

23. Juanita Noon testified that Mrs. Noon's breathing was normal for her within 45 minutes of using the oxygen concentrator, and Mrs. Noon stayed on the concentrator through the night. [Dep. J. Noon at 73:6-18; 75:6-17].

24. At approximately 7:00 a.m. on July 8, 2019, after the ship had reached its destination port of Miami [D.E. 24 at ¶ 18], someone called Mrs. Noon's stateroom to advise that the concentrator would be picked back up. [Dep. J. Noon at 75:25; 76:20-77:5].

25. Juanita Noon asked the person calling about the concentrator whether there were any portable concentrators that could leave the ship, but she was told that CCL did not have any O2 bottles or portable concentrators. [Dep. J. Noon at 77:6-8; 78:3-5]. CCL's corporate representative, Suzanne Vazquez, confirmed that there were no portable medical concentrators onboard the ship. [Dep. S. Vazquez at 99:9-10].

26. Mr. Noon testified that he did not hear Juanita Noon say that she did not want the concentrator to be picked up. [Dep. R. Noon at 54:21-25].

27. Juanita Noon did not ask the person calling about the concentrator to arrange for an ambulance to meet Mrs. Noon port-side. [Dep. J. Noon at 77:17-21]. The Noons planned to drive to the hospital or have their "pick-up people" drop them off. [*Id.* at 77:17-22].

28. Shortly after the call, two porters came to pick up the oxygen concentrator. [Dep. R. Noon at 55:6-15]. When the porters arrived at the cabin, the door was open. [Dep. R. Noon at 56:9-13; Dep. J. Noon at 77:11-16]. Mr. Noon pushed the concentrator out the door for the porters to take. [Dep. R. Noon at 56:6-7]. Neither Mr. Noon, Mrs. Noon, or Juanita Noon had any conversation with the porters. [*Id.* at 56:22-57:4]. In particular, the porters did not comment on how Mrs. Noon looked. [*Id.* at 59:6-10]. Mr. Noon also did not request that the porters leave the concentrator rather than take it. [*Id.* at 57:20-23].

29. Mrs. Noon was feeling fine while she was in the cabin during the morning of July 8, 2019. [Dep. R. Noon at 57:5-14]. Only after Mrs. Noon left the cabin did she start to have trouble breathing. [*Id.* at 57:11-14].

30. Melissa Lenard did not ask Mrs. Noon whether she wanted to see someone in the medical center before she left the ship. [Dep. M. Lenard at 82:10-12]. Melissa testified that Mrs. Noon did not indicate that she wanted to see someone at the medical center. [*Id.* at 82:13-15]. Instead, the Noon family intended to a doctor as soon as they got off the ship. [*Id.* at 82:15-23].

31. Melissa Lenard testified that, to her knowledge, no one in her family ever asked CCL to call EMS or 9-1-1 to have an ambulance meet Mrs. Noon port-side. [Dep. M. Lenard at 82:24-83:1].

32. After leaving the cabin, Mrs. Noon, Juanita Noon, and Melissa Lenard waited on line to check out and pay the charges on their onboard account. [Dep. J. Noon at 79:12-80:17; Dep. M. Lenard at 83:5-16]. Mrs. Noon was fine for a while, but was sweating and having trouble breathing by the time that she got to the counter. [Dep. J. Noon at 80:20-21; 81:22-82:1; Dep. M. Lenard at 83:17-21].

33. Juanita Noon testified that Mrs. Noon did not ask to go to the medical center at such time because she was about to get off of the ship. [Dep. J. Noon at 82:2-3]. Neither Juanita Noon nor Melissa Lenard asked anyone to call EMS at such time or arrange for an ambulance to meet them port side. [*Id.* at 82:4-6; Dep. M. Lenard at 84:4-6].

34. As Mrs. Noon was paying her onboard account, the guest services representative commented that Mrs. Noon was not looking good and asked if she was okay. [Dep. J. Noon at 82:9-10; Dep. R. Noon at 58:18-21]. Mrs. Noon's onboard account statement reflects that she paid her charges at 8:29 a.m. [Onboard account statement, attached as Ex. 2].

35. Juanita Noon testified that she advised the representative that Mrs. Noon was having trouble breathing and needed to get off of the ship to go the emergency room. [Dep. J. Noon at 82:10-12]. The representative got on a walkie-talkie and made arrangements for someone to push Mrs. Noon off of the ship in her wheelchair. [*Id.* at 82:14-83:5; Dep. M. Lenard at 84:25-85:11].

36. During the time that they spoke with CCL personnel to get Mrs. Noon off the ship, neither Mrs. Noon, Mr. Noon, or Juanita Noon asked CCL to have an ambulance waiting port side or to call 9-1-1. [Dep. J. Noon at 85:18-86:2; Dep. R. Noon at 62:19-21].

37. A crewmember came to wheel Mrs. Noon off of the ship, and Mrs. Noon

disembarked from the ship at 8:42 a.m. on July 8, 2019. [Dep. J. Noon at 86:6-8; Movement Report, attached as Ex. 3].

38. Although Mrs. Noon was not breathing well and did not look good at the custom desk, and did not appear to be comprehending what they were saying to her, Juanita Noon did not ask Mrs. Noon if she wanted medical assistance or ask for customs to call 9-1-1. [Dep. J. Noon at 86:9-87:2].

39. The Noons intended to get Mrs. Noon onto a shuttle to take her to a hospital or, if it could not, take their own cars to a hospital. [Dep. J. Noon at 87:24-88:3].

40. Once Mrs. Noon boarded a shuttle bus, she went into cardiopulmonary arrest. [Dep. J. Noon at 89:22-92:6; D.E. 24 at ¶ 25].

41. Mrs. Noon was taken to Jackson Memorial Hospital by ambulance, where she was pronounced dead on July 9, 2019. [D.E. 24 at ¶¶ 26-29].

42. Mr. Noon had a full-time job as a factory worker at the time of Mrs. Noon's death [Dep. R. Noon at 6:7-25; 8:14-18].

43. Makayla Noon lived with her mother at the time of Mrs. Noon's death. [Dep. J. Noon at 18:21-22].

44. While Sage May Lenard and Elijah Randall Lenard lived with Mr. and Mrs. Noon from late 2016 until June 2017, they were not living with the Noons at the time of Mrs. Noon's death. [Dep. M. Lenard at 43:11-44:11; Dep. R. Noon at 19:6-20:7]

45. Mr. Noon testified that he was not aware of any financial support given by Mrs. Noon to her grandchildren. [Dep. R. Noon at 74:18-20].

46. Mr. Noon testified that he paid for Mrs. Noon's funeral expenses. [Dep. R. Noon at 71:10-12].

Respectfully submitted,

/s/ *Marc J. Schleier*
Christopher E. Knight
Fla. Bar No. 607363
Email: cknight@fowler-white.com
Marc J. Schleier
Fla. Bar No. 389064
Email: mschleier@fowler-white.com
Katina M. Hardee
Fla. Bar No. 16069
Email: khardee@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23rd day of August, 2019, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ *Marc J. Schleier*
Marc J. Schleier

**SERVICE LIST**

CASE NO. 18-cv-23181-Williams/Torres

Philip M. Gerson, Esq.
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145-2624
E-Mail: pgerson@gslawusa.com
filing@gslawusa.com
zdiaz@gslawusa.com
Telephone: (305) 371-6000
Facsimile: (305) 371-5749
RANDALL NOON , as Personal
Representative of the Estate of
KAREN NOON, deceased