June 25, 2019

Philip Gerson, Esquire
c/o Gerson and Schwartz, P.A.
1980 Coral Way
Miami, Florida 33145
pgerson@gslawUSA.com

**RE:** Report of Robert J. Myerburg, MD in the Matter of the Death of Karen Noon versus Carnival Cruise Lines

Dear Mr. Gerson:

I have reviewed the materials you provided to me regarding the case of Noon versus Carnival Cruise Lines. This document constitutes my report and opinions concerning Mrs. Noon's cardiopulmonary arrest on July 8, 2017 and subsequent death on July 9, 2017. For preparing this report, I have reviewed and considered the following materials:

- Review of Miami-Dade Police report
- Review of miami-Dade Fire Rescue report
- Jackson Memorial Hospital medical records, July 8-9, 2017
- Deposition of David Orwick
- Deposition of Julio Puentes

In addition to the facts of the case, I have relied upon scientific information contained in peer-reviewed publications in formulating my opinions, as well as my background, knowledge, and experience in the diagnosis and treatment of cardiovascular disorders generally, and of cardiac arrest and its consequences in particular. I also applied my knowledge and experience regarding the causes of, circumstances surrounding, and outcomes of cardiac arrests that are primarily associated with heart disease, compared to those that are a consequence of non-cardiac conditions, such as pulmonary diseases, renal failure, metabolic disorders, and electrolyte imbalances, as well as the outcomes after cardiac arrest of these various causes.

All of the opinions and conclusions set forth in this report are made to a reasonable degree of medical probability, based upon reliable scientific evidence, and generally accepted principles of links between association and causation.[1] I set forth the physical, physiological, anatomical or other scientific basis for each of my opinions and conclusions.

## I. Background and Qualifications.

**EXHIBIT A**

I hold the rank of Professor in the Departments of Medicine and Physiology, and the American Heart Association Chair in Cardiovascular Research, at the University of Miami Miller School of Medicine. From September 1, 1973 through August 31, 2004, I served as Director of the Division of Cardiology at the University of Miami Miller School of Medicine, and Chief of the Cardiology Service at Jackson Memorial Hospital. Since stepping down from the position of Division Chief on September 1, 2004, I have continued as a full-time faculty member at the University of Miami, with duties that include patient care, teaching, and research. I also continue to be directly involved in the cardiovascular medicine and cardiac electrophysiology training programs at the University of Miami. A copy of my current Curriculum Vitae is attached to this report.

I am certified by the American Board of Internal Medicine in the fields of Internal Medicine and Cardiovascular Medicine, and have held a time-limited Certificate of Added Qualifications in Clinical Cardiac Electrophysiology (CCEP). The latter was awarded following my serving 3 consecutive 2-year terms on the writing committee for the CCEP board examination and one term as chair of the CCEP self-evaluation examination writing committee, both being components of the American Board of Internal Medicine (ABIM) testing and certification system. I am currently certified in both Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) by the American Heart Association certification program.

In addition to an active involvement in clinical practice, teaching, and research at the University of Miami, I continue to lecture elsewhere, including national and international scientific meetings, and have served as a consultant for various academic and public components of the cardiovascular enterprise. In 2015-2016, I served on a committee of the Institute of Medicine of the National Academy of Science, Engineering, and Medicine, that was convened to evaluate the current status of responses to cardiac arrest in the United States and provide recommendations for actions that will result in improvements in outcomes. I also served recently on a Guidelines Writing Committee, convened by the American Heart Association and American College of Cardiology, to update the 2005 Guidelines on Ventricular Arrhythmias and Sudden Cardiac Death. The update was published in 2017.

During the course of my career, I have remained active in clinical practice and teaching in all aspects of cardiovascular medicine, including coronary artery disease and its consequences, heart muscle diseases due to causes other than coronary artery disease, diseases of the heart valves, and infectious and inflammatory diseases of the heart, including the valves, muscle, and the pericardium. Throughout my career, I have maintained a particular interest in cardiac arrhythmias, cardiac arrest, and sudden cardiac death, the various causes that result in these conditions, and their clinical consequences.

Among my specific areas of interest, I have been directly involved in research and clinical activities regarding patients at risk for heart attacks and sudden cardiac arrest, as well as research into the clinical use, guideline development, and decision-making strategies for implantable cardioverter-defibrillators (ICD's).[2-5] During the past 18 years, I have also become actively involved in cardiovascular genetics as Director of a Cardiovascular Genetics Clinic in the Division of Cardiology at the University of Miami, as well as the Sports Cardiology program, the latter focusing on pre-participation clearance of competitive athletes and guidance of competitive and recreational athletes with known or suspected cardiac conditions. My interest in genetics focuses on inherited risks of life-threatening heart rhythm disturbances and the genetic epidemiology of sudden cardiac death.[6,7] In the late 1990's, I initiated a program in conjunction with the Miami-Dade County Fire and Police Departments that led to the deployment of automated external defibrillators (AED's) in all police vehicles in the county, to complement Fire Rescue and improve overall response times to cardiac arrest victims.[8] These fields of interest require me to be

thoroughly familiar with the conditions that cause cardiac arrest, the expected responses to cardiac arrest by physicians, paramedics, and emergency medical technicians, trained lay responders, and lay bystanders, and the expected outcomes in cardiac arrest victims, based upon the various causes.

## II. Definitions of Terms and Abbreviations

This Report will contain a number of medical terms repetitively. As an aid to those reading this Report, a list of definitions and abbreviations that will appear in the Report is provided.

**Cardiac arrest:** Loss of blood flow through the body due to cessation of the mechanical contraction of the heart muscle.

**Sudden cardiac arrest (SCA):** An abrupt and unexpected loss of blood flow due to unexpected failure of the heart muscle to pump blood in response to heart conditions, or other triggers unrelated to heart disease, such as respiratory failure or abnormalities of the chemicals in the blood . Under appropriate conditions, SCA can be reversed by prompt interventions, avoiding death.

**Sudden cardiac death (SCD):** Biological death following a SCA, and occurring as a consequence of that event.

**Sudden death:** A more general term related to a sudden death that may or may not be primarily due to a cardiac cause.

**Ventricular fibrillation (VF):** VF is a common mechanism of cardiac arrest that causes a loss of a coordinated heart muscle contraction pattern, sometimes referred to as a "quivering" of the heart muscle, as opposed to an organized contraction. VF results in complete loss of pumping function of the heart muscle, and results in loss of consciousness in 10-12 seconds, or less. It is uniformly fatal if not reverted promptly by a shock to the chest – i.e., defibrillator shock.

**Pulseless ventricular tachycardia (pVT):** pVT is an organized rhythm originating in the ventricles (pumping chambers of the heart) at a rate too rapid to provide sufficient blood flow to the brain to maintain consciousness. This is a mechanism of cardiac arrest. Time from onset to loss of consciousness may be a little longer than in the case of VF because of residual blood flow. This pattern is often transient, quickly degenerating to VF or in rare cases reverting to a normal rhythm spontaneously.

**Ventricular tachycardia (VT):** VT is a more general term for an organized rhythm originating in the ventricles, in which consciousness may be maintained when the rate is not fast enough to result in reduction of blood flow to the brain sufficient to impair consciousness. VT is not a uniform equivalent of cardiac arrest, but may lead to pVT or VF.

**Pulseless electrical activity (PEA):** PEA is a form of ventricular rhythm in which an electrical impulse occurs, but fails to initiate a mechanical response and therefore the heart does not beat, despite the electrical signal.

**Asystole:** Asystole is the absence of the electrical signal of the heart, resulting in failure to initiate mechanical activity. This is often referred to as a "flat line" in lay terms; and is almost always fatal, but may be reversible in some circumstances.

**Shockable rhythms:** VF, pVT, and VT are amenable to termination and restoration of a normal rhythm by a shock from a defibrillator or AED. Survival rates depend upon specific rhythm, time to response, and presence and/or extent of an underlying heart disease.

**Non-shockable rhythms:** PEA and asystole do not respond to defibrillator shocks, and have much lower survival rates. Survival is best when a reversible cause, such as impaired breathing or massive blood loss, is identified and managed.

**Implantable cardioverter-defibrillator (ICD):** An ICD is a small device that can be implanted below the skin with wires going to the heart. It continuously monitors the heart beat and automatically delivers a shock to the heart when it recognizes a life-threatening heart rhythm disturbance. It is most commonly used for patients at risk for cardiac arrest due to shockable rhythms.

**Automated external defibrillator (AED):** An AED is an electronic device capable of delivering a shock to the chest into order to interrupt the electrical circuit in the heart responsible for VF or pVT, thereby restoring a normal heart beat. It has no value for PEA or asystole, which are non-shockable rhythms. An AED is a specialized portable defibrillator that is capable of diagnosing a shockable rhythm (VF, pVT) and prompting a lay responder whether to deliver a shock or just continue CPR. AEDs are commonly deployed at sites with public access (office buildings, police cars, stadiums, and other public sites) for non-conventional responders and lay bystanders to use in response to cardiac arrests, while awaiting emergency rescue arrival.

**Respiratory failure, respiratory arrest (cessation of breathing), cardiorespiratory arrest (cardiac arrest associated with respiratory failure or arrest):** This group of terms refer to conditions of a primary pulmonary origin, in which an underlying lung condition (acute, chronic, or both) is responsible for loss of bodily functions, including cardiac function, because of a primary inability to exchange oxygen and carbon dioxide. When respiratory failure or arrest leads to cardiac arrest, the mechanism more-likely-than-not will be a non-shockable rhythm, PEA or asystole, and the outcome will be fatal if the respiratory failure is not reversed. However, if oxygenation of the blood is improved by supporting breathing, survival maybe achieved.

**Acute-on-chronic respiratory failure:** Among patients with chronic lung disease, which may be at various levels of symptomatology under baseline conditions, superimposed problems such as viral infections may create acute symptoms that require supplemental oxygen or even hospitalization and mechanical ventilation, depending upon the severity.[9] Acute-on-chronic decompensation may be life-threatening if left untreated, and conversely respiratory-based cardiac arrest may be averted if the acute respiratory failure is improved or reversed with oxygenation.[10]

## III. Overview of Sudden Cardiac Arrest

SCA is defined as an abrupt and unexpected loss of consciousness due to a sudden loss of cardiac function in a person with or without known preexisting heart disease.[4] According to generally applied definitions

for most clinical circumstances, it occurs within one hour after an abrupt change in the victim's clinical status. For circumstances in which cardiac arrest is associated with or triggered by physical or stress-related circumstances, the timing of onset is determined by the specific cause. There are 3 potential outcomes of SCA:

1. Survival free of neurological injury, usually a result of rapid emergency response interventions;

2. Survival with persistent neurological injury, ranging from impaired ability to performs various activities of daily living to a permanent vegetative state;

3. Death attributable to the SCA within 30 days of the SCA and by mechanisms directly attributable to the SCA, in which case it is referred to as sudden cardiac death (SCD).

The statistics for these specific outcomes are determined by the integration of multiple factors, the most important of which are the time between onset of SCA and return of spontaneous circulation (ROSC), effective bystander CPR given prior to ROSC, the electrical mechanism of the SCA (see below – Section IV), the nature and severity of any underlying heart disease,[2] and the presence and reversal of transient factors that caused or contributed to the SCA. The overall survival currently is approximately 10%, driven largely by the fact that up to 80% of SCA's occur in the home, which portends a survival rate of only 6%. Witnessed SCA's in public locations have better outcomes, especially when emergency medical technicians (EMT's), paramedics, or lay responders are present at the time of onset and have an AED rapidly available. As an example, the highest reported out-of-hospital cardiac arrest survival rates come from the Las Vegas casinos, where security guards have AED's immediately available.[11] This study revealed that survival of those with initial shockable rhythms is greater than 70% if responded to within a few minutes. Extending beyond that study, it is generally accepted that cardiac arrest victims with initial shockable rhythms (VF, pVT) who do not have advanced or end-stage structural heart disease as the basis, and receive immediate CPR and an AED shock within a few minutes, will have similar survival expectations. Cardiac arrest victims whose initial rhythm is a non-shockable rhythm (PEA, Asystole) generally have a very low survival rate.[12] The exception is those circumstances in which reversible causes are promptly managed. Relevant to the events leading to the death of Mrs. Noon, non-shockable rhythms are the dominant rhythms identified when a cardiac arrest is caused or triggered by reversible acute respiratory failure (see below). Moreover, when acute respiratory decompensation is based upon an acute change that responds to oxygenation, the cardiac arrest may be avoided.[10]

More than 390,000 out-of-hospital SCAs causing SCD are estimated to occur in the United States each year,[5] representing an annual incidence of 1 SCD per 1,000 persons in the general population over the age of 35 years. The incidence can be considerably higher in subgroups of the population selected for the presence of advanced heart disease. The cumulative figure of 390,000 constitutes approximately 50% of all cardiac deaths in the United States, and 15-20% of all natural deaths. However, a different set of statistics apply to younger subsets of the population, especially those from the mid-teen years up to the age of 30 years, among whom the risk of SCA is very low. In this subpopulation, the annual risk of naturally-occurring SCD is 1 SCD per 100,000 persons, or 0.001%/year. This figure is 1% of the risk in the middle-aged and older adult population.

In most instances, SCA occurs as a direct consequence of an abrupt change in the electrical rhythm of the heart. In the past, the most common electrical disturbance of the heart (defined as a life-threatening arrhythmia) responsible for SCD was ventricular fibrillation (VF) or pulseless ventricular tachycardia (pVT), which had been estimated to be the primary electrical disturbance in 65-80% of the deaths. Recent

data, however, indicates that a lower percentage of out-of-hospital cardiac arrests, much less than 50%, are associated with VF or pVT as the initially observed rhythm.[2,4] This may be due in part to expansion of Emergency Medical Systems (EMS), linked to Fire Departments, to broader outreaches of expanding metropolitan and rural areas, that have delayed response times. In contrast, responses to witnessed arrests with immediate availability of AED are associated with higher proportions of shockable rhythms and better outcomes, as is cardiac arrest associated with an acute myocardial infarction, the common "heart attack."

Asystole and PEA occur in a number of different circumstances. In contrast to VF and pVT, PEA and asystole have always been more common mechanisms of cardiac arrest when it is secondary to breathing problems, such as restraint of breathing, asphyxia, respiratory failure, or pulmonary embolism, or when it is due to severe blood loss, or to shock due to overwhelming infections. These mechanisms also occur as the primary mechanism in patients with end-stage heart disease, or other disorders such end-stage cancer, and after failure to revert pVT or VF because of prolonged cardiac arrest response times. When asystole or PEA occurs as a result of transient reversible conditions (e.g., acute respiratory problems, blood loss, or serum electrolytes), prompt correction of those factors associate with better survival. However, when it is associated with non-reversible factors, such as end-stage heart disease, the outcome remains dismal, even with prompt interventions.

All forms of heart disease can be responsible for SCD. Generally, the fact that 50% of all heart-related deaths are sudden and unexpected applies individually to each of the specific heart diseases, when heart disease is the primary triggering factor. In a few conditions, the proportion of deaths that are sudden is higher than 50%. The most common cause of SCD in adults in Western civilizations is atherosclerotic heart disease (coronary artery disease) due to cholesterol deposits in the coronary arteries and resulting heart attacks that trigger VF. This one cause accounts for approximately 70-80% of all SCDs. The second most common cause is a group of disorders called the cardiomyopathies, which collectively share the feature of deterioration and/or dysfunction of the heart muscle due to diseases that affect the muscle itself, rather than being mediated through heart attacks from coronary artery disease. Included among the cardiomyopathies are subgroups of dilated and hypertrophic cardiomyopathy, with the dilated form being far more common. This group of causes collectively accounts for 10-15% of all SCDs. All of the other heart diseases combined account for no more than 5-10% of all SCDs. The statistics specific to SCD associated with coronary heart disease apply to the general population, but are dominated by population subsets over the age of 35 years, as the incidence of coronary heart disease and SCD increase rapidly with increasing age up to the age of 60-70 years, after which the incidence of SCD due to coronary heart disease decreases, yielding to cancer and other chronic diseases in other organ systems, such as kidneys and lungs.[4]

For younger subsets of the population, uncommon or rare heart disorders are the most common causes of SCD, in contrast to common diseases such as coronary artery disease and cardiomyopathies that dominate in the middle-aged and older adult population. Recent data has demonstrated an association between left ventricular hypertrophy (most common due to inadequately treated high blood pressure) or unexplained fibrosis (scarring) of the heart muscle and the risk of SCA. The rare disorders include a number of inherited, developmental, and acquired diseases. The available literature suggests that myocarditis is a major contributor to SCD in this age group. The relative frequency, compared to other causes, is uncertain because of inconsistent diagnostic criteria in the older studies. Finally, since the majority of cases of myocarditis are mild or benign, the chances of an affected individual dying suddenly are small, especially after the acute phase has healed. In addition, many "rare syndromes" that are either developmental in the fetus or genetically determined and inherited among families, contribute to deaths in this age group. These

include inherited structural disorders (e.g., hypertrophic cardiomyopathy and right ventricular dysplasia), congenital abnormalities of the coronary arteries or heart valves, and a number of poorly-defined structural causes that are only now beginning to be understood.[6] For this group of rare syndromes, the initial electrical mechanism of a SCA is almost always pVT or VF, the shockable rhythms.

When no explanation for SCA associated with VF or pVT is identified, the event is usually labeled "idiopathic ventricular fibrillation." As diagnostic capabilities and clinical insight have improved in recent years, the number of deaths so classified has decreased. A small residual (likely less than 1 percent) still exists, but it is likely that the magnitude of this classification will continue to contract over time.

The final category of SCA includes those events in which an exogenous factor is responsible for a fatal heart rhythm disturbance. This group includes physical causes (e.g., *commotio cordis*) resulting from blunt trauma to the front of the chest by objects such as hockey pucks and baseballs,[6] or accidental electric shocks triggering fatal fatal heart rhythm disturbances. Restraint of breathing can also be a cause, but more often by the mechanism of PEA or asystole. In regard to the latter, excessive or improper restraint (especially in the prone position) may cause inadequate respiratory excursions, leading to respiratory failure and cardiorespiratory arrest. In the absence of external causes of respiratory triggers of cardiac arrest, primary lung disease, often interacting with pre-existing heart disease, may be the triggering factor in the patient with insufficient oxygen in the blood. *Commotio cordis* and electrical shocks are most likely to trigger shockable mechanisms of cardiac arrest (VF, pVT), while inadequate oxygenation of the blood is more likely to cause PEA or asystole.

Exogenous factors also include chemical substances. Among the latter, cocaine abuse is among the more common of such causes in the United States. Acute excess alcohol consumption, especially binge drinking with very high blood alcohol levels, has been associated with some impairment of heart muscle function, but only a limited risk of SCD. In the case of the latter, it is generally associated with the presence of pre-existing heart disorders or respiratory depression, and has blood alcohol concentrations of 0.300% or higher in the absence of associated co-morbidities or additional drugs.

The entity referred to as "acquired long QT interval (LQT) syndrome" is another example of exogenous factors. Historically, this has been linked to certain categories of drugs, such as the antiarrhythmic drugs, among others. In recent years, it has been demonstrated that a substantial subset of victims of "acquired" LQT are individuals who are susceptible to this response based on their genetic profiles. Such victims may have normal ECGs in the absence of the offending agents, and therefore are unrecognizable short of either genetic studies or exposures to drugs that allow expression of the syndrome. The frequency of such mutations or functional polymorphisms among the general population is currently unknown, but the incidence of proarrhythmic responses to potentially offending substances is thought to be less than 1-3%. The figure is lower in normal subjects and likely higher among those with advanced heart disease.

## IV. Onset of Cardiac Arrest: Predisposing Factors, Prediction, and Triggers

SCA is commonly initiated by interactions between pre-existing structural heart disease and transient physiological factors that alter the state of the heart at the time of onset of the cardiac arrest. Under such circumstances, the underlying substrate constitutes an anatomic or molecular substrate that establishes a predisposition to cardiac arrest, and the transient trigger is a significant contributing factor without which the cardiac arrest would not have occurred at a specific point in time. Among the structural predisposing factors, coronary atherosclerosis and the non-ischemic cardiomyopathies (primary heart muscle disease)

account for 90−95 percent of SCDs in middle age or older subjects. In the younger population, the substrate is more likely to be an enlarged heart from high blood pressure, scarring of the heart muscle from prior viral infections, or other causes. A general example of this interaction comes from the Northridge earthquake in California in 1994. On the day of the earthquake, the incidence of SCA was 4 to 5 times higher than had been observed historically during the week before that event or during the same week going back 3 or 4 years.[13] In the week or two following the earthquake, the incidence was lower than the historically expected incidence. The conclusion was that the earthquake served as a stressful triggering event that initiated cardiac arrest in individuals who are susceptible to such events and brought them together at one point in time. This general principle can be applied to random individual stressors as well, raising the question whether an intensely stressful situation can be the initiator of a cardiac arrest in an individual, with or without disease, but not at high risk for a cardiac arrest at that point in time. A possibly related phenomenon is death occurring during excited (agitated) delirium. This debated entity, which is not recognized by a specific diagnostic code, is associated with precipitous deaths in some cases, 2/3 of which are in subjects with prior cardiac diseases that placed them at risk, and/or use excitatory drugs. Deaths occurring under these circumstances are preceded by prolonged and intense agitation and disorientation, and appear to be respiratory in nature.

The various structural disorders may interact with transient factors, such as acute interruption of blood flow (ischemia) in the case of coronary artery disease, changes in ventricular pumping function (heart failure) in both ischemic- and non-ischemic cardiomyopathies, electrolyte shifts, respiratory and metabolic factors, and autonomic (e.g., adrenalin) fluctuations.[14]

Attributing coronary artery disease as the cause of a specific SCD is straightforward when post-mortem examination reveals a fresh blood clot occluding a coronary artery, with or without evidence of heart muscle injury or necrosis (cell death), or the presence of severe coronary artery disease (e.g., cholesterol plaques) in the absence of any other identifiable cause of SCD. In addition, SCA can be initiated by spasm of a coronary artery. This generally occurs in the presence of a plaque that is not sufficient to trigger an event on its own, but makes the blood vessel susceptible to closing off when it goes into spasm.

## V. Summary and Analysis of the Events Surrounding the Cardiac Arrest and Subsequent Death of Karen Noon, and Causation Opinions

Mrs. Karen Noon was a 56-year-old woman who died on July 9, 2017, following a cardiopulmonary arrest that occurred on July 8, 2017. Her cardiac arrest occurred by a non-shockable mechanism (PEA, followed by asystole), and more-likely-than-not, was a consequence of respiratory failure (see below). Because of the fact that she had reversible features of her breathing problems, she was able to achieve a return of spontaneous circulation (pulse and blood pressure) as a result of the emergency rescue response, but suffered extensive brain damage because of the duration of the cardiopulmonary arrest. The nature and extent of the brain damage lead to the decision to remove life support the next day. The brain damage was a direct consequence of the cardiopulmonary arrest, and prevention of the arrest would have avoided the brain damage.

Mrs. Noon had a past history of chronic obstructive pulmonary disease (COPD), asthma, diabetes, and hypertension. Information on her prior medical history in the Jackson Memorial Hospital records, provided by her family members, revealed that she had long-standing asthma and chronic COPD that was stable and minimally symptomatic most of the time, but had periodic intervening factors such as

pneumonia. At those times when she became more short of breath acutely, and was given supplemental oxygen, she did better until the transient factor abated.

During the course of her cruise in July 2017, she became symptomatic, likely due to an intervening viral infection or pneumonia, and she requested supplemental oxygen. According to information available, her breathing improved to some extent when she was receiving the supplemental oxygen. This overall pattern is referred to as an "acute-on-chronic" respiratory problem, meaning that a patient has stable breathing as a baseline state, but when there is an acute problem, such as infection, it becomes worse. Once the acute problem resolves, the breathing status will return to its baseline stable state. The information from the incident that occurred on the ship suggests that Mrs. Noon's acute symptoms indeed did improve when she was receiving the supplemental oxygen.

Mrs. Noon's intent was to go to a local hospital after she left the ship, and requested to keep the oxygen canister when she got off the ship in order to provide her with breathing support until she got to the hospital. This request was not granted, nor were any arrangements made for providing her safe transportation to the hospital with continuous oxygen availability. Rather, she had to disembark with the rest of the passengers, and had to fend for herself off the ship. Under these circumstances, in the absence of supplementary oxygen, her respiratory difficulties got worse after she disembarked, and she had a cardiopulmonary arrest.

The records reflect that her breathing got worse after disembarking without oxygen support. She was witnessed to lose consciousness and had involuntary movements. She was responded to initially by bystanding police officers, who provided CPR, but she did not have oxygen support available until Fire Rescue arrived. The initial observation recorded by the emergency responders was electrical activity at a rate of 102 impulses/minute, but without a pulse or blood pressure, and she was unconscious. This combination fulfills the definition of pulseless electrical activity (PEA) and subsequently went into asystole; both PEA and asystole are non-shockable rhythms. When personnel from Fire Rescue arrived, they provided oxygen support and continuing CPR, but it appears that return of spontaneous circulation with a pulse and blood pressure was not achieved until she was transported to Jackson Memorial Hospital Emergency Department and treated there. When she was noted to have a spontaneous circulation (i.e., her pulse and blood pressure had returned), she remained unconscious. The time between the onset of cardiopulmonary arrest and return of spontaneous circulation, part of which while receiving CPR, is not clear, but it was at least 20 – 30 minutes. This length of time without adequate blood flow to the brain was sufficient to cause brain damage, even with continuing CPR. Moreover, there is no other basis for her brain damage, since the imaging study of the brain done at the hospital did not reveal an ordinary stroke or a brain hemorrhage, but rather the pattern that is produced by loss of blood supply to the entire brain as a result of a cardiac arrest. Because of the extensive brain damage and persistent coma, the decision to remove life support was made the next day. Central nervous system injury is the most common cause of death during hospitalization of victims who have been resuscitated from out-of-hospital cardiac arrest; and when this sequence occurs, the cause of death is attributed to the cardiac arrest that resulted in the brain damage.[2]

Mrs. Noon's cardiac work up at Jackson Memorial Hospital further supported a respiratory basis for her cardiopulmonary arrest. Echocardiography revealed that her heart was structurally and functionally normal, with the exception of findings in the right ventricle that are consistent with chronic (and/or acute) lung disease. Those finding also led the physicians to get a CT angiogram (an advanced form of X-ray) to make sure that she did not have a pulmonary embolism (i.e., a blood clot in the lungs). That study was also negative. The left ventricle was functioning normally. Electrocardiograms suggested transient left

ventricular muscle injury as a result of the cardiac arrest, but the echocardiogram showed no evidence of a myocardial infarction (heart attack) as the cause of her cardiac arrest. The ECG findings were due to transient heart muscle injury from the cardiac arrest and not related to the cause of her cardiac arrest or death. The combination of heart and lung evaluations lead to the conclusion that Mrs. Noon's cardiac arrest was indeed due to lack of oxygen from her acute-on-chronic respiratory disorder, rather than another cause.

Another major issue in this case is prevention. Specifically, given the fact that Mrs. Noon was in the midst of an acute-on-chronic breathing problem at the time, and had improved somewhat with supplemental oxygen provided to her while on the ship, consistent with her prior history of similar events, it is more-likely-than-not that the cardiopulmonary arrest would have been avoided if she had been able to continue supplemental oxygen support when she disembarked the ship and was being transported to the nearest hospital. If the cardiopulmonary arrest was prevented, it is more-likely-than-not that she would have survived the acute-on-chronic respiratory event, since there is no other identifiable basis for her cardiopulmonary arrest.

In summary, it is my opinion that Mrs. Karen Noon suffered a cardiopulmonary arrest as a consequence of an acute-on-chronic respiratory event. The cardiopulmonary arrest followed the loss of availability of supplementary oxygen support, which had improved her symptoms while it was available onboard the ship. When she was ultimately re-oxygenated by emergency rescue responders after her cardiopulmonary arrest, she had a return of her pulse and blood pressure, but by then had had absence of blood flow to her brain for a sufficient period of time to cause massive brain injury. Had she received continuous supplemental oxygenation until she arrived at the hospital for definitive care of her acute-on-chronic respiratory failure, it is more-likely-than-not that she would have avoided the cardiac arrest and survived.

My opinions regarding causation are derived from the currently available facts of the case, and are based upon a reasonable degree of medical probability. My opinions take into consideration these facts, in conjunction with my personal education, background, knowledge, and experience, and reliable medical information published in peer-reviewed journals. I reserve the right to expand or alter any of my opinions based upon any new or additional information provided to me in the future.

Robert J. Myerburg, M.D.
Miami, Florida

## REFERENCES


1. Hill AB: The environment and disease: association or causation? Proc Roy Soc Med. 1965;58:295–300.

2. Myerburg RJ, Castellanos A. Cardiac Arrest and Sudden Cardiac Death - Chapter 38. In: *Mann DL, Zipes DP, Libby P, Bonow RO, editors,* Braunwald's Heart Disease: A Textbook of Cardiovascular Medicine, 10th edition. Oxford, UK. Elsevier. 2015; pages 821-860.

3. Zipes DP, Camm AJ, Borggrefe M, Buxton AE, Chaitman B, Fromer M, Gregoratos G, Klein G, Moss AJ, Myerburg RJ, Priori SG, Quinones MA, Roden DM, Silka MJ, Tracy C et al. ACC/AHA/ESC 2006 Guidelines for Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death – Executive Summary, Circulation 2006; 114: e385-484.

4. Myerburg RJ: Implantable cardioverter-defibrillators after myocardial infarction. New Engl J Med 2008; 359:2245-2253.

5. Myerburg RJ, Reddy V, Castellanos A: Indications for implantable cardioverter- defibrillators based on evidence and judgment. JACC 2009; 54:747-763.

6. Myerburg RJ: Scientific gaps in the prediction and prevention of sudden cardiac death. *J Cardiovasc Electrophysiol* 2002; 13: 709-723.

7. Bonow R, Clark EB, Curfman GD, Guttmacher A, Hill MN, Miller, DC, Morrison AR, Myerburg RJ, Schneider MD, Weisfeldt ML, Willerson JT, Young JB. Task force on strategic research direction: Clinical science subgroup. *Circulation* 2002; 106: e162-e166.

8. Myerburg RJ, Fenster J, Velez M, Rosenberg D, Lai S, Kurlansky P, Newton S, Knox M, Castellanos A. Impact of community-wide police car deployment of automated external defibrillators on survival from out-of-hospital cardiac arrest. Circulation 2002; 106:1058-1064.

9. Schmidt GA, Hall JB: Acute on chronic respiratory failure: Assessment and management of patients with COPD in the emergent setting. JAMA 1989;261:3444-3453.

10. Herlitz J, Rosenfelt M, Bång A, Axelsson A, Ekström L, Wennerblom B, Löwhagen O, Palmqvist M, Holmberg S: Prognosis among patients with out-of-hospital cardiac arrest judged as being caused by deterioration of obstructive pulmonary disease. Resuscitation 1996; 32:177-84.

11. Valenzuela TD, Roe DJ, Nichol G, Clark LL, Spaite DW, Hardman RG: Outcomes of rapid defibrillation by security officers after cardiac arrest in casinos. N Engl J Med. 2000;343:1206-1209.

12. Myerburg RJ, Halperin H, Egan D, Boineau R, Chugh SS, Gillis AM, Goldhaber J, Lathrop DA, Liu P, Niemann JT, Ornato JP, Sopko G, Van Eyk J, Walcott G, Weisfeldt M, Wright JD, Zipes DP: Pulseless electrical activity – definition, causes, mechanisms, management, and research priorities for the next decade: Report from a National Heart, Lung, and Blood Institute

Workshop. Circulation 2013; 128:2532-2541.

13 Leor J, Poole WK, Kloner RA: Sudden cardiac death triggered by an earthquake. N Engl J Med. 1996; 334:413-419.

14. Huikuri HV, Makikallio TH, Raatikainen MJ, Perkiomaki J, Castellanos A, Myerburg RJ: Prediction of sudden cardiac death: appraisal of the studies and methods assessing the risk of sudden arrhythmic death. *Circulation* 2003; **108**: 110-115.