UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 8-CV-23181-WILLIAM/TORRES

RANDALL NOON, As Personal Representative of the Estate of KAREN NOON, deceased,

Plaintiff,

-vs-

CARNIVAL CORPORATION, as Panamanian Corporation d/b/a CARNIVAL CRUISE LINES,

Defendant.
______________________________/

DEPOSITION OF ROBERT J. MYERBURG, M.D.

Friday, July 26, 2019
9:00 a.m. - 10:46 a.m.

Jackson Memorial Hospital
Central Building - Room C403
1611 Northwest 12th Avenue
Miami, Florida 33136

Reported By:
Guerlin Kelly Boyd, Court Reporter
Notary Public, State of Florida



APPEARANCES:

On behalf of the Plaintiff:

PHILIP M. GERSON, ESQ.
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145
(305) 371-6000
pgerson@gslawusa.com
cbenedi@gslawusa.com

On behalf of the Defendant:

GEORGE M. KOONCE, III, ESQ.
FOWLER WHITE BURNETT, P.A.
1395 Brickell Avenue
14th Floor
Miami, Florida 33131
(305) 789-9256
gkoonce@fowler-white.com

\- - -



EXAMINATIONS


| DEPOSITION OF | PAGE |
|---|---|
| ROBERT J. MYERBURG, M.D., | 4 |
| DIRECT EXAMINATION BY MR. KOONCE, III | 4 |
| CERTIFICATE OF REPORTER | 105 |
| CERTIFICATE OF OAT | 106 |

PLAINTIFF'S EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| | NONE | |

DEFENDANT'S EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| Defendant's Exhibit No. 1 | CV | 19 |
| Defendant's Exhibit No. 2 | Flash Drive | 25 |
| Defendant's Exhibit No. 3 | Document | 27 |
| Defendant's Exhibit No. 4 | Document | 62 |




Deposition taken before Guerlin Kelly Boyd, Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

Thereupon,

ROBERT J. MYERBURG, M.D.,

having been first duly sworn or affirmed and saying, "I do," was examined and testified as follows:

DIRECT EXAMINATION

BY MR. KOONCE, III:

Q. Good morning, Mr. Myerburg. My name is George Koonce, Law Firm of Fowler White Burnett to take your deposition. I'm representing Carnival Cruise Line today. It's my understanding you've been identified as an expert on behalf of Ms. Noon's estate and Ms. Noon; is that correct, sir?

A. That's correct.

Q. So can you please give me your full name and your professional address, please.

A. So it's Robert J. Myerburg, work, University of Miami North School of Medicine.

Q. Okay. It's my understanding, sir, you are a cardiologist and -- a cardiologist; is that correct?



EXHIBIT B

5

A. In part, yeah.
Q. Okay. And what is your specialty, sir?
A. So I am board certified in internal medicine.
Q. Okay.
A. Board certified in cardiology and with a subspecialty within cardiology and cardiac electrophysiology. There is a board in that. I had a time limit certification on that because I had been on the writing committee for the initial go-around for that board when it was created in 1990 and I did like 32 years hence. And then after that those of us who were on the initial committee got a time limited certification. And then we were supposed to sit for the exam in 2005 or something like that and I decided not to. So I'm not certified, but I am in the writing committee.
Q. I understand, sir. Now, sir, it's my understanding you have three main practice locations; one here at Jackson Memorial Hospital, we're here now, University Miami Hospital and the Lennar Center in Coral Gables. Is that correct, sir?
A. That's generally true. My activities

6

in Jackson have decreased because the University and Jackson relationship within cardiology has changed over the past or seven or eight years. So other than my office still being, I'm doing limited work here. Most of my work is either University of Miami Hospital or Lennar.
Q. Okay. And so, sir, is it safe to stay that you don't have a, lack of a better term, you don't cover shifts here at Jackson?
A. That's correct.
Q. You don't supervise residents here at Jackson?
A. Formally, no.
Q. Okay.
A. Informally they often, because my office is here, they'll come by and present a case to me and we'll discuss it and get my opinion, but that's informal.
Q. Let me ask the question this way: You don't have assigned residents or fellows; is that correct?
A. Resident -- or the fellows in cardiology are assign to my clinic. Let me just give you a little background on that because my own practice pattern has changed.

7

So what I'm doing these days, mainly, is cardiac electrophysiology in addition to the cardiovascular genetics and sports cardiology. So those are the three main fields, and just a lot of that's outpatient. So as far as inpatient work is concerned is much more limited and it's for consultations, but not taking call.
Q. Okay. So you don't take call at all?
A. I don't take call.
Q. When was the last time you took call?
A. I don't know, five, six years ago.
Q. Okay. And, sir, in regards to, just so I'm clear, with regards to your clinic, is your clinic at the Lennar Center on the main campus of the University of Miami?
A. Both there and the clinic at University of Miami Hospital.
Q. Thank you, sir.
A. And I will cover the clinic at Jackson, the cardiology clinic when they need an extra hand.
Q. Okay. And, sir, you don't supervise or follow hospital patients unless you are just going to consult; is that correct?
A. Exactly.

8

Q. Okay. So you don't have assigned teaching days?
A. Well, yes, I do. I mean, there are teaching assignments that are based on lectures, meeting the fellows, having sit-down rounds to go over patients and the patients that are presented to me for consultation.
Q. Okay.
A. But as far as this month you're on counsels, no.
Q. Yes. Okay. Now, sir, you are a professor; is that correct?
A. Correct.
Q. And are you a tenure professor?
A. Yes.
Q. And so you don't have a mandatory retirement age; is that correct, sir?
A. Correct.
Q. Okay. And so you have been practicing -- you don't have a mandatory requirement age, then you obviously are not retired; is that correct?
A. That's correct.
Q. And it's my understanding that you see patients approximately two to three times in one

week?
**A. Not just two or three patients two or three sessions.**
Q. No, I said two or three times a week, sir. You see patients two or three times a week?
**A. Two or three session a week.**
Q. Two or three sessions a week?
**A. In addition to anybody that they may come to me about special circumstances.**
Q. But you are at established clinics two to three times a week?
**A. Yes. Yes.**
Q. Is that a decrease from what you did in the past, sir?
**A. The number of clinics is actually more. What is decreased is things like night and weekend calls.**
Q. Okay.
**A. Decreased to the point of disappearing.**
Q. That's when you would take call -- when you would be on-call for cardiology consults, emergencies, things of that nature?
**A. Yes.**
Q. And so I can assume that you don't



supervise a cardiac care unit, a cardiac ICU or a critical care unit; is that correct, sir?
**A. Not in a formal sense, no.**
**MR. GERSON: Objection.**
**BY MR. KOONCE, III:**
Q. Okay. You are not directly responsible for any of those types of units?
**A. No, in the sense of being assigned as the attending of the month, no.**
Q. Sir, when did you graduate from medical school, what year?
**A. 1961.**
Q. Okay. And, sir, I knew that you are -- your -- obviously, your credentials are established as a cardiologist. I just want to make sure. You don't have any other specialties with inside medicine; is that correct?
**A. I've outlined to you the areas in which I have had training and board certification.**
Q. Let me re-ask the question. That was a poor question.
**A. Yeah.**
Q. I know your specialty is with cardiology and electrophysiology. You don't have any other specialties outside of that, such as



pulmonology, critical care, things of that nature?
**A. So in a defined sense of being labeled as one of those specialties, the answer is, no, I don't. In terms of my areas of interest in electrophysiology, which is in part related to cardiac arrest and sudden cardiac death. There's a lot of crosstalk and overlap between the various subspecialties.**
**And so to that extent, not in a formal sense, but in a functional sense that there is a need to deal with those issues, yes.**
Q. And, but, sir, you've not done a residency or fellowship in pulmonology; is that correct?
**A. That's correct.**
Q. You've not done a residency or fellowship in critical care; is that correct?
**A. That's correct.**
Q. You've not done a residency or fellowship in anesthesiology?
**A. Correct.**
Q. Okay. And, sir, in terms of running what we call maybe a code blue or resuscitation, you don't formally serve on a code blue team now; is that correct?



**A. No.**
Q. Okay. You don't formally run resuscitation efforts either at Lennar Center, UMH or here at Jackson?
**A. In a sense of being a code blue team?**
Q. Yes.
**A. No. In the sense of if I am around when something happens, I will initiate CPRs and basic life support and if defibrillators show up, the more advanced life support. I've done that in the airport a few times when people have --**
Q. But what I'm asking, sir, is that you are not part of a code blue team at the facilities you're at?
**A. No, but I am certified by the American Heart Association in both basic life support and advanced life support and those are current certifications.**
Q. And, sir, when was the last time that you renewed your certification in those two?
**A. For advance life support, it was this year; and for basic life support, it was either the year before or the year before that.**
Q. Okay.
**A. But both are active now.**

Q. Thank you, sir. And, sir, with regards to COPD patients --
A. Yes.
Q. -- you don't primarily follow those type of patients in your practice?
A. So I do not follow patients for COPD specifically. The problem is that for the topic of cardiac arrest, not all cardiac arrests are cardiac related and some of them are related to other organ system diseases, most prominently CNS, lungs and kidneys.
So there is that overlap between the area of the cardiac clinical electrophysiology and those specialties. So for instance, if a patient has a cardiac arrest and the cause is determined to be COPD, I will deal with the issues related to the cardiac arrest and to future care among the survivors in relation to that, but not for the management of COPD primarily.
Q. Now, sir, with regards to -- I know you deal with a lot of work obviously in cardiac arrest, you're a cardiologist, you also have a background in electrophysiology. I have a quick question: With regards to those individuals that are smokers, as long as they're a smoker, does that



increase their chances for a cardiac arrest?
A. Yes.
Q. Okay. And why is that?
A. Okay. So the problem with smoking and heart disease generally, including cardiac arrest among that, is that it is clearly established that smoking is a risk factor for cardiac events.
Q. Okay.
A. The thing about smoking, cardiac consequences of smoking as opposed to a pulmonary such as COPD or lung cancer, is that the cardiac risk disappears or is markedly reduced when you stop smoking.
Q. Okay.
A. So it's not a permanent risk in ex-smokers from the cardiac point of view. For pulmonary issues it is a risk.
Q. Okay. And so, sir, with regards to a patient suffering from COPD, you say you follow those patients in a limited standpoint from a cardiac standpoint; is that correct?
A. Correct, if they've had a cardiac event, yes.
Q. Do you recommend that those patients continue smoking or stop smoking?



A. I recommend that all patients stop smoking.
Q. Thank you, sir. So were you aware that Ms. Noon in this case was a smoker?
A. Yes.
Q. Okay. And do you agree that her risk for a cardiac event was increased because she was a smoker and suffered from COPD?
A. Okay. So what I don't recall from the record is whether she was an ex-smoker or current smoker at the time of this event. If she was still smoking then, yes, it would have increased her risk for these events. If she was an ex-smoker then primarily the cardiac events would have ameliorated or decreased or maybe even disappeared.
But one of the causes of cardiac arrest is COPD and particularly when it's unstable. And so it could have been associated with a risk for a cardiac arrest, even though the direct cardiac affects were on their way.
Q. Now, sir, it's my understanding that there's been testimony from a member of the Noon family that Ms. Noon was continuing to smoke. I believe it was a half pack a day, I think she might have had ten cigarettes on the cruise itself.



A. Yes.
Q. If that were true that she was smoking a half pack a day and she was still continuing to smoke, would that increase her risk for a cardiac event or a cardiac event just based on those issues?
MR. GERSON: Form.
THE WITNESS: Okay. So that's a complicated question. If she had underlying heart disease, which placed her at risk for cardiac arrest and she was smoking then her cardiac arrest risk would have been higher than it would have been if she was no longer smoking.
BY MR. KOONCE, III:
Q. Okay.
A. So that's correct. The records do reflect that she did not have any underlying heart disease. So the only thing that would have created her risk for cardiac arrest is destabilization of her underlying lung problems.
Q. Now, sir, you would agree with me that smoking and COPD are a bad mixture in terms for the patient?
A. Yes.

Q. Okay. So therefore that if someone is continuing to smoke with COPD it can almost cause their -- they have a decreased oxygen supply to their entire body?
**A. Well, that's a bit of a stretch. You have to put it in the context of her specific clinical state.**
Q. Sure and please.
**A. So from the materials that I have looked at in this case, which include the Jackson records, the deposition of her husband and summaries of the depositions of her two daughters. It seems clear to me that, yes, she did have COPD chronically, that most of the time she was clinically stable. Where she became unstable is when she had a superimposed problem on her lung disease, such as what I refer to in the report as acute on chronic.**
**So if she gets a viral infection or if she gets influenza, then she would be at greater risk of all the complications of her pulmonary status. And once that passed, she was reasonably stable. It sounds from the record that she was not terrible symptomatic even though she did have that disease.**



**That being the case, and in the absence of any identified structural heart disease, I would not place her at a high risk of cardiac arrest except if she became low on oxygen because of an acute change in her situation, such as what appears to have been a viral infection when she was on the ship.**
Q. Now, sir, would you agree with me that smoking does reduce your ability, the body's capacity to take in oxygen?
**A. The consequences of smoking, yes.**
Q. The consequences. Thank you, sir. And, sir, I forgot to ask a couple questions. Let me back up, sir, just to be sure.
Is it -- have you ever worked as an emergency room physician, sir?
**A. I consulted in the emergency room for many years.**
Q. Okay.
**A. In fact, I occasionally still come down there for opinions, but --**
Q. I didn't see in your CV, but I have to ask the question. Have you ever served as a cruise line physician?
**A. No.**



Q. Okay. Have you ever been to a cruise line medical center before?
**A. No.**
Q. Okay. Thank you. Have you been on a cruise out of curiosity?
**A. Well, my wife and I do is go on small boat trips, not big cruise lines.**
Q. I want to make sure, have you ever been on the Carnival SENSATION before?
**A. Never been.**
Q. Have to ask the question just to make sure, sir.
Now, do you have a current copy of your CV with you?
**A. I sent it to your office.**
Q. Okay. So that's your most current copy?
We'll mark that as Exhibit Number 1 to the deposition.
I'll send you a copy of that. Okay?
**(Defendant's Exhibit No. 1, CV, was marked for identification.)**
**BY MR. KOONCE, III:**
Q. Now, sir, the nature of your appointment, I assume it's professor of medicine at



the University of Miami?
**A. (Nods head.)**
Q. You have to say "yes."
**A. I'm sorry?**
Q. You have to say "yes." You nodded your head. You have to say "yes."
**A. No. What was the question?**
Q. You're a current professor of medicine at the University of Miami?
**A. Yes.**
Q. Okay. Is there limitations on that appointment as a professor, sir? Is it emeritus? Is there anything --
**A. No, no, no, no. I'm still full time, considered full-time faculty and that's it.**
Q. Okay. And, sir, where do you currently hold privileges?
**A. So I have privileges at the three things that we talked about before. I still have privileges at Jackson. I have privileges at UMH, University of Miami Hospital, and outpatient privileges at Lennar.**
Q. Okay. Are there any other hospitals you hold privileges at in the UM/Jackson system?
**A. No.**

Q. Okay. Thank you. And do you hold privileges at any other hospitals?
**A. No.**
Q. Okay. With regards to the three institutions we have discussed, what are you privileged to do, sir?
**A. Well, my privilege is to cover all aspects of cardiology. So if I wanted to do ward attending or inpatient consults, I could do that. I'm covered for all of that. So Lennar is strictly outpatient.**
Q. Okay.
**A. And UMH and Jackson are outpatient and inpatient. What else? Oh, EKGs and ambulatory heart rhythm monitors, Holter monitors, I do those weekly.**
Q. Okay. And, sir, you don't do cardiac surgery; is that correct?
**A. No.**
Q. You've never done cardiac surgery, correct?
**A. No.**
Q. Okay. Angiogram, cardiac catheterizations?
**A. In the very early years of my career,**



**yes, I did angiograms when that was in physics, I did electrophysiologic studies, but no longer.**
Q. Okay. Thank you, sir. And, sir, I may have the answer to this question, I just want to make sure I'm clear. With regards to your practice, how many hours a week do you spend practicing medicine?
**A. Well, the clinics -- so let's say three clinics a week on average, and they are four to five hours each. And then the rest of the time is things like reading EKGs and Holter monitors. The consults I'm asked to comment on, things like that.**
**So I mean, as far as actual work hours, I'm right at 40 in terms of additional work done at home, unless you bring in my wife, that's more than that.**
Q. And so, sir, with regards to your practice, I want to make sure I'm clear, is the majority of your practice an office-based practice, sir?
**A. Yes.**
Q. Okay. And the question I need to ask, and I know that the Jackson records are voluminous, but did you ever treat Ms. Noon?



**A. No.**
Q. When we were consulting regarding her care while she was an inpatient here?
**A. No.**
Q. Okay. It's a question I had to ask because I don't know what might pop up on the records and see you consulted. So I just need to make sure we're clear on that. Okay.
And so with that majority of your practice being office based, would you say that 100 percent of your practice is office based now, sir?
**A. No, but close to it.**
Q. So 95?
**A. I mean, so on average about one full day a week on Holter monitors and EKG.**
Q. Okay. Is that reading them, sir?
**A. Reading them, yeah. That's basically it. That plus the clinics, yeah.**
Q. Okay.
**A. And whatever comes up they run by me.**
Q. And the consults they run by you are informal in nature; is that correct?
**A. Yes.**
Q. And, sir, with regards to medical



licenses, you only have one active medical license, I think it's Florida?
**A. Correct.**
Q. Do you have any other inactive licenses?
**A. I don't know what the definition of inactive is, but in the past I have been licensed in New York, Louisiana. I didn't require licensing in Georgia when I was training there. And Maryland of course where it all began.**
Q. Okay. And, sir, have you ever had any strikes or problems with any of your licenses?
**A. No.**
Q. Sir, have you been sued for malpractice before?
**A. I had been included in a couple of cases that the university was named in. But I don't believe I've ever been the subject of a suit.**
Q. Have you ever been deposed in a medical malpractice case where your care was questioned?
**A. Well, I have been -- yes, one case that I don't know, ten or 15 years ago where the university was named in the case and the treating physicians were all deposed.**

Q. Okay. Any other cases, sir?
A. **Any what?**
Q. Any other cases you were involved?
A. **No, I mean as treating physician, yes.**
Q. But no where you've actually been named in and your care was the one under question?
A. **No, I don't believe so.**
Q. Okay. Now, sir, with regards to your file, what I have -- you were kind of giving me a flash drive, which contained some documents on it. And what I have on that flash drive is the fire rescue reports and it has what's called JAM Dropbox records, which appear to contain the entire chart for Ms. Noon. It's about 1,039 pages of records.
A. **Correct.**
Q. Now, that's what you've given me and we're going to mark this as Exhibit Number 2 to our deposition today.
**(Defendant's Exhibit No. 2, Flash Drive, was marked for identification.)**
**THE WITNESS: Didn't I give you also the police report?**
**BY MR. KOONCE, III:**
Q. I'm coming to that in a second.
A. **Oh, okay.**



Q. I just want to kind of divide up what you've given me in the flash drive. And I believe there's some additional things you reviewed since then.
A. **Yes.**
Q. So what have you reviewed since then and are -- do you have a list of those or are -- you're reading something there?
A. **Okay. So this is my original report. I've added a few things to it. So I have reviewed the Miami-Dade police report, fire rescue report, the mention of the Jackson records for July 8th and 9th, 2017, depositions of David Orwick and Julio Puentes, deposition of Mr. Noon and a summary of the recent depositions of the two daughters.**
Q. Okay. And summaries of the depositions, I'm assuming those were provided by Mr. Gerson's office.
A. **Yes, because the transcripts weren't available.**
Q. Do you have those summaries?
A. **Yeah, they're in this material.**
Q. May I see that material, sir?
MR. GERSON: Are you -- is there any kind of privilege or anything?



**MR. KOONCE, III: No. Thank you. I'll give this right back to you, sir.**
**BY MR. KOONCE, III:**
Q. So we're going to mark these items as Exhibit Number 3.
**(Defendant's Exhibit No. 3, Document, was marked for identification.)**
**BY MR. KOONCE, III:**
Q. And it contains your report. It contains -- I assume an excerpt of the Jackson record.
A. **Yeah.**
Q. I see the police reports and then you also have reports of other experts. Let me just put this down over here.
And these records are double-sided; is that correct, sir?
A. **Yes.**
Q. Okay. I just want to make sure there's a notion so when we copy it. Can we get this copied at some point in time?
A. **Sure, as long as I get it back.**
Q. Oh, yes, sure. No problem.
MR. KOONCE, III: Just a note for the



record, these records are double-sided so make sure the front and back gets copied when the exhibit gets made.
**BY MR. KOONCE, III:**
Q. We have a deposition of Mr. Orwick, the one of Randall Noon. You have the report of Ms. Butterfield.
Have you read a summary of her deposition or her deposition at all?
A. **No.**
Q. Okay. You have the report of Dr. Hyzy (phonetic)?
A. **Correct.**
Q. You reviewed that also, sir?
A. **I read that, yeah.**
Q. Okay. And then finally we have an e-mail from Mr. Gerson -- well, two e-mails from Mr. Gerson. One dated July 23rd, 2019; one dated July 25th, 2019. And it seemed to be a summary of the depositions of Melissa Leonard Noon and Juanita Noon from a David El Marble (phonetic) who sent out the summaries.
**MR. GERSON: Is that a question? Are you just identifying what's there?**
**MR. KOONCE, III: Identifying for the**

record.
BY MR. KOONCE, III:
Q. And you've reviewed these summaries, correct?
A. Yes.
Q. I'm going to hand this back to you now.
Have you reviewed Ms. Noon's records from her prior treatment, sir?
A. No, I have not been provide that.
Q. Did you request those records, sir?
A. Yes.
Q. And do you know why you were not provided those records?
A. The attorney didn't have them.
Q. Okay. And I believe that she was treated at Sparrow Medical Center somewhere in Michigan?
A. Yeah.
Q. Would those records have been helpful to see what her prior cardiac concerns may have been or what the treatment she received for her COPD?
A. I would have liked to have seen them, but I got a pretty good picture from the



combination of the depo of her husband and the reports of the depos of her two daughters as to what her overall clinical status was.
Q. So -- just so I'm clear, sir, you have not reviewed any medical records pertaining to Ms. Noon other than those that after her cardiac arrest?
A. That's correct.
Q. Okay. So you have no idea as to what her medical condition was prior to her cardiac arrest and her admission to Jackson?
MR. GERSON: Object to the form.
THE WITNESS: Well, I do have an idea based on the deposition of her husband and the summaries of the deposition of the two daughters. What I don't have is medical record confirmation of that.
BY MR. KOONCE, III:
Q. Okay. Let me rephrase my question so I'm clear.
What you have are what her daughters and husband have testified to as to Ms. Noon's condition, you don't have the actual statements and record of her physicians and other care providers?
A. With one additional point, and that is



the Jackson records contained references to her prior medical status to a limited extent. And so that also contributed to my perception of this.
Q. But you don't have the actual detailed records from her prior care providers up in Sparrow Medical Center where she was treated?
A. That's correct.
Q. Thank you, sir. And, sir, you don't have the Carnival Cruise Line records; is that correct?
MR. GERSON: Object to the form. Are their Carnival Cruise Line medical records?
MR. KOONCE, III: Well, not -- let me rephrase.
BY MR. KOONCE, III:
Q. I said records, not medical records. The records from the notations of the nurses, sir?
A. Yeah.
MR. GERSON: I've seen those and I think he does have those.
MR. KOONCE, III: I did not mean to insinuate there were medical records.
MR. GERSON: Okay.
BY MR. KOONCE, III:
Q. It was the notations regarding the



nurse.
A. Yes, I've seen this.
Q. Okay. You've seen that particular chart, sir?
A. Yes.
Q. Thank you, sir. It wasn't within your stat. I didn't see it --
A. It would have been neglected to put it there, but I have seen them.
Q. Okay. And you have not reviewed the deposition that was taken of Nurse Ursua who made these records?
A. That's correct.
Q. It's U-R-S-U-A. Thank you.
Now, sir, have you seen the complaint in this matter?
A. The what?
Q. The complaint?
A. Don't recall if I've seen that or not. I usually get those.
Q. Okay.
A. If it's not on here and it's not in here then I haven't seen it.
Q. Thank you, sir. Because I did not see it on the flash drive either, it could have been on

there.

And, sir, with regards to the records, have you seen the BODYCAM video from the police officer?

A. No.

Q. Okay. Have you seen any policies from Carnival regarding the delivery of gas or the production of concentrators like that?

A. No.

Q. Okay. So have you described what you've reviewed, all of what you reviewed?

A. Yes.

Q. Okay. Now, when were you first contacted regarding this case, sir?

THE WITNESS: You remember? I don't remember precisely. It was not -- oh, yes, I do.

MR. GERSON: Quite awhile ago. It was last year, actually.

THE WITNESS: No, I think you originally contacted me in July of 2018, but I didn't have any records at that point in time and things sort of drifted and just sat there. And then I was recontacted probably within in the last two months or so something to that. Is that right?



MR. GERSON: No, it would have been in probably March.

THE WITNESS: Oh, so something like March.

MR. GERSON: February or March.

BY MR. KOONCE, III:

Q. Now, I'm assuming you were contacted by Mr. Gerson who is sitting to my right?

A. Yes, and/or his assistant.

Q. Okay. And do you know, I assume you talked with Mr. Gerson regarding the case --

A. Yes.

Q. -- and you agreed to sign onto the case?

A. Yes.

Q. What did Mr. Gerson ask you to do in terms of reviewing this case?

A. To review the records, to review with specific emphasis on the circumstances of the events that occurred and give my opinions on causation.

Q. Okay. And, sir, you are limited to a causation expert only; is that correct?

MR. GERSON: Object to the form. That's a legal question, not a medical



question for the witness.

THE WITNESS: There has been some discussion about responsibility, which I guess goes beyond causation. I'm not sure. But predominantly it was about causation.

BY MR. KOONCE, III:

Q. Okay. And we will get into your opinions in a few minutes. I just wanted to -- now, sir, I know it was not your report, but do you have any opinions regarding the life expectancy of Ms. Noon?

A. Yes, I do.

Q. Okay.

A. So and that's involved a bit as I've gotten more information.

Q. Okay.

A. So the perception that I have from the combination of the Jackson records and the deposition of her husband and the two summaries of depositions of her daughters, is that my initial perception was that I wasn't entirely clear about the baseline severity of her COPD.

Q. Okay.

A. Meaning that, you know, what was her status when she was just in her chronic stable



state. What has become clear from the material I've reviewed more recently is that she was virtually asymptomatic from her COPD except when she got superimposed problem, something I refer to as acute on chronic pulmonary problems in my report.

And that was with reference to an episode of pneumonia or a viral infection of some type in the past where she required supplemental oxygen at home for a period of time. And once that cleared she went back to her baseline of functioning perfectly normally. I get the same perception of what happened on the last few days on the ship when she deteriorated but responded to oxygen.

So when I put all that together, I think that her life expectancy was longer than I had initially -- put it this way, I shouldn't say initially thought, but I was uncertain of initially. So in terms of actually putting a number to it, that's very hard to do. I think one thing is in a positive sense for her life expectancy is that her workup after the cardiac arrest when she was in Jackson did not reveal any underlying heart disease.

So pre -- heart disease predisposing to an early death is a -- the absence of heart disease predisposing to an early death was well handled in her Jackson workup. So that's not on the table as far life limiting.

There was no history to my knowledge of cancer or anything like that. And so it all comes back you get down to chronic stable COPD, which gets worse when she has a superimposed problem, which responds to oxygen.

All that said, putting a number on this, the average life expectancy for a woman at her age would be to live on average to the early 80s for the overall population. As you get older the number of added years decreases, but the age gets a little longer. But at that point in time I would give her a life expectancy approximating late 70s, early 80s, so roughly 25 years I guess.

Q. So you would -- just let me back up a little bit, sir.

A. Yeah.

Q. You were offering a life expectancy opinion of approximately an additional 25 years?

A. Yeah. She was in her early mid 50s, right?



Q. Yes.

A. Yeah, take her up to around 80.

Q. Okay. But now, sir, you are offering this opinion without reviewing any of her prior medical records?

A. That's correct.

Q. Okay.

A. I don't have her prior medical records.

Q. Okay. And, sir, you're also -- well, let me ask the questions this way.

Would you agree with me, sir, that smoking is a life-limiting activity?

A. It decreases life expectancy, yes.

Q. Okay. And it can prevent you from living a normal life expectancy, correct?

A. Yes.

Q. And why is that, sir?

A. That's statistically. Again, because of lung disease, lung cancer and cardiovascular risk if she's still an active smoker.

Q. Now, sir, what do you base your opinion regarding life expectancy on specifically?

A. So the overall life expectancy is based on the Life Tables, the United States Life



Tables, which I think come from Medicare or Social Security, which gives you age and gender-related added years of life expectancy for individuals, pick an age and they'll give you the number. So that's where the general number comes.

Now, the specific number that applies to a person who has minimally symptomatic COPD or asymptomatic COPD versus in the absence of heart disease is -- that would be somewhat reduced. But the number of years from a statistical point of view, the reduction is relatively small. So it may be a year or two difference on average. And I put a good deal of weight on the question of her lack of symptomology from her COPD and the incidents of cancer in the general population.

Q. Now, sir, are there any specific study, text or journal article that you're using to support your opinions here today?

MR. GERSON: Objection. Asked and answered.

THE WITNESS: Not specifically. I rely on the Life Tables for the general opinion.

BY MR. KOONCE, III:

Q. Okay.



A. And then for the specific opinion for her, I would reduce that by a couple years based on knowledge and experience and how you translate population risk and individual risk.

Q. And, sir, have you been accepted as a life expectancy expert in a court of law, previously?

A. I have testified on life expectancy in various cases that I've been involved in. Is that your question?

Q. Yes.

A. Yes.

Q. But has it been accepted by a court of law when you testified to it in court at trial?

MR. GERSON: Well, if he's testified I guess it was accepted, don't you think?

MR. KOONCE, III: Well, I'm asking --

THE WITNESS: I'm trying to think. There was an incident in --

MR. GERSON: Delaware.

BY MR. KOONCE, III:

Q. I believe that your opinion was limited in Delaware based on the methodology at some point in time.

A. Do you have the name of the case?

**Because obviously you read it.**
Q. Hang on one second.
A. **Give me the case and I'll tell you what the problem was.**
Q. Well, there was Betal versus Kazer (phonetic) case. That's a different issue.
A. **Yeah, that's a different issue.**
Q. One second here. Obviously, I read it. Let me find it. I'm skipping ahead --
A. **It was basically a technical issue with the judge.**
Q. The Pruett versus Louis case in Delaware. Pruett P-R-U-E-T-T versus Louis --
A. **I'd have to go back and look, but I know you're right. There was an incident in which I could not provide -- actually there were two things. There was a thing up in Maine as well.**
Q. There's another Delaware case, Johnson versus Ports. Do you recall those two cases where your opinion was limited?
A. **There was one case in Maine where the judge would not let me rely on statistics, but he would let me rely on my background experience and knowledge. So I got the testimony in anyway.**
Q. Sir --



A. **The other one was some kind of a technical issue in this other case and I don't remember what it was.**
Q. So with regards to your --
A. **But as far as life expectancy, I don't recall ever being denied an opportunity to express my opinion on life expectancy.**
Q. Now, sir, with regards to your opinion on life expectancy, can you give me a specific methodology that you're using to arrive at an additional 25 years for Ms. Noon?
A. **Yeah. So for the additional 25 years, and I did not look at the tables specifically in preparation for today, but I've looked at those tables a number of times for individual cases and this is the range of added years of life expectancy for a 54-year-old woman in the United States.**
Q. Okay.
A. **So that's where the general number comes from. The specific number comes from experience and knowledge about the reduction in life expectancy for a population of patients and individuals who have COPD.**
Q. Okay. Now sir, with regards to the methodology you're using for the term "life



expectancy" is there a formula, is there some kind of a text that you're relying on, sir?
A. **Well, I would refer you to the tables.**
Q. Okay.
A. **So if you look at the -- and I don't remember if it's Social Security or Medicare. I think it's Social Security tables, they're easily accessible on the Internet. They would give you everything I'm telling you. They will give you the -- by gender and age, what the added years of life expectancy are for the general population in the United States.**
Q. Now, sir, it's my understanding that you are a trained cardiologist and electrophysiologist; is that correct, sir?
A. **Correct.**
Q. What, in your training and your experience, in your opinion, allows you to express opinions on life expectancy of COPD patients?
A. **So in addition to what we've talked about in terms of my activities, a lot of my research is based on -- is focused on epidemiology. And epidemiology is the science that gets into evaluation of statistical risks and things like that. So I have a good deal of background**



**experience and publications on that topic. Specific -- hang on a second.**
Q. No problem.
A. **Excuse me for a second. Can we go off?**
Q. Sure. No problem.
(Thereupon, a discussion was had off the record.)
THE WITNESS: Where were we? Okay.
**BY MR. KOONCE, III:**
Q. The last question was about --
A. **Epidemiology.**
Q. Yes, epidemiology, sir, yes.
A. **So in terms of you were asking COPD and I can't be specific about that, but for medical conditions generally there are data out there which basically say what the -- based on the incidents of the disorders what the life expectancy would be, how it would be modulated.**
Q. Have you, yourself, conducted any original research or been part of research projects, which examined the life expectancy of COPD patients?
A. **Only in so far as it relates to cardiac arrest, and I'm sure we'll get to that**

**later on. But not if you're talking about COPD as an isolated diagnosis not knowing where we could be involved in that, no, I haven't done any independent research.**

Q. Okay. And, sir, are the cases or the studies or journal articles you were involved in with COPD patients and cardiac risks and life expectancy, are those included in your CV, sir?

**A. Yes.**

Q. Okay. We'll come to that in a second.

Now, sir, just briefly about your prior testimony, when did you first start reviewing cases, sir?

**A. I don't know, maybe in the 1980s, very limited at that time.**

Q. How many cases, sir, have you reviewed since the 1980s?

**A. I don't know.**

Q. Okay.

**A. I would say that I get maybe ten or 12 calls a year, maybe half of them proceed to sending records and reviewing records and some percentage of them end up in either depositions or trial appearances.**

Q. Okay. And, sir, with regards to your



review of cases, what percentage are plaintiff, what percentage are defendant?

**A. So for the calls that I get about 75 percent are defense and about 25 percent are plaintiff.**

Q. Okay.

**A. For the ones that go -- actually go forward, there's problems and some conflicts and that is a lot of the calls that I get from plaintiff's attorneys relate to people who had previously trained here. And so I, you know, feel there's a potential conflict there. But what I will do is if they describe the case to me and it sounds reasonable I would refer them to somebody who doesn't have a conflict as well as in those cases.**

Q. So what percentage of your depositions, like here today, people come and question you about stuff, what percentage are you on the side of a --

**A. The thing that actually go forward --**

Q. I didn't finish my question.

**A. Okay.**

**MR. GERSON: Object to the form.**

**BY MR. KOONCE, III:**



Q. What percentage are you retained by the plaintiff? What percentage are you retained by the defendant in a deposition context?

**A. Just deposition or deposition and trial?**

Q. Just depositions right now, sir.

**A. Okay. I can't separate that out from trials because I don't keep that kind of -- but I would feel pretty comfortable saying that about 90 percent of the things that actually go forward to either deposition or trial are defense cases and about 10 percent plaintiff.**

Q. Thank you, sir. Now, sir, what percentage of your time do you spend on, let's call it medical legal work where you are consulting either for the plaintiff or defense in a case?

**A. So very little of my time at work, but off time, you know, I take total professional activities work and home, probably in the order of 10 percent.**

Q. And, sir, what percentage of your income comes from expert work, sir?

**A. I don't know. I haven't separated that out. I can't give you that.**

Q. Okay. Now, sir, I know you provided



us previously with a list of your court appearances.

**A. Yes.**

Q. And is that the only list you maintain of your court appearances?

**A. Well, I was asked to provide the last ten years or so --**

Q. Okay.

**A. -- so I didn't give any before that.**

Q. Okay. Thank you, sir. And, sir, with regards to -- I know we asked the question briefly before -- can you recall any cases where your opinions have been disqualified in court?

**A. No.**

Q. And you don't recall the Pruett versus Louis case in Delaware or the Johnson versus Ports case in Delaware?

**A. It wasn't my opinion that was disqualified.**

Q. Okay.

**A. It was the judge did not feel that -- and I'm trying to recall the specifics, but relying on statistics was valid even though I could rely on background experience.**

Q. Okay.

**A. So the opinion went through, it was just how it got there.**
Q. Now, sir, with regards to your accepting cases, do you take plaintiff cases here in the state of Florida against other medical providers?
**A. Okay. So there's a problem with that. And that's another part of limitation work actually that the University of Miami does not allow full-time clinical faculty to do plaintiff cases in the five county area against other physicians.**
Q. Okay.
**A. And they discourage doing it against other academic medical centers. So I have to take those off the table. So there are cases, plaintiff cases, in north Florida that I have taken although not so much I generally tend to generalize what the university wants us to do. Out of state I'm more willing to do that or able to do that.**
Q. So a vast majority of your plaintiff cases come from out of state, sir?
**A. Yes.**
Q. So –
**A. I shouldn't say a vast majority, a majority, but I don't know the numbers.**



Q. Okay. So you've testified against other medical providers in Colorado before?
**A. Yes, there was a case in Colorado.**
Q. In Connecticut?
**A. I'm sorry?**
Q. In Connecticut? Same question.
**A. If you say so. I don't remember.**
Q. Georgia?
**A. Oh, wait a minute, there's a current case that I did a depo on. Is this what you're talking about?**
Q. Yes, sir.
**A. Do you have the name of the case?**
Q. I do not have the name of the case, no, I do not.
**A. Do you have the name of the attorney?**
Q. No, I do not, sir.
**A. Okay. But there's a case in Connecticut now that is percolating through, yes.**
Q. Have you done cases for the plaintiff in the state of Georgia, sir?
**A. One of the north Florida cases was actually a Georgia case, but it ended up in being tried or brought in Florida. I don't remember the details of that.**



Q. How about the state of Missouri, sir?
**A. Wait. There was another case in Georgia that I remember reviewing. I don't think I did a depo. I'm sorry, which --**
Q. State of Missouri you testified for the plaintiff.
**A. Don't remember.**
Q. Okay. How about the state of Washington, sir?
**A. Yes.**
Q. Okay.
**A. But that was a defense case.**
Q. Okay.
**A. There was a plaintiff case, also.**
Q. Okay.
**A. There were two cases there.**
Q. In the state of Utah, sir?
**A. Yes.**
Q. Okay. Sir, now, sir, with regards to cases you get in for review, looking at the last five years, how many cases do you get on average a month to review?
**A. Well, as I said, it's not that many that I would put it in months. I would say that I am contacted, I don't know, ten times a year, maybe**



**12 times a year.**
Q. Okay.
**A. And about half of those actually go through to some review. So that's roughly the numbers.**
Q. And so roughly the last five years, how many depositions did you give a month?
**A. I don't know. You have the list.**
Q. Okay. Is that – the list would be a consistent list?
**A. Yeah.**
Q. Okay. And it would also include your trials, correct?
**A. Yes. Yes.**
Q. Sir, have you ever been retained by Mr. Gerson before?
MR. KOONCE, III: I'm saying that correctly?
**MR. GERSON: Gerson.**
**THE WITNESS: Yes, yes.**
**BY MR. KOONCE, III:**
Q. I believe it was the Bonner (phonetic) versus Royal Caribbean case?
**A. Correct.**
Q. Have there been any other cases where

you have been retained by Mr. Gerson before as an expert?
**A. Not by him, but he was involved in another case that he --**
**MR. GERSON: You were retained by the opposing party in the other case.**
**THE WITNESS: Okay.**
**MR. GERSON: That's when I discovered what a distinguished expert you are.**
**BY MR. KOONCE, III:**
**Q.** Any other cases, sir?
**A. Beg your pardon?**
**Q.** That you've been retained by Mr. Gerson?
**A. That's probably it.**
**Q.** Okay. Sir, with regards to your fees, how much do you charge per hour?
**A. 800.**
**Q.** Is that for everything, depositions included, sir?
**A. Yes.**
**Q.** Okay. And, sir, with regards to your trial testimony fees, how much do you charge to appear at trial for testimony?
**A. Okay. So the minimum fee is $4,000**



**which covers the first five hours.**
**Q.** Okay.
**A. Anything running over that is billed at the normal rate of 800 an hour.**
**Q.** Okay. That includes the first eight hours, sir?
**A. Yes, the first five.**
**Q.** Five hours. I apologize. I couldn't quite hear you. Thank you, sir.
And, sir, with regards to your -- do you charge them a travel portal to portal from your home? I think this case is at the Dade -- Miami-Dade -- sorry, District Court, Federal Court in Dade County, correct, sir?
**MR. GERSON: That's right, downtown Miami.**
**BY MR. KOONCE, III:**
**Q.** So would you charge from your home to the courthouse any type of fees?
**A. I would include that time within the number of hours.**
**Q.** Okay.
**A. If I'm traveling out of town for an appearance then I would charge portal to portal, but I don't charge if I'm sleeping.**



**Q.** I had to ask the question.
Now, sir, how much have you billed Mr. Gerson so far in this case?
**A. Something a little over 7200.**
**Q.** Okay. So if I did 7200 divided by 800 that would be the number of hours?
**A. Roughly. But there's been a little more since then, but I haven't billed it yet.**
**Q.** Do you know how many hours you expect to bill up until the deposition today?
**A. No, I have to look it up.**
**Q.** Is it more than ten?
**A. I'm sorry?**
**Q.** Is it more than ten hours, sir?
**A. Ten additional hours?**
**Q.** Yes.
**A. Probably not, but something in that range.**
**Q.** Sir, I know we asked you to bring your billing records with you today. If you could submit those to Mr. Gerson so we have them so we have your complete billing files report now. Would you mind doing that?
**A. Yeah. Well, you have my billing records. On this case you mean?**



**Q.** Yes, the ones that you have not billed after the --
**A. Oh, oh, okay.**
**MR. GERSON: Yes, we'll provide them to you voluntarily. No question. No problem with that.**
**BY MR. KOONCE, III:**
**Q.** Okay. Sir, I'm sorry -- I forgot to ask this question. Do you have advertise your services at all as an expert?
**A. No, I don't.**
**Q.** Okay. Now, with regards to the questions, with regards to your report, sir, is this the only version of your report you have?
**A. The final -- I did drafts along the way, but I don't retain them.**
**Q.** Okay. So you don't have any other retained drafts versions of your report?
**A. No.**
**Q.** Do you know how many drafts you did?
**A. No.**
**Q.** Was it more than five drafts?
**A. No, no.**
**Q.** Okay. And how many times have you spoken to Mr. Gerson prior to the deposition

regarding the case, sir?
A. I don't know, four or five, something in that order.
Q. Okay. Did any of these conversations discuss the draft of your report and revisions regarding the same?
A. I asked him some technical question about designer report.
Q. Okay.
A. But nothing about content.
Q. Okay. So Mr. Gerson did not make any suggestions regarding content of the report?
A. No, sir, that would be inappropriate.
Q. Now, sir, with regards to your report, there's one thing that I wanted to ask you a question about before we got started. And on page 9 of the report, do you have it in front of you?
A. You shuffled all my papers now, I have --
Q. I apologize.
A. Okay. Here we go. So page --
Q. Page 9 of your report.
A. Okay.
Q. I just want to ask this question



before we get started. On page 9 of your report, you mentioned -- I'm referring to the third paragraph, the one that starts with Ms. Noon.
A. Uh-huh.
Q. As you see, Ms. Noon's intent was to go a local hospital after she left the ship and requested to keep the oxygen canister.
A. Yes.
Q. Okay. Now, you say canister there, sir?
A. Yes.
Q. Because I believe that the records indicated she had an oxygent concentrator.
A. Correct. Correct.
Q. Okay. Because those are two different things --
A. They're two different things, but from the point of view of what she required, they were basically equivalent. So the terminology is not accurate, I agree to that.
Q. Okay.
A. But it was a canister. I mean, it was a concentrator.
Q. Now, sir, with regards to an oxygen concentrator, I believe the one that was described



by the technician, that is something that is not a portable unit so to speak, it comes plugged into the wall?
A. Okay. So --
MR. GERSON: Object to the form.
THE WITNESS: I do not know for that specific variety. Oxygen concentrators have electrical requirements, but for some of them also have batteries so that if it gets disconnected for a while, it still functions for a while until you can get to another connector. I don't know if this specific one had those criteria.
BY MR. KOONCE, III:
Q. You were unfamiliar with -- you don't know what type of oxygen concentrator Ms. Noon had on the Carnival ship?
A. Correct.
Q. Okay. Thank you, sir. Okay. Now, with regards to Ms. Noon, you agree with me, sir, that she was a smoker, correct?
A. Yes.
Q. You don't dispute that?
A. Yes.
Q. And you would defer to her family



members to the amount of smoking that she did during her life?
A. Unless I see something in records that -- that is different.
Q. Okay. And so with regards to the Jackson records, in your review of the Jackson records, did they comment, to your recollection, regarding her smoking and how many packs a day she smoked?
A. I don't recall.
Q. Okay. So you don't recall any difference than a half a pack a day; is that correct?
A. Right. Correct. Yes.
Q. We also agreed that Ms. Noon had COPD; is that correct?
A. Correct.
Q. Chronic COPD?
A. Correct.
Q. And just so I'm clear, sir, how do you define -- I believe COPD stands for chronic obstructive pulmonary disease, correct?
A. Correct.
Q. How do you define that disease so that we have common knowledge where we understand?

A. It is a combination of abnormality in pulmonary structure, lung structure, that is creating obstruction to airflow often related to some degree of asthmatic component to it, but sometimes just based upon the lung disease.
Q. Okay. Thank you, sir. Now, you also agree with me, sir, that patients cannot be treated without their consent?
A. Correct.
Q. Okay. So therefore you can't seek out and force the treatment of a patient?
A. Correct.
Q. A patient has to come voluntarily and consent to treatment from a physician or a medical care provider?
A. Correct, if they're able to provide consent.
Q. Okay. Now, based on -- I know you've read summaries of the depositions, you've reviewed the deposition of Mr. Noon. You would agree with me, sir, that the Noon family did not seek out the medical care that was on the ship to have their mother cared for?
MR. GERSON: Object to the form.
THE WITNESS: They did not seek out a



medical -- an interaction with a physician. That's correct. They did seek out oxygen support.
BY MR. KOONCE, III:
Q. Okay. Sir, do you consider oxygen support to be medical care?
A. It is a portion of medical care.
Q. Okay. Now, sir, would you agree with me that they were offered a chance to see and speak to a physician?
A. Yes.
Q. Okay. And I believe that in the -- I know you said you reviewed it, I just want to make sure I'm clear here -- is that the documentation by Nurse Ursua, who we'll mark as the next exhibit, this documentation here, it ask -- invites them to bring Ms. Noon down to be examined by a physician?
A. Yes.
(Defendant's Exhibit No. 4, Document, was marked for identification.)
BY MR. KOONCE, III:
Q. Okay. And that's something that was offered to the family; is that correct?
MR. GERSON: Let me object to the form of the last two questions. The document speaks for



itself. It says what it says.
BY MR. KOONCE, III:
Q. Well, let me ask the question this way:
Sir, you don't dispute the statements of that document; is that correct?
A. Correct.
Q. And just so I'm clear, nothing in the materials you reviewed, either the deposition summary, the deposition with Mr. Noon, disputes the fact that the family was invited to bring Ms. Noon to be examined by a physician in the Carnival SENSATION's medical center?
MR. GERSON: Object to the form.
THE WITNESS: Correct.
MR. GERSON: George, I believe that that's actually in a testimony yesterday. I don't know if we summarized all of it for the witness or not, but I believe that there was a dispute about what the exchange was when the oxygen canister was given to Juanita and Randall.
MR. KOONCE, III: I was asking specifically -- asking Mr. -- the witness what his understanding of it was. That's



all I wanted.
MR. GERSON: Okay. And I'm just pointing out to you that we don't have the transcript yet and we were just trying to make your deposition today as productive as possible by providing some input to the witness about the depositions of the last two days. And when you get those transcribed, we'll provide them to him and he will have the right to correct or amend any answer based on what the testimony actually is.
BY MR. KOONCE, III:
Q. Let me ask the question this way to make it simpler. Dr. Myerburg, obviously, you'll be provided with the transcript testimony of the -- of Ms. Noon's daughter once it's transcribed.
A. Yes.
Q. Once you have a chance to review that if you have any changes to your opinions, changes to your testimony, I'm assuming you're going to let Mr. Gerson know.
A. Yes, that goes for that and any other materials that I don't have yet that comes up.
Q. And, obviously, Mr. Gerson did inform

65

me that there might be a change or alteration to those opinions.

MR. KOONCE, III: Is that correct, Mr. Gerson?

**MR. GERSON: Yes, and you still have other depositions that you're trying to schedule that have not even been scheduled yet much less taken.**

**So we will provide the witness with all the deposition testimony that's relevant once it become available and he'll -- if he changes his opinions we'll let you know.**

**We're simply trying to get within the court deadlines for the depositions and provide the witness the best information available and given that one of those was only taken yesterday we certainly have no transcript.**

**MR. KOONCE, III: I understand.**

**BY MR. KOONCE, III:**

**Q.** Okay. Now, sir, with regards to the medical center on the ship, would you dispute the fact that oxygen can be provided in that medical center?

66

**A. I'm sorry. Say that again.**

**Q.** That oxygen can be provided --

**A. Can be provided?**

**Q.** -- in the medical center?

**A. Yes.**

**Q.** Would you dispute that fact, sir?

**A. No.**

**Q.** Okay. So you would agree with me that on the ship the medical center has the ability to provide oxygen to patients?

**MR. GERSON: Object to the form. There's no foundation. How would he know what they have, what they don't have in the medical center?**

**BY MR. KOONCE, III:**

**Q.** Okay. Let me ask the question this way.

MR. GERSON: I agree with you, though, that they should.

**THE WITNESS: I'm sure they do.**

**BY MR. KOONCE, III:**

**Q.** Let's put it this way: Sir, you have not reviewed the deposition of Nurse Usura; is that correct?

**A. That's correct.**

67

**Q.** Have you requested to review that deposition?

**A. I didn't even know it was done yet.**

**Q.** Okay. So, sir, you've not been provided the deposition by counsel, Mr. Gerson, correct?

**A. I beg your pardon?**

**Q.** You've not been provided that deposition by Mr. Gerson?

**A. Right.**

**Q.** Sir, if -- if I were to present to you or to say to you that oxygen could be provided in the medical center on this ship, would have any reason to dispute that?

**A. No.**

**MR. GERSON: George, we don't disagree.**

**MR. KOONCE, III: Okay.**

**MR. GERSON: So there's no point -- I know we have limited time here because of some technical difficulties this morning. So just to help move things along, we're not claiming that it wasn't available in the medical center.**

**BY MR. KOONCE, III:**

**Q.** Okay. Now, in reviewing the

68

deposition trial -- I'm sorry -- the deposition transcript of Mr. Noon and also the summaries of the family, would you agree with me that the family could have telephoned to either the medical center or other shipboard personnel to get help for their mother while on the ship?

**MR. GERSON: Object to the form.**

**THE WITNESS: I thought they did in the sense of requesting the oxygen concentrator.**

**BY MR. KOONCE, III:**

**Q.** Okay. Now, sir, just to confirm also in my review of the medical records from Jackson Memorial Hospital, I did not see an autopsy of Ms. Noon. You have not reviewed the autopsy; is that correct?

**A. I have not reviewed any material regarding an autopsy.**

**MR. GERSON: Is there an autopsy?**

**MR. KOONCE, III: No, there's not. That's why I'm asking if he's seen it. I haven't seen it.**

**MR. GERSON: Because as far as I know there is none and if there is one I certainly want to see it.**

MR. KOONCE, III: Same for me, but I'm asking the represent witness if -- has he reviewed all thousand pages.

MR. GERSON: Oh, okay. I gather the question is: Was there an autopsy in the medical record?

THE WITNESS: To my knowledge, no.

BY MR. KOONCE, III:

**Q.** Okay. Okay. Now, with regards to the opinions you have here today, sir, I know you submitted a 12-page report and I believe that you have a certain opinions section. Can you give me a summary of what your opinions are, sir.

**A.** Sure. So I believe that Ms. Noon did have chronic obstructive pulmonary disease. I believe that it was minimally if symptomatic at all under her baseline conditions. She had had a prior history of an incident at home where she had an apparent infection and deteriorated and was given oxygen at home. And as that superimposed condition improved she went back to her baseline, which was fully functional.

There's some delusion to possibly some other incidents of a similar nature where transient oxygen was helpful, but her baseline condition was



very stable.

This applied to the ship as well. So she was initially on the ship, she was doing well. Then she developed symptoms of what sounded like an upper respiratory or viral infection, which is not uncommon when you get into a crowded environment such as on a ship.

When that happened, she became short of breath and so now we have another example of acute on chronic. At that point she got the oxygen supplementation and when she got the oxygen, she improved and her husband stated in his deposition that she actually slept well during the night and her daughter stated that when she had the oxygen she was much better.

So the issue then becomes what happens when she gets off the ship and she had to return the oxygen canister. When that happened she begins to deteriorate again and this time she deteriorates much more quickly and ends up in a cardiac arrest.

**Q.** Okay.

**A.** Now, the records of the cardiac arrest reveal that the form of cardiac arrest that she had was initially pulseless electrical activity, which means that she had electrical activity on an EKG



but no pulse or blood pressure. That's quite typical for a pulmonary cause.

The other feature of this is that pulseless electrical activity or asystole, which is another form of that, is very, very uniformly fatal except in one condition. And the one condition is people who have reversible causes. And when she gets to Jackson, they are able to intubate her, get her oxygen supply up and at that point they have a return to spontaneous circulation.

So that this goes very strongly to the fact that when you put her previous symptoms together with the superimposed problems, its response to oxygen, her deterioration after she no longer has oxygen available, goes very strongly to a reversible pulmonary cause, which should lead to survival once you restore circulation, except for the fact that she was in cardiac arrest for a sufficient length of time to cause brain damage and that was the ultimate cause of death.

It's still considered a cardiac arrest death, secondary to the transient pulmonary problem, but it is reversible. And had it not been for the brain damage, she would have survived.

That said, had she had continuous



oxygen available, more likely than not she would not have had the cardiac arrest; therefore would not have the brain damage, therefore would not have died.

**Q.** Okay.

**A.** So my opinion centers around the fact that she had a transient problem that was manageable with oxygen. And then that goes to an area that has been evolving in the last, I don't know, six, seven years or so of the concept of transfer of care.

So there is an obligation and this is for medical and nonmedical people, that when you are transferring care you have to provide or should provide the support necessary to maintain stability. And this is applied a lot in hospitals going from one type of unit to another, but it's also applied in out of hospital environments as well.

So if she had had the availability of oxygen in the transition from when she had to return the oxygen concentrator until she had either arrived at the emergency room or had fire rescue available to oxygenate her, my opinion is the cardiac arrest never would have occurred, which

73

means the brain damage would never have occurred, which means the death would have not occurred.
Q. Okay. And sir --
A. That's a brief summary of my opinion.
Q. Thank you, sir. Just kind of backing up a little bit. With regards to the transfer of care you just mentioned, you're saying that if she had oxygen while she was either getting off the ship, waiting on the ship until she get to a new source of oxygen with EMS or hospital --
A. Or EMS, yeah, EMS or hospital, yeah.
Q. EMS or hospital.
A. Yeah, yeah.
Q. Okay. So just so I'm clear from your understanding, sir, you'd agree with me that where she stopped breathing was off the ship; is that correct?
A. Correct.
Q. In the transport van?
A. Right.
Q. Okay. Or thereby. Now, do you know where this is located in relationship to the ship?
A. No.
Q. Okay. And you don't know where the taxi bench was where they tried to do the

74

resuscitation in location of the ship?
A. No, I have not seen the physical layout.
Q. Okay. Okay. Now, with regards to -- with regards to the transfer of care, you don't know if the oxygen concentrator that she was using whether it was portable and could be used off of a source of electricity?
A. No, I don't know that.
Q. Okay.
A. But it's my understanding that cruise ships have people onshore right by the ship that can arrange for appropriate transfer of patients who need immediate care.
So one scenario would have been -- I noticed that one of the employees noticed that she did not look well. So one of the -- one approach would have been to contact the people off the ship, get fire rescue there, keep her on oxygen until they arrive and then you've got a minute or two, whatever it takes to get her moved out to them. So that's what I would characterize as an efficient transfer of care.
Q. Now, sir, in a scenario is this scenario possible; could Ms. Noon have gone to the

75

medical center on the ship, received oxygen until EMS could take her off the ship?
A. If -- yes, that's a possibility.
Q. Okay.
A. The other possibility is that -- and I don't know what their policy is of people going to the medical facility when they're about to get off the ship, but the other possibility is to arrange with the shore base people to have somebody there and then move her quickly out and keep her on the oxygen concentrator since it worked so well for her, according to all the testimony.
Q. Okay. Now, is it also possible that the family could have contacted 911 before -- or strike that question.
The family could have contacted EMS or the medical arrived before they even left the ship to be ready to receive Ms. Noon?
A. It's my understanding, and correct me if I'm wrong, but you cannot call 911 from the ship. That's why they have people on -- right off the ship to deal with these transitions of transfer of care.
Q. Now, sir, from your review of the records --

76

MR. GERSON: Let me object to the form. I think he's referring to passengers, not -- the ship can call 911, but passengers can't make phone calls.
MR. KOONCE, III: You objected to his answer?
MR. GERSON: No, no, I object to the form of the question.
MR. KOONCE, III: Okay. I thought you objected to the answer, but --
BY MR. KOONCE, III:
Q. Sir, with regards to the other question I have, would it have been possible for one of the family members to contact either the medical center or guest services from the ship to arrange EMS to be available for their mother upon docking the ship?
A. Yeah, it would have been possible. The point was that the way I see it is that she had responded so well to the oxygen canister that it is entirely reasonable that they could have said, look, you know, let's just have her have oxygen until somebody is there and then move her.
Q. But again sir, you're not sure what the portability, functionality of that oxygen --

A. I don't know.
Q. -- outside of the room?
A. Correct. I don't know if it was one that had a battery backup.
Q. Okay.
A. To my knowledge most of them do, but I don't know if all of them do.
Q. Okay. Now, sir, with regards to -- well, let me ask the question this way: Do you know what was her O2 saturation prior to being on the oxygen concentrator?
A. No.
Q. Okay. Now, all -- the only information you have regarding the use of the oxygen concentrator comes from the testimony of the Noon family; is that correct, sir?
A. And the records, the Jackson records, but of course that --
Q. Is also subjective --
A. -- that was the source -- the source of that was the family.
Q. Okay. So you don't know how long -- well, strike that question.
There's no objective medical record or objective evidence of Ms. Noon's use of the oxygen



concentrator from the time that it was given to Mr. Noon and his daughter up until the time that she left the ship?
A. I agree there's no medical record. I don't agree that there's no information because the testimony of Mr. Noon itself points out that she had been using it because she had a beneficial response to it and she kept it on at night and she slept well and everything was going fine until it was removed.
Q. Let me rephrase my question to make it a little clearer.
As you said, there's no medical record by a medical care provider regarding Ms. Noon's use of the oxygen concentrator. The only evidence you have is testimony of her husband?
A. Yes. Yes.
Q. Thank you, sir.
A. And her daughter.
Q. And her daughter. I apologize. Thank you, sir. Now, do you know what time Ms. Noon actually decompensated?
A. So it was in the early morning hours. It's not clear to me precisely what time she was off the oxygen concentrator, but what I see is that



the deterioration began when she was off the oxygen concentrator fairly promptly and progressed rapidly.
Q. But you're not sure of what time -- strike that question.
A. Roughly 9:00 a.m. as I recall.
Q. There are times for the response times for the EMS, correct, on the EMS report, right?
A. Yes.
Q. There are times, the response times from the police on the police report, correct?
A. Yes.
Q. And all the times that she arrived at Jackson Hospital on those type of arrival times, correct?
A. Right.
Q. But you can't postulate as to what time she actually decompensated or began to decompensate?
A. Based on the testimony it sounds like very shortly after she no longer had oxygen available she began to deteriorate again.
When you say decompensate if you mean became unstable heading into cardiac arrest, as a further progression and of the event over time.



Q. And you're not sure what time that is exactly, sir?
A. No, it's in that time range around 9 a.m., but I'm not sure precisely.
Q. Okay. Thank you, sir. Okay. Now, I know that they were waiting for a transport van to take her to the hospital from the Port of Miami?
A. Right.
Q. Would -- were you aware of any family member that offered to take her immediately in a taxi and not wait for a shuttle van?
MR. GERSON: Object to the form.
THE WITNESS: No, I didn't see that, but I have the impression the shuttle was there immediately anyway. But that's not the major issue. The major issue here is the withdrawal of oxygen support.
BY MR. KOONCE, III:
Q. Now, sir, with regards to the duty you mentioned before, the duty to arrange the transfer of care, that's one of the key points of your opinions; is that correct, sir?
A. It's not my causation opinion.
Q. I know.
A. It is --

Q. But we'll get to that in a second. But you do mention -- you just mentioned that there was a duty to arrange this transfer of care; is that correct?

**A. Okay. So let me clarify that a little.**

Q. Okay.

**A. I think I pointed out over the last several years there's been a lot of emphasis on the concept of transfer of care and how to make it go forward properly. A lot of this has been developed on -- in hospital, but also between hospital transfers, and more and more is getting out in the community.**

**So the term duty might, from a legal point of view, might not be correct. I'm not sure about that. But the responsibility is there and it's something that's been really emphasized recently.**

Q. So, therefore, just so I'm clear, sir, on your opinion while I have the chance to talk to you, is that there was a responsibility for Carnival Cruise Lines to ensure that she was transferred appropriately to whatever level -- next level of care?



**A. I would say it would be reasonable and prudent.**

Q. Okay. And what triggered that reasonable and prudent responsibility, sir?

**A. The recognition that transfer of care is an important component of healthcare.**

Q. Okay. But I'm asking, though, what action, what activity; was it the request of the oxygen concentrator or was it the fact that she felt ill?

**A. Okay. The fact that she was getting progressively worse over the last few days of the trip that this progressive deterioration was respiratory in nature and when she got the oxygen concentrator she got better. When it was returned she began to deteriorate.**

**So at that point, continuous oxygen support is reasonable and prudent and so then you move forward from there to protect her until she can get into an environment where she can receive continuous oxygen support, which could probably go on for days and then finally whatever the superimposed infection would heal up and she would go back to her baseline.**

Q. Now, sir, with regards to the several



days of the cruise, you would agree with me during that time period, breaking down what you just said that time period, during that time period the Carnival medical staff, the front personnel, would have no idea what her condition is?

**A. Correct.**

Q. You'd also agree with me that at least on one occasion when the oxygen concentrator was requested on I believe that's 7/7/2017, that there was invitation to have Ms. Noon examined so someone could know what her condition is?

**A. Yes.**

Q. And that invitation was declined --

**A. Yes.**

Q. -- by the Noon family?

**A. Yes.**

Q. So what I'm trying to understand is where does the responsibility for Carnival originate if they don't know what her condition is?

**A. Well, that's a legal question.**

Q. Okay. So --

**A. The issue here is that the best source of information is the patient and the patient is deteriorating and you've got a medically knowledgeable family that's recognizing this. And**



**I'm quite certain, and this is an assumption I agree, but so be it, that had she not responded to the oxygen concentrator, that they would have taken her to the medical facility to get evaluated there.**

Q. That's an assumption, correct?

**A. That's an assumption, but based on the medical knowledge of the family, the fact that she did respond and this has been her pattern in the past is what I think led to the idea that as long as she's getting the oxygen she'll be okay till she can get to some place where she can get continuous oxygen.**

Q. Now, sir, with regards to the fact that this is a medically knowledgeable family, that they would have walked to the medical center had she not responded, that's what you said, correct?

**A. Correct. Now, I'm talking about knowledgeable in terms of her condition and in terms of their experience with the healthcare system.**

Q. I fully understand that, sir. But, sir, you would agree with me that there would have been -- well, strike that question.

You just said the patient is the best resource of knowledge for medical care providers?

**A. For how they're feeling.**
Q. How they're feeling, correct?
**A. Yes.**
Q. And you would agree with me that the Carnival medical staff, support services, anyone from Carnival had no idea it was cut off from that resource during the final days of the cruise?
MR. GERSON: Object to the form.
THE WITNESS: Say that again.
**BY MR. KOONCE, III:**
Q. Well, you say the patient is the best resource for how they're feeling and how they're doing, correct?
**A. Yes.**
Q. The Carnival staff, including the medical staff, support services, people that help people get off, were deprived of that resource, of the knowledge how Ms. Noon was doing in the last few days of her cruise because she did not seek out care of the medical facility?
**MR. GERSON: Object to the form.**
**THE WITNESS: The medical staff I would agree with, but there was an employee when she was checking out who noticed that she didn't look well.**



**BY MR. KOONCE, III:**
Q. Okay.
**A. And so there was somebody in the constellation of Carnival's employees who noticed that something wasn't right and this was a point in time when she was off of oxygen.**
Q. And so you're saying that at that point of noticing something wasn't right should have prompted that employee to do what?
**A. Contact about continuing -- contact somebody about continuing oxygen until she could get to an oxygen supply.**
Q. Now, sir, would you agree with me, sir, that if the Noon family had told the medical staff about needing oxygen, needing a continuous oxygen supply, it would have allowed information to spread throughout the Carnival system about what needed for this patient moving forward to getting off the ship?
**A. I'm not sure I understand the question.**
Q. Question this way: Had Ms. Noon been examined by a medical staff member --
**A. Yeah.**
Q. -- before the oxygen concentrator was



given, that would have provided more information about Ms. Noon that could have been passed onto others to help facilitate her getting off the ship in a safe manner?
**A. Actually, no, because that would have probably led to the same thing. But the real critical point was after the oxygen was removed and she began to deteriorate again, that's the point in time where you have a transition.**
Q. Okay. So now when the oxygen was removed, do you have any -- let me ask the question: Sir, are you saying on the day that the oxygen should have not been removed at all?
**A. Correct.**
Q. Okay.
**A. Until -- I think it would not have been inappropriate to remove it transiently and see how she does and if she begins to deteriorate as she did get it back and then make an arrangement.**
Q. Sir, with regards to the removal of the oxygen, what -- is there any evidence that you can point to in the depositions or in someone's deposition that you have been provided that the Noon family informed whoever moved the oxygen that Ms. Noon continued to need it?



**A. Only the interaction with the employee when they were checking out.**
Q. Okay. This -- the one that you're describing before that said that she does not feel well?
**A. Right.**
Q. Are you saying that employee took the oxygen away at that point in time?
**A. No, it was already gone.**
Q. It was already gone. So is there any evidence that you use to support that anyone told, that's from the Noon family, told anyone from Carnival that she needed the oxygen going forward to get off the ship?
**A. Not that I saw, no.**
Q. Okay. And I think you just said that the patient is best resource for what's going on with them; is that correct?
**A. Yes.**
Q. So, therefore, if Ms. Noon -- you're saying that Ms. Noon, the family didn't tell anyone that she needed the oxygen going forward, how is Carnival supposed to know what Ms. Noon needed going forward?
**A. Well, they --**

89

MR. GERSON: Object to the form. Inaccurate, factual, hypothetically. You may answer.
THE WITNESS: They may ask for taking the canister with them because she was beginning to deteriorate, but they were told that they couldn't.
BY MR. KOONCE, III:
Q. Okay.
A. But that doesn't exclude them from saying well, there is an alternative, you can sit on the ship until we get -- using the oxygen canister until we get somebody here and then you can transition as I said before.
So, yes, there is an alternative to how that could have been done.
Q. Had Ms. Noon -- well, at the time when the oxygen source was removed, that's what you're saying, and that they said they needed it, could the Noon family have telephone EMS at that point in time to meet them outside of the ship?
A. It's my understanding that they couldn't, right? I mean, the ship can't call 911 from the ship.
Q. Well, but do you know if they had cell

90

phones? They were at the dock at that point in time. Did they have cell phones?
A. I don't know.
Q. And so if they had a cell phone, could they have called 911?
A. I don't know. My understanding was until you're off the ship you couldn't -- but I don't know.
Q. Okay. But now was there anything preventing the Noon family from going to the medical center at that point in time to receive oxygen?
A. So, again, I don't know because if the ship is already docked what the policies and procedures are about using the medical facility as opposed to contacting a shore base.
Q. Is there any evidence that you're seeing in record where the Noon family attempted to go to the medical center after the oxygen canister -- or the oxygen concentrator was removed and were prevented from doing so?
A. No.
Q. Is there any evidence you're seeing, sir, where the Noon family attempted to call EMS or arranged for EMS and they were prevented from doing

91

so because of a technical difficulty or someone preventing them?
A. I don't fully get the question.
Q. Let me rephrase the question.
With regards to the calling of EMS, at the time the oxygen concentrator was no longer in Ms. Noon's possession, was the family prevented from calling EMS by some way that you can see from the evidence you have?
A. From my information as long as they're on the ship they can't call EMS.
Q. What information is saying -- telling you that, sir, that they can't call EMS?
A. They're not allowed to use cell phones.
Q. Okay. Let me ask the question this way: Once they were disembarking, which means they were at a port in a city and I'm pretty sure cell phones work at the city -- Port of Miami --
A. Yeah.
Q. -- what prevented them at that point in time from using their cell phones?
MR. GERSON: Object to the form. Move to strike counsel's factual statement.
THE WITNESS: I don't know what would

92

have prevented them, but the point was that once she was off the ship she was deteriorating very rapidly. The better way would have been to maintain what had been working until EMS was at the point of the ship and then transfer her care.
BY MR. KOONCE, III:
Q. Now, sir, you agree with me that --
A. Before the cardiac -- the prevention of the cardiac arrest is the whole story here.
Q. Now, sir, you would agree with me, sir, that Ms. Noon was continuing to smoke on the ship even though she had COPD and an exacerbation of her COPD?
A. That, I didn't see. I don't know.
Q. Okay.
A. I have no opinion on that.
Q. Now, had she continued to smoke in that condition, would that have been detrimental to her health?
A. Well, it wouldn't have helped, but the problem was if it's correct that she was chronically smoking anyway, but was clinically stable for most of the time, the more important issue was the viral infection or whatever it was

that was causing her deterioration and its response to oxygen.

Q. Now, sir, with regards to those people that are suffering from COPD and an exacerbation of it with pneumonia, smoking is not advised; is that correct, sir?

A. Well, I don't advise smoking any time.

Q. But in that particular context smoking is not advised; is that correct, sir?

A. That is correct.

Q. Okay. Why is that, sir?

A. Because it's not going to be helpful and it could be harmful. But, again, I would go back to the information that says she was smoking all the time anyway. It didn't create a problem with her clinical stability until she had a superimposed infection in which she did not have enough oxygen available, but that was reversed with the oxygen availability.

So all this goes to the opinion that more likely than not, providing the oxygen was the single most important thing about preventing the cardiac arrest which would have prevented the death.

Q. Okay. Now, sir, the information you



have about her smoking not affecting her health or her COPD comes from the daughters and the husband; is that correct?

A. Correct.

Q. You have not reviewed the medical records from --

A. As I pointed out, I have not received --

Q. I didn't finish my question, sir.

You have not reviewed the medical records regarding this issue from prior to her being on the ship?

A. That's correct.

Q. Thank you, sir. Now sir, with regards to the, I guess, responsibility or duty that you talked about there in support of that issue, is there any specific literature article, policy procedure, journal, anything specifically from a reference point that you are basing that opinion or statement on?

A. So there are -- there's a lot in literature in recent years on the concept of appropriate transfer of care. For the specific circumstance of a person with COPD who deteriorates because of a viral infection on a ship and a cruise



with oxygen supplementation, what constitutes proper transfer of care in that setting is more based on clinical experience and knowledge than on any literature because it's such a narrow area of the whole field that it's not something that would have been studied early in the game.

Q. And, sir, with regards to the clinical knowledge, I guess, what about your specific practice area, your specific period allows you to make that opinion, sir?

A. Oh, I mean, pulmonary deterioration can cause cardiac arrest.

Q. Okay.

A. A specific mechanism is highly fatal unless there's a reversible, unless there's brain damage. If a patient responds to oxygen by improvement of symptoms that's a very good sign that this therapy is working and appropriate and preventive. I am virtually 100 percent convinced that had she been on oxygen the entire time, the cardiac arrest would not have happened.

Q. I'm asking a little bit slightly different question, sir. The question I'm asking is this: What about your training, experience, research allows you to comment that there was a



responsibility, duty, it was reasonable for the Carnival personnel to continue this oxygen?

A. Well, I see at least two different questions there.

Q. Okay.

A. What is the -- what is it that allows me to say or induces me to say that this was the right thing to do and that's based on years and years of experience about the interaction of the heart, the lungs and acute infection superimposed on pulmonary problems and the beneficial affects of oxygen. So that's what allows me to say that.

Q. Okay.

A. As far as Carnival Cruise Line is concerned, that's an issue of consideration of somebody who they had provided an oxygen concentrator to -- that had an improved response when they had it and now when they maintained oxygenation if they get off the ship because they deteriorated when it was removed, that gets into an issue of what's reasonable and prudent for them to do under the circumstances of the case. There's nothing in literature or my personal experience on that, but just the nature of the problem and the circumstances of the case.

Q. Now, sir, with regards to your treatment of patients, sir, if a patient doesn't tell you something about what is going on with them, if they have started smoking again after having cardiac problems or they don't inform you about a certain thing that is going wrong with them, are you responsible if there's some kind of drug interaction, if there's some kind of death because you didn't know about something?

**MR. GERSON: Form.**

**THE WITNESS: So I'm very careful about that. Through years of experience I've learned that patients don't always tell you what you need to hear. And even though there are the best source I'm very careful about eliciting information.**

**And information subsequently in this case is the sort of thing that I would have been looking for. So I think that answers your question.**

**BY MR. KOONCE, III:**

Q. Okay. Well, I'm asking the question is: If you were not told something by a patient, you didn't know something about a patient --

**A. Okay.**



Q. -- are you assumed to have to know that because simply --

**A. Well, I assume it's my responsibility to elicit important information.**

Q. Okay. As a medical care provider, correct?

**A. Right.**

Q. And you would extend that on to the staff at Carnival that they should have known about Ms. Noon's condition?

**A. Well, no, because they never saw the information. That's not the issue. The issue is the family had wanted to keep the oxygen concentrator because she improved when she had it and deteriorated when she didn't. And so with that circumstance, it would have been prudent for them to say, okay, here's an alternative, sit here, use it, we'll call 911. They'll be right at the ship. You get right off and go to them, they'll do whatever needs to be done. If it's not a battery powered. If it is a battery powered then the ship employee could go out with them while they're waiting for 911 on the outside, wait for the arrival and then transfer care that way if it's a battery powered device.**



Q. Now, sir, you'd agree with me that no one from Carnival had any pulse oximeter readings from Ms. Noon from the time she got off the concentrator?

**A. No pulse oximeter, but the symptom pattern as described is pretty clearcut.**

Q. Let me rephrase my question, different question so the record is clear.

No one from Carnival had any knowledge regarding her oxygen saturation from the time she got the concentrator up from the time ship arrived back at the port?

**A. Her oxygen concentration, no.**

Q. Okay. No one had any pulse oximetry readings from the time period?

**A. Correct.**

Q. No one had any vital sign as per Carnival, had provided knowledge of her vital signs at all off the oxygen concentrator and on the oxygen concentrator?

**A. Correct.**

Q. So there was no medical data and no information flowing to Carnival or anyone in the employ of Carnival regarding Ms. Noon's condition either on the oxygen concentrator or off the oxygen



concentrator?

**A. Other than she got the oxygen concentrator because she was having symptoms that got better when she was on it.**

Q. Okay. And you would agree with me, sir, that no one even knew what, from Carnival, no one even knew what her symptoms were prior to getting off the concentrator because she didn't present to the medical facility?

**A. The medical staff did not know.**

**MR. GERSON: Object to the form.**

**THE WITNESS: The medical staff did not know.**

**BY MR. KOONCE, III:**

Q. Sir, with regards to the citations in your report on page 11 and 12, do any of those citations deal with life expectancy?

**A. I don't believe so. Hang on a second. No.**

Q. Okay. And, again, sir, I'm going -- I think I'm almost done. You have to leave 10:50 or so?

**A. I have to leave in about five minutes.**

Q. Okay. I am almost done here.

**MR. GERSON: I haven't asked for a**

bathroom break because I know that we're short on time now so I'm waiting.

MR. KOONCE, III: Do you need a bathroom break or --

MR. GERSON: I do, but let's just -- I don't want to eat into your time budget here --

MR. KOONCE, III: I'm almost done here.

MR. GERSON: -- given the way that we're going here. I think you're getting close.

MR. KOONCE, III: So I am.

BY MR. KOONCE, III:

Q. Sir, with regards to have I asked -- strike that question.

Do you have any other opinions I haven't asked you about, sir?

A. No.

Q. And, obviously, you have no other reports; is that correct?

A. Correct.

Q. And, sir, your life expectancy opinion is that contained in your report somewhere, I just missed it?



A. Well, I told you where you could find the life expectancy.

Q. Yes, you told me. I'm curious, was it in your report because I didn't see it.

A. Oh, no, I don't think I addressed life expectancy in the report.

Q. So you've added on during the deposition today?

A. Yeah.

Q. Okay.

A. Because you asked.

Q. I asked. One second, sir. I need to check one thing to make sure.

Just out of curiosity, sir, are you involved in any type of current research into life expectancy of COPD patients or cardiac patients?

A. Not of COPD patients. Of cardiac patients we're putting in a project that has to do with Type 2 diabetes and cardiac arrest risks, but that's future research and --

Q. And, sir, you don't know -- strike that question.

There's no evidence presented in the record to you today, sir, about whether or not there was a phone in the cabin that was working?



MR. GERSON: That was a what?

BY MR. KOONCE, III:

Q. A phone in the cabin that was working?

A. A phone?

Q. Yes, a phone.

A. I thought there was a phone onboard the ship, but not externally.

Q. Yes, no, a phone to call within the ship, sir?

A. I thought there was, but I'm not sure.

Q. Okay. I just want to make sure we're on the same page.

I don't have anything further, sir.

A. Okay.

MR. KOONCE, III: We're going to attach those three exhibits. I have nothing further, Mr. Gerson.

MR. GERSON: No questions.

MR. KOONCE, III: Thank you for your time, sir.

THE WITNESS: All right.

MR. GERSON: Dr. Myerburg, you have a right to read and sign the deposition transcript or you can waive it.

THE WITNESS: No, I'll read.



(Thereupon, the deposition concluded at 10:46 a.m. with the reading and signing having been not waived.)

CERTIFICATE OF SHORTHAND REPORTER

STATE OF FLORIDA )
) SS.
COUNTY OF DADE )

I, the undersigned authority hereby certify that the foregoing transcript, pages 1 through 104 are a true and correct transcription of the deposition of ROBERT MYERBURG, M.D., taken before me at the time and place stated in the caption hereof.

I further certify that the said witness was duly sworn according to law.

I further certify that I am not of counsel to either of the parties to said cause or otherwise interested in the event thereof.

IN WITNESS WHEREOF, I hereunto set my hand and affix my official seal of office this 26th day of July, 2019.

---------------------------------
GUERLIN KELLY BOYD, Reporter
Notary Public in and for the State of Florida
My Commission No. GG 038772
Expires: October 16, 2020

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF DADE

I, the undersigned authority, certify that ROBERT MYERBURG, M.D., personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 26th day of July, 2019.

_ _ _ _ _ _ _ _ _ _ _ _ _ _
GUERLIN KELLY BOYD
Notary Public State of Florida
My commission Expires: 10-16-20



JURAT PAGE

STATE OF FLORIDA )
)SS.
COUNTY OF DADE )

I, hereby certify that I have read the foregoing transcript pages 1 to 104 and find the same to be true and accurate.

Any corrections made by me are set forth on the errata page attached hereto.

-----------------------------
(ROBERT MYERBURG)

Sworn to and subscribed before me on this, ______ day of __________, 2019.

-----------------------------
Notary Public in and for the State of Florida at Large.
My Commission expires:



JEANNIE REPORTING
28 West Flagler Street
Suite 610
Miami, Florida 33130

TO: ROBERT MYERBURG
c/o GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145

7/26/219

IN RE: RANDALL NOON , as Personal Representative of the Estate of KAREN NOON, deceased v. CARNIVAL CORPORATION, as Panamanian Corporation d/b/a CARNIVAL CRUISE LINES
CASE NO: 8-CV-23181-WILLIAM/TORRES

Dear ROBERT MYERBURG,

With reference to the examination of YOURSELF, deponent in the above-styled cause, taken on July 26, 2019 under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting your signature.

Please arrange to conclude this matter at your earliest convenience. We would suggest that you telephone this office and arrange an appointment suitable for all concerned.

However, if this has not been taken care of by September 9, 2019 we shall conclude the reading and signing of said deposition has been waived, and shall then proceed to file the original of the said transcript with the party who took the deposition, without further notice to any parties.

Sincerely,

-----------------------------
Guerlin Kelly Boyd

cc: All Counsel of Record.

ERRATA SHEET

F.R.C.P. RULE 1.310 PROVIDES IN PART: (e)"...Any changes in form or substance that the witness wants to make shall be entered upon a separate correction page by the officer with a statement of the reasons given by the witness for making them..."

| PAGE/LINE | CHANGE/CORRECTION | REASON |
|---|---|---|

I, ________________, do hereby certify that I have read the foregoing transcript of my deposition, given on July 26, 2019, and that together with any additions or corrections made herein, it is true and correct.

______________________
ROBERT MYERBURG, M.D.

**$**

**$4,000** [1] - 53:25

**0**

**038772** [1] - 105:18

**1**

**1** [5] - 3:13, 19:18, 19:21, 105:5, 107:7
**1,039** [1] - 25:14
**1.310** [1] - 109:2
**10** [2] - 47:12, 47:20
**10-16-20** [1] - 106:19
**100** [2] - 23:11, 95:19
**104** [2] - 105:5, 107:7
**105** [1] - 3:5
**106** [1] - 3:5
**10:46** [2] - 1:15, 104:2
**10:50** [1] - 100:21
**11** [1] - 100:16
**12** [3] - 45:20, 52:1, 100:16
**12-page** [1] - 69:11
**12th** [1] - 1:18
**1395** [1] - 2:11
**14th** [1] - 2:11
**15** [1] - 24:23
**16** [1] - 105:19
**1611** [1] - 1:18
**19** [1] - 3:13
**1961** [1] - 10:12
**1980** [2] - 2:5, 108:6
**1980s** [2] - 45:14, 45:17
**1990** [1] - 5:13

**2**

**2** [4] - 3:14, 25:17, 25:19, 102:19
**2005** [1] - 5:16
**2017** [1] - 26:13
**2018** [1] - 33:20
**2019** [9] - 1:15, 28:18, 28:19, 105:12, 106:10, 107:17, 108:13, 108:18, 109:21
**2020** [1] - 105:19
**23rd** [1] - 28:18
**25** [6] - 3:14, 37:18, 37:23, 42:11, 42:12, 46:4
**25th** [1] - 28:19
**26** [3] - 1:15, 108:13, 109:21
**26th** [2] - 105:12, 106:10
**27** [1] - 3:15
**28** [1] - 108:1

**3**

**3** [3] - 3:15, 27:5, 27:6
**305** [2] - 2:6, 2:12
**32** [1] - 5:13
**33130** [1] - 108:2
**33131** [1] - 2:12
**33136** [1] - 1:18
**33145** [2] - 2:5, 108:6
**371-6000** [1] - 2:6

**4**

**4** [4] - 3:3, 3:4, 3:16, 62:19
**40** [1] - 22:15

**5**

**50s** [1] - 37:24
**54-year-old** [1] - 42:17

**6**

**610** [1] - 108:2
**62** [1] - 3:16

**7**

**7/26/219** [1] - 108:7
**7/7/2017** [1] - 83:9
**70s** [1] - 37:18
**7200** [2] - 55:4, 55:5
**75** [1] - 46:3
**789-9256** [1] - 2:12

**8**

**8-CV-23181-WILLIAM/TORRES** [2] - 1:3, 108:10
**80** [1] - 38:2
**800** [3] - 53:18, 54:4, 55:5
**80s** [2] - 37:14, 37:18
**8th** [1] - 26:12

**9**

**9** [5] - 57:17, 57:23, 58:1, 80:3, 108:18
**90** [1] - 47:9
**911** [7] - 75:14, 75:20, 76:3, 89:23, 90:5, 98:18, 98:23
**95** [1] - 23:14
**9:00** [2] - 1:15, 79:6
**9th** [1] - 26:13

**A**

**a.m** [5] - 1:15, 79:6, 80:4, 104:2
**ability** [2] - 18:9, 66:9
**able** [3] - 49:19, 61:16, 71:8
**abnormality** [1] - 61:1
**above-styled** [1] - 108:13
**absence** [3] - 18:2, 37:2, 39:8
**academic** [1] - 49:14
**accepted** [3] - 40:5, 40:13, 40:16
**accepting** [1] - 49:4
**accessible** [1] - 43:8
**according** [2] - 75:12, 105:8
**accurate** [2] - 58:20, 107:8
**action** [1] - 82:8
**active** [3] - 12:25, 24:1, 38:21
**activities** [3] - 5:25, 43:21, 47:19
**activity** [5] - 38:13, 70:24, 70:25, 71:4, 82:8
**actual** [3] - 22:14, 30:23, 31:4
**acute** [5] - 17:18, 18:5, 36:5, 70:10, 96:10
**added** [6] - 26:10, 37:15, 39:3, 42:16, 43:10, 102:7
**addition** [3] - 7:2, 9:8, 43:20
**additional** [7] - 22:15, 26:3, 30:25, 37:23, 42:11, 42:12, 55:15
**additions** [1] - 109:22
**address** [1] - 4:20
**addressed** [1] - 102:5
**admission** [1] - 30:11
**advance** [1] - 12:21
**advanced** [2] - 12:10, 12:17
**advertise** [1] - 56:9
**advise** [1] - 93:7
**advised** [3] - 93:5, 93:9, 108:13
**affecting** [1] - 94:1
**affects** [2] - 15:20, 96:11
**affirmed** [1] - 4:7
**affix** [1] - 105:12
**age** [7] - 8:17, 8:21, 37:13, 37:15, 39:2, 39:4, 43:10
**ago** [3] - 7:11, 24:23, 33:17
**agree** [26] - 15:6, 16:22, 18:8, 38:12, 58:20, 59:20, 61:7, 61:20, 62:8, 66:8, 66:18, 68:3, 73:15, 78:4, 78:5, 83:1, 83:7, 84:2, 84:22, 85:4, 85:23, 86:13, 92:8, 92:11, 99:1, 100:5
**agreed** [2] - 34:13, 60:15
**ahead** [1] - 41:9
**airflow** [1] - 61:3
**airport** [1] - 12:11
**allow** [1] - 49:9
**allowed** [2] - 86:16, 91:14
**allows** [5] - 43:18, 95:9, 95:25, 96:6, 96:12
**almost** [4] - 17:2, 100:21, 100:24, 101:8
**alteration** [1] - 65:1
**alternative** [3] - 89:11, 89:15, 98:17
**ambulatory** [1] - 21:14
**ameliorated** [1] - 15:14
**amend** [1] - 64:10
**American** [1] - 12:15
**amount** [1] - 60:1
**anesthesiology** [1] - 11:20
**angiogram** [1] - 21:23
**angiograms** [1] - 22:1
**answer** [6] - 11:3, 22:4, 64:11, 76:6, 76:10, 89:3
**answered** [1] - 39:20
**answers** [1] - 97:19
**anyway** [4] - 41:24, 80:15, 92:23, 93:15
**apologize** [3] - 54:8, 57:21, 78:20
**apparent** [1] - 69:19
**appear** [2] - 25:13, 53:24
**appearance** [1] - 54:24
**APPEARANCES** [1] - 2:1
**appearances** [3] - 45:24, 48:2, 48:5
**appeared** [1] - 106:7
**applied** [3] - 70:2, 72:16, 72:18
**applies** [1] - 39:6
**appointment** [3] - 19:25, 20:12, 108:16
**approach** [1] - 74:17
**appropriate** [3] - 74:13, 94:23, 95:18
**appropriately** [1] - 81:24
**approximating** [1] - 37:17
**area** [5] - 13:13, 49:11, 72:9, 95:4, 95:9
**areas** [2] - 10:18, 11:4
**arrange** [7] - 74:13, 75:8, 76:16, 80:20, 81:3, 108:15, 108:16
**arranged** [1] - 90:25
**arrangement** [1] - 87:19
**arrest** [30] - 11:6, 13:8, 13:15, 13:17, 13:22, 14:1, 14:5, 15:17, 15:19, 16:11, 16:12, 16:20, 18:4, 30:7, 30:11, 36:24, 44:25, 70:20, 70:22, 70:23, 71:18, 71:21, 72:2, 72:25, 79:24, 92:10, 93:23, 95:12, 95:21, 102:19
**arrests** [1] - 13:8
**arrival** [2] - 79:14, 98:24
**arrive** [2] - 42:10, 74:20
**arrived** [4] - 72:23, 75:17, 79:13, 99:11
**article** [2] - 39:17, 94:17
**articles** [1] - 45:6
**aspects** [1] - 21:8
**assign** [1] - 6:23
**assigned** [3] - 6:20, 8:1, 10:8
**assignments** [1] - 8:4
**assistant** [1] - 34:9

associated [1] - 15:18
Association [1] - 12:16
assume [5] - 9:25, 19:25, 27:11, 34:10, 98:3
assumed [1] - 98:1
assuming [3] - 26:17, 34:7, 64:21
assumption [3] - 84:1, 84:5, 84:6
asthmatic [1] - 61:4
asymptomatic [2] - 36:3, 39:8
asystole [1] - 71:4
attach [1] - 103:16
attached [1] - 107:10
attempted [2] - 90:18, 90:24
attending [2] - 10:9, 21:9
attorney [2] - 29:15, 50:16
attorneys [1] - 46:10
authority [2] - 105:4, 106:6
autopsy [5] - 68:14, 68:15, 68:18, 68:19, 69:5
availability [2] - 72:20, 93:19
available [10] - 26:20, 65:11, 65:17, 67:23, 71:15, 72:1, 72:24, 76:16, 79:22, 93:18
Avenue [2] - 1:18, 2:11
average [6] - 22:9, 23:15, 37:12, 37:13, 39:12, 51:21
awaiting [1] - 108:14
aware [2] - 15:3, 80:9
awhile [1] - 33:17

B

background [5] - 6:24, 13:23, 41:23, 43:25, 48:24
backing [1] - 73:5
backup [1] - 77:4
bad [1] - 16:23
base [3] - 38:22, 75:9, 90:16
based [18] - 8:4, 16:5, 22:20, 23:10, 23:11, 30:14, 38:25, 40:2, 40:23, 43:22, 44:17, 61:5, 61:18, 64:11, 79:20, 84:6, 95:3, 96:8
baseline [6] - 35:22, 36:11, 69:17, 69:21, 69:25, 82:24
basic [3] - 12:9, 12:16, 12:22
basing [1] - 94:19
bathroom [2] - 101:1, 101:4
batteries [1] - 59:9
battery [4] - 77:4, 98:20, 98:21, 98:25
became [4] - 17:15, 18:4, 70:8, 79:24
become [2] - 36:1, 65:11
becomes [1] - 70:16
beg [2] - 53:12, 67:7
began [6] - 24:10, 79:1, 79:18, 79:22, 82:16, 87:8
beginning [1] - 89:6
begins [2] - 70:18, 87:18
behalf [3] - 2:3, 2:9, 4:16
bench [1] - 73:25
beneficial [2] - 78:7, 96:11
best [6] - 65:16, 83:22, 84:24, 85:11, 88:17, 97:15
Betal [1] - 41:5
better [5] - 6:8, 70:15, 82:15, 92:3, 100:4
between [3] - 11:7, 13:12, 81:12
beyond [1] - 35:4
big [1] - 19:7
bill [1] - 55:10
billed [4] - 54:3, 55:2, 55:8, 56:1
billing [3] - 55:20, 55:22, 55:24
bit [5] - 17:5, 35:14, 37:20, 73:6, 95:22
blood [1] - 71:1
blue [4] - 11:23, 11:24, 12:5, 12:13
board [5] - 5:4, 5:7, 5:9, 5:12, 10:19
boat [1] - 19:7
body [1] - 17:4
body's [1] - 18:9
BODYCAM [1] - 33:3
Bonner [1] - 52:22
BOYD [2] - 105:17, 106:18
Boyd [3] - 1:22, 4:1, 108:24
brain [5] - 71:19, 71:24, 72:3, 73:1, 95:15
break [2] - 101:1, 101:4
breaking [1] - 83:2
breath [1] - 70:9
breathing [1] - 73:16
Brickell [1] - 2:11
brief [1] - 73:4
briefly [2] - 45:11, 48:11
bring [4] - 22:16, 55:19, 62:17, 63:11
brought [1] - 50:24
budget [1] - 101:6
Building [1] - 1:17
BURNETT [1] - 2:10
Burnett [1] - 4:13
butterfield [1] - 28:7
BY [44] - 3:4, 4:11, 10:5, 16:15, 19:23, 25:23, 27:3, 27:9, 28:4, 29:2, 30:18, 31:15, 31:24, 34:6, 35:6, 39:24, 40:21, 44:10, 46:25, 52:21, 53:10, 54:17, 56:7, 59:14, 62:4, 62:21, 63:2, 64:13, 65:21, 66:15, 66:21, 67:24, 68:11, 69:8, 76:11, 80:18, 85:10, 86:1, 89:8, 92:7, 97:21, 100:14, 101:14, 103:2

C

c/o [1] - 108:5
C403 [1] - 1:17
cabin [2] - 102:25, 103:3
campus [1] - 7:14
cancer [4] - 14:11, 37:7, 38:20, 39:15
canister [9] - 58:7, 58:9, 58:22, 63:21, 70:18, 76:20, 89:5, 89:13, 90:20
cannot [2] - 61:7, 75:20
capacity [1] - 18:10
caption [1] - 105:7
cardiac [58] - 5:8, 7:2, 10:1, 11:6, 13:8, 13:13, 13:15, 13:17, 13:21, 14:1, 14:5, 14:7, 14:9, 14:11, 14:16, 14:21, 14:22, 15:7, 15:14, 15:16, 15:19, 15:20, 16:4, 16:5, 16:11, 16:12, 16:20, 18:3, 21:17, 21:20, 21:23, 29:21, 30:6, 30:10, 36:23, 44:25, 45:7, 70:20, 70:22, 70:23, 71:18, 71:21, 72:2, 72:25, 79:24, 92:9, 92:10, 93:23, 95:12, 95:21, 97:5, 102:16, 102:17, 102:19
cardiologist [5] - 4:24, 10:15, 13:22, 43:14
cardiology [9] - 5:7, 5:8, 6:2, 6:23, 7:3, 7:20, 9:22, 10:24, 21:8
cardiovascular [2] - 7:3, 38:20
care [35] - 10:1, 10:2, 11:1, 11:17, 13:17, 23:3, 24:20, 25:6, 30:24, 31:5, 61:15, 61:22, 62:6, 62:7, 72:11, 72:14, 73:7, 74:5, 74:14, 74:23, 75:23, 78:14, 80:21, 81:3, 81:10, 81:25, 82:5, 84:25, 85:20, 92:6, 94:23, 95:2, 98:5, 98:24, 108:18
cared [1] - 61:23
career [1] - 21:25
careful [2] - 97:11, 97:16
Caribbean [1] - 52:23
CARNIVAL [4] - 1:8, 1:9, 108:9, 108:10
Carnival [25] - 4:14, 19:9, 31:9, 31:12, 33:7, 59:17, 63:12, 81:23, 83:4, 83:18, 85:5, 85:6, 85:15, 86:17, 88:13, 88:23, 96:2, 96:14, 98:9, 99:2, 99:9, 99:18, 99:23, 99:24, 100:6
Carnival's [1] - 86:4
case [41] - 6:16, 15:4, 17:10, 18:1, 24:20, 24:22, 24:24, 33:14, 34:11, 34:14, 34:17, 40:25, 41:3, 41:6, 41:12, 41:18, 41:21, 42:2, 46:13, 47:16, 48:16, 48:17, 50:3, 50:10, 50:13, 50:14, 50:18, 50:23, 51:2, 51:12, 51:14, 52:23, 53:4, 53:6, 54:12, 55:3, 55:25, 57:1, 96:22, 96:25, 97:18
CASE [2] - 1:3, 108:10
cases [26] - 24:17, 25:1, 25:3, 40:9, 41:19, 42:15, 45:5, 45:13, 45:16, 46:1, 46:16, 47:11, 48:12, 49:4, 49:10, 49:15, 49:16, 49:21, 50:20, 50:22, 51:16, 51:20, 51:21, 52:25, 53:11
catheterizations [1] - 21:24
causation [5] - 34:21, 34:23, 35:4, 35:5, 80:23
causes [2] - 15:16, 71:7
causing [1] - 93:1
cbenedi@gslawusa.com [1] - 2:7
cc [1] - 108:25
cell [6] - 89:25, 90:2, 90:4, 91:14, 91:18, 91:22
center [15] - 19:2, 63:13, 65:23, 65:25, 66:4, 66:9, 66:14, 67:13, 67:23, 68:4, 75:1, 76:15, 84:15, 90:11, 90:19
Center [5] - 5:23, 7:14, 12:3, 29:17, 31:6
centers [2] - 49:14, 72:6
Central [1] - 1:17
certain [3] - 69:12, 84:1, 97:6
certainly [2] - 65:18, 68:25
CERTIFICATE [4] - 3:5, 3:5, 105:1, 106:1
certification [4] - 5:10, 5:15, 10:19, 12:20
certifications [1] - 12:18
certified [4] - 5:4, 5:7, 5:18, 12:15
certify [6] - 105:5, 105:8, 105:9, 106:6, 107:6, 109:19
chance [3] - 62:9, 64:19, 81:21
chances [1] - 14:1

change [2] - 18:5, 65:1
CHANGE/ CORRECTION [1] - 109:6
changed [2] - 6:3, 6:25
changes [4] - 64:20, 65:12, 109:2
characterize [1] - 74:22
charge [6] - 53:17, 53:23, 54:11, 54:18, 54:24, 54:25
chart [2] - 25:13, 32:4
check [1] - 102:13
checking [2] - 85:24, 88:2
chronic [8] - 17:18, 35:25, 36:5, 37:8, 60:18, 60:21, 69:15, 70:10
chronically [2] - 17:14, 92:23
cigarettes [1] - 15:25
circulation [2] - 71:10, 71:17
circumstance [2] - 94:24, 98:16
circumstances [4] - 9:9, 34:19, 96:22, 96:25
citations [2] - 100:15, 100:17
city [2] - 91:18, 91:19
claiming [1] - 67:22
clarify [1] - 81:5
clear [16] - 7:13, 17:13, 22:5, 22:19, 23:8, 30:4, 30:20, 35:21, 36:1, 60:20, 62:14, 63:8, 73:14, 78:24, 81:20, 99:8
clearcut [1] - 99:6
cleared [1] - 36:11
clearer [1] - 78:12
clearly [1] - 14:6
clinic [6] - 6:23, 7:13, 7:14, 7:16, 7:19, 7:20
clinical [7] - 13:13, 17:7, 30:3, 49:10, 93:16, 95:3, 95:7
clinically [2] - 17:15, 92:23
clinics [5] - 9:10, 9:15, 22:8, 22:9, 23:19
close [2] - 23:13, 101:12
CNS [1] - 13:10
code [4] - 11:23, 11:24, 12:5, 12:13
Colorado [2] - 50:2, 50:3
combination [3] - 30:1, 35:18, 61:1
comfortable [1] - 47:9
coming [1] - 25:24
comment [3] - 22:12, 60:7, 95:25
Commission [2] - 105:18, 107:21
commission [1] - 106:19
committee [3] - 5:11, 5:14, 5:18
common [1] - 60:25
community [1] - 81:14
complaint [2] - 32:15, 32:18
complete [1] - 55:22
complicated [1] - 16:9
complications [1] - 17:21
component [2] - 61:4, 82:6
concentration [1] - 99:13
concentrator [31] - 58:13, 58:23, 58:25, 59:16, 68:10, 72:22, 74:6, 75:11, 77:11, 77:15, 78:1, 78:15, 78:25, 79:2, 82:9, 82:15, 83:8, 84:3, 86:25, 90:20, 91:6, 96:17, 98:14, 99:4, 99:11, 99:19, 99:20, 99:25, 100:1, 100:3, 100:8
concentrators [2] - 33:8, 59:7
concept [3] - 72:10, 81:10, 94:22
concerned [3] - 7:6, 96:15, 108:17
concerns [1] - 29:21
conclude [2] - 108:15, 108:18
concluded [1] - 104:1
condition [13] - 30:10, 30:23, 69:20, 69:25, 71:6, 83:5, 83:11, 83:19, 84:18, 92:19, 98:10, 99:24
conditions [2] - 44:16, 69:17
conducted [1] - 44:20
confirm [1] - 68:12
confirmation [1] - 30:17
conflict [2] - 46:12, 46:15
conflicts [1] - 46:8
Connecticut [3] - 50:4, 50:6, 50:19
connector [1] - 59:12
consent [3] - 61:8, 61:14, 61:17
consequences [3] - 14:10, 18:11, 18:12
consider [1] - 62:5
consideration [1] - 96:15
considered [2] - 20:15, 71:21
consistent [1] - 52:10
constellation [1] - 86:4
constitutes [1] - 95:1
consult [1] - 7:24
consultation [1] - 8:7
consultations [1] - 7:7
consulted [2] - 18:17, 23:7
consulting [2] - 23:2, 47:15
consults [4] - 9:22, 21:9, 22:12, 23:22
contact [4] - 74:18, 76:14, 86:10
contacted [6] - 33:14, 33:20, 34:7, 51:25, 75:14, 75:16
contacting [1] - 90:16
contain [1] - 25:13
contained [3] - 25:10, 31:1, 101:24
contains [2] - 27:10, 27:11
content [2] - 57:10, 57:12
context [3] - 17:6, 47:3, 93:8
continue [2] - 14:25, 96:2
continued [2] - 87:25, 92:18
continuing [6] - 15:23, 16:3, 17:2, 86:10, 86:11, 92:12
continuous [5] - 71:25, 82:17, 82:21, 84:11, 86:15
contributed [1] - 31:3
convenience [1] - 108:16
conversations [1] - 57:4
convinced [1] - 95:19
COPD [34] - 13:2, 13:6, 13:16, 13:19, 14:11, 14:19, 15:8, 15:17, 16:23, 17:2, 17:13, 29:23, 35:22, 36:3, 37:8, 39:7, 39:8, 39:14, 42:23, 43:19, 44:14, 44:23, 45:1, 45:7, 60:15, 60:18, 60:21, 92:13, 92:14, 93:4, 94:2, 94:24, 102:16, 102:17
copied [2] - 27:22, 28:2
copy [4] - 19:13, 19:17, 19:20, 27:21
Coral [3] - 2:5, 5:23, 108:6
CORPORATION [2] - 1:8, 108:9
Corporation [2] - 1:9, 108:10
correct [102] - 4:17, 4:18, 4:25, 5:23, 6:10, 6:21, 7:24, 8:12, 8:13, 8:17, 8:18, 8:22, 8:23, 10:2, 10:17, 11:14, 11:15, 11:17, 11:18, 11:21, 11:25, 14:21, 14:22, 16:17, 21:18, 21:21, 23:23, 24:3, 25:15, 27:18, 28:13, 29:4, 30:8, 31:7, 31:10, 32:13, 34:23, 38:6, 38:16, 43:15, 43:16, 52:13, 52:24, 54:14, 58:14, 59:18, 59:21, 60:13, 60:14, 60:16, 60:17, 60:19, 60:22, 60:23, 61:9, 61:12, 61:16, 62:2, 62:23, 63:6, 63:7, 63:15, 64:10, 65:3, 66:24, 66:25, 67:6, 68:16, 73:17, 73:18, 75:19, 77:3, 77:16, 79:8, 79:11, 79:15, 80:22, 81:4, 81:16, 83:6, 84:5, 84:16, 84:17, 85:2, 85:13, 87:14, 88:18, 92:22, 93:6, 93:9, 93:10, 94:3, 94:4, 94:13, 98:6, 99:16, 99:21, 101:21, 101:22, 105:5, 109:23
correction [1] - 109:3
corrections [2] - 107:9, 109:22
correctly [1] - 52:18
Counsel [1] - 108:25
counsel [2] - 67:5, 105:10
counsel's [1] - 91:24
counsels [1] - 8:10
COUNTY [3] - 105:3, 106:4, 107:3
County [1] - 54:14
county [1] - 49:11
couple [3] - 18:13, 24:16, 40:2
course [2] - 24:10, 77:18
COURT [1] - 1:1
court [7] - 40:6, 40:13, 40:14, 48:1, 48:5, 48:13, 65:15
Court [3] - 1:22, 54:13
courthouse [1] - 54:19
cover [3] - 6:9, 7:19, 21:7
covered [1] - 21:10
covers [1] - 54:1
CPRs [1] - 12:8
create [1] - 93:15
created [2] - 5:12, 16:19
creating [1] - 61:3
credentials [1] - 10:14
criteria [1] - 59:13
critical [4] - 10:2, 11:1, 11:17, 87:7
crosstalk [1] - 11:7
crowded [1] - 70:6
CRUISE [2] - 1:9, 108:10
cruise [10] - 15:25, 18:23, 19:1, 19:5, 19:7, 74:11, 83:1, 85:7, 85:19, 94:25
Cruise [5] - 4:15, 31:9, 31:12, 81:23, 96:14
curiosity [2] - 19:5, 102:14
curious [1] - 102:3
current [7] - 12:17, 15:10, 19:13, 19:16, 20:8, 50:9, 102:15
cut [1] - 85:6
CV [5] - 3:13, 18:22, 19:14, 19:21, 45:8

**D**

d/b/a [2] - 1:9, 108:10
DADE [3] - 105:3,

106:4, 107:3
Dade [4] - 26:11, 54:12, 54:13, 54:14
damage [5] - 71:19, 71:24, 72:3, 73:1, 95:16
data [2] - 44:16, 99:22
dated [2] - 28:18
daughter [5] - 64:17, 70:14, 78:2, 78:19, 78:20
daughters [7] - 17:12, 26:15, 30:2, 30:16, 30:21, 35:20, 94:2
David [2] - 26:13, 28:21
days [9] - 7:1, 8:2, 36:13, 64:8, 82:12, 82:22, 83:1, 85:7, 85:19
deadlines [1] - 65:15
deal [7] - 11:11, 13:16, 13:21, 39:13, 43:25, 75:22, 100:17
Dear [1] - 108:11
death [8] - 11:6, 37:2, 37:3, 71:20, 71:22, 73:2, 93:24, 97:8
deceased [1] - 1:5
deceasedv [1] - 108:9
decided [1] - 5:17
declined [1] - 83:13
decompensate [2] - 79:19, 79:23
decompensated [2] - 78:22, 79:18
decrease [1] - 9:13
decreased [5] - 6:1, 9:16, 9:19, 15:15, 17:3
decreases [2] - 37:15, 38:14
defendant [2] - 46:2, 47:3
Defendant [2] - 1:10, 2:9
DEFENDANT'S [1] - 3:11
Defendant's [8] - 3:13, 3:14, 3:15, 3:16, 19:21, 25:19, 27:6, 62:19
defense [4] - 46:4, 47:11, 47:16, 51:12
defer [1] - 59:25
defibrillators [1] - 12:9
define [2] - 60:21, 60:24
defined [1] - 11:2
definition [1] - 24:6
degree [1] - 61:4
Delaware [6] - 40:20, 40:23, 41:13, 41:18, 48:16, 48:17
delivery [1] - 33:7
delusion [1] - 69:23
denied [1] - 42:6
depo [3] - 30:1, 50:10, 51:4
deponent [1] - 108:13
depos [1] - 30:2
deposed [2] - 24:19, 24:25
DEPOSITION [2] - 1:13, 3:2
deposition [39] - 4:1, 4:14, 17:11, 19:19, 25:18, 26:14, 28:5, 28:9, 30:14, 30:15, 32:11, 35:19, 47:3, 47:4, 47:11, 55:10, 56:25, 61:20, 63:9, 63:10, 64:5, 65:10, 66:23, 67:2, 67:5, 67:9, 68:1, 70:12, 87:23, 102:8, 103:23, 104:1, 105:6, 108:19, 108:20, 109:21
Deposition [1] - 108:14
depositions [16] - 17:12, 26:13, 26:15, 26:17, 28:20, 35:20, 45:23, 46:18, 47:6, 52:7, 53:19, 61:19, 64:7, 65:6, 65:15, 87:22
deprived [1] - 85:17
describe [1] - 46:13
described [3] - 33:10, 58:25, 99:6
describing [1] - 88:4
Description [2] - 3:8, 3:12
designer [1] - 57:8
destabilization [1] - 16:20
detailed [1] - 31:4
details [1] - 50:25
deteriorate [6] - 70:19, 79:22, 82:16, 87:8, 87:18, 89:6
deteriorated [4] - 36:14, 69:19, 96:20, 98:15
deteriorates [2] - 70:19, 94:24
deteriorating [2] - 83:24, 92:3
deterioration [5] - 71:14, 79:1, 82:13, 93:1, 95:11
determined [1] - 13:15
detrimental [1] - 92:19
developed [2] - 70:4, 81:11
device [1] - 98:25
diabetes [1] - 102:19
diagnosis [1] - 45:2
died [1] - 72:4
difference [2] - 39:12, 60:12
different [8] - 41:6, 41:7, 58:15, 58:17, 60:4, 95:23, 96:3, 99:7
difficulties [1] - 67:21
difficulty [1] - 91:1
DIRECT [2] - 3:4, 4:10
direct [1] - 15:19
directly [1] - 10:6
disagree [1] - 67:17
disappeared [1] - 15:15
disappearing [1] - 9:20
disappears [1] - 14:12
disconnected [1] - 59:10
discourage [1] - 49:13
discovered [1] - 53:8
discuss [2] - 6:17, 57:5
discussed [1] - 21:5
discussion [2] - 35:3, 44:7
disease [15] - 14:5, 16:10, 16:19, 17:17, 17:25, 18:2, 36:25, 37:1, 37:3, 38:20, 39:9, 60:22, 60:24, 61:5, 69:15
diseases [1] - 13:10
disembarking [1] - 91:17
disorders [1] - 44:18
dispute [6] - 59:23, 63:5, 63:20, 65:23, 66:6, 67:14
disputes [1] - 63:10
disqualified [2] - 48:13, 48:19
distinguished [1] - 53:9
DISTRICT [2] - 1:1, 1:1
District [1] - 54:13
divide [1] - 26:1
divided [1] - 55:5
DIVISION [1] - 1:2
dock [1] - 90:1
docked [1] - 90:14
docking [1] - 76:17
Document [4] - 3:15, 3:16, 27:7, 62:19
document [2] - 62:25, 63:6
documentation [2] - 62:14, 62:16
documents [1] - 25:10
done [14] - 11:12, 11:16, 11:19, 12:10, 21:20, 22:16, 45:3, 50:20, 67:3, 89:16, 98:20, 100:21, 100:24, 101:8
double [2] - 27:17, 28:1
double-sided [2] - 27:17, 28:1
down [6] - 8:5, 18:21, 27:16, 37:8, 62:17, 83:2
downtown [1] - 54:15
Dr [2] - 28:11, 64:15
dr [1] - 103:22
draft [1] - 57:5
drafts [4] - 56:15, 56:18, 56:20, 56:22
drifted [1] - 33:22
drive [4] - 25:10, 25:11, 26:2, 32:25
Drive [2] - 3:14, 25:20
Dropbox [1] - 25:12
drug [1] - 97:8
duly [3] - 4:7, 105:8, 106:8
during [6] - 60:2, 70:13, 83:1, 83:3, 85:7, 102:7
duty [6] - 80:19, 80:20, 81:3, 81:15, 94:15, 96:1

## E

e)"...Any [1] - 109:2
e-mail [1] - 28:17
e-mails [1] - 28:17
earliest [1] - 108:16
early [8] - 21:25, 37:2, 37:3, 37:13, 37:18, 37:24, 78:23, 95:6
easily [1] - 43:7
eat [1] - 101:6
efficient [1] - 74:22
efforts [1] - 12:3
eight [2] - 6:3, 54:5
either [14] - 6:5, 12:3, 12:22, 32:25, 45:23, 47:11, 47:16, 63:9, 68:4, 72:22, 73:8, 76:14, 99:25, 105:10
EKG [2] - 23:16, 70:25
EKGs [2] - 21:14, 22:11
El [1] - 28:21
electrical [4] - 59:8, 70:24, 70:25, 71:4
electricity [1] - 74:8
electrophysiologic [1] - 22:2
electrophysiologist [1] - 43:15
electrophysiology [6] - 5:9, 7:2, 10:24, 11:5, 13:13, 13:23
elicit [1] - 98:4
eliciting [1] - 97:16
emergencies [1] - 9:23
emergency [3] - 18:16, 18:17, 72:23
emeritus [1] - 20:12
emphasis [2] - 34:19, 81:9
emphasized [1] - 81:18
employ [1] - 99:24
employee [5] - 85:23, 86:9, 88:1, 88:7, 98:22
employees [2] - 74:16, 86:4
EMS [17] - 73:10, 73:11, 73:12, 75:2, 75:16, 76:16, 79:8, 89:20, 90:24, 90:25, 91:5, 91:8, 91:11, 91:13, 92:5
end [1] - 45:23
ended [1] - 50:23
ends [1] - 70:20
ensure [1] - 81:23
entered [1] - 109:3
entire [3] - 17:4, 25:13, 95:20
entirely [2] - 35:21, 76:21
environment [2] - 70:6, 82:20
environments [1] - 72:18
epidemiology [4] - 43:22, 43:23, 44:12, 44:13
episode [1] - 36:8
equivalent [1] - 58:19

**errata** [1] - 107:10
**ERRATA** [1] - 109:1
**ESQ** [2] - 2:4, 2:10
**established** [3] - 9:10, 10:15, 14:6
**Estate** [2] - 1:5, 108:9
**estate** [1] - 4:17
**evaluated** [1] - 84:4
**evaluation** [1] - 43:24
**event** [7] - 14:23, 15:7, 15:11, 16:5, 79:25, 105:10
**events** [4] - 14:7, 15:13, 15:14, 34:20
**evidence** [8] - 77:25, 78:15, 87:21, 88:11, 90:17, 90:23, 91:9, 102:23
**evolving** [1] - 72:9
**ex** [3] - 14:16, 15:10, 15:13
**ex-smoker** [2] - 15:10, 15:13
**ex-smokers** [1] - 14:16
**exacerbation** [2] - 92:13, 93:4
**exactly** [2] - 7:25, 80:2
**exam** [1] - 5:16
**EXAMINATION** [2] - 3:4, 4:10
**examination** [1] - 108:12
**EXAMINATIONS** [1] - 3:1
**examined** [6] - 4:8, 44:22, 62:17, 63:12, 83:10, 86:23
**example** [1] - 70:9
**except** [4] - 18:4, 36:3, 71:6, 71:17
**excerpt** [1] - 27:11
**exchange** [1] - 63:20
**exclude** [1] - 89:10
**excuse** [1] - 44:4
**Exhibit** [13] - 3:8, 3:12, 3:13, 3:14, 3:15, 3:16, 19:18, 19:21, 25:17, 25:19, 27:5, 27:6, 62:19
**exhibit** [2] - 28:2, 62:15
**exhibits** [1] - 103:16
**EXHIBITS** [2] - 3:7, 3:11
**expect** [1] - 55:9
**expectancy** [29] - 35:10, 36:17, 36:23, 37:12, 37:17, 37:22, 38:14, 38:16, 38:23, 38:24, 39:3, 40:6, 40:8, 42:5, 42:7, 42:9, 42:16, 42:22, 43:1, 43:11, 43:19, 44:18, 44:22, 45:8, 100:17, 101:23, 102:2, 102:6, 102:16
**experience** [12] - 40:3, 41:23, 42:21, 43:18, 44:1, 48:24, 84:19, 95:3, 95:24, 96:9, 96:23, 97:12
**expert** [7] - 4:16, 34:23, 40:6, 47:22, 53:2, 53:9, 56:10
**experts** [1] - 27:15
**expires** [1] - 107:21
**Expires** [2] - 105:19, 106:19
**express** [2] - 42:6, 43:18
**extend** [1] - 98:8
**extent** [2] - 11:9, 31:2
**externally** [1] - 103:7
**extra** [1] - 7:21

## F

**F.R.C.P** [1] - 109:2
**facilitate** [1] - 87:3
**facilities** [1] - 12:13
**facility** [5] - 75:7, 84:4, 85:20, 90:15, 100:9
**fact** [11] - 18:20, 63:11, 65:24, 66:6, 71:12, 71:18, 72:6, 82:9, 82:11, 84:7, 84:13
**factor** [1] - 14:7
**factual** [2] - 89:2, 91:24
**faculty** [2] - 20:15, 49:10
**fairly** [1] - 79:2
**family** [27] - 15:23, 59:25, 61:21, 62:23, 63:11, 68:3, 75:14, 75:16, 76:14, 77:16, 77:21, 80:9, 83:15, 83:25, 84:7, 84:14, 86:14, 87:24, 88:12, 88:21, 89:20, 90:10, 90:18, 90:24, 91:7, 98:13
**far** [9] - 7:5, 8:9, 22:14, 37:5, 42:5, 44:24, 55:3, 68:23, 96:14
**fatal** [2] - 71:5, 95:14
**feature** [1] - 71:3
**February** [1] - 34:5
**Federal** [1] - 54:13
**fee** [1] - 53:25
**fees** [3] - 53:16, 53:23, 54:19
**fellows** [3] - 6:20, 6:22, 8:5
**fellowship** [3] - 11:13, 11:17, 11:20
**felt** [1] - 82:10
**few** [6] - 12:11, 26:10, 35:8, 36:13, 82:12, 85:19
**field** [1] - 95:5
**fields** [1] - 7:4
**file** [2] - 25:9, 108:19
**files** [1] - 55:22
**final** [2] - 56:15, 85:7
**finally** [2] - 28:16, 82:22
**fine** [1] - 78:9
**finish** [2] - 46:22, 94:9
**fire** [4] - 25:11, 26:11, 72:23, 74:19
**Firm** [1] - 4:13
**first** [6] - 4:7, 33:13, 45:12, 54:1, 54:5, 54:7
**five** [11] - 7:11, 22:10, 49:11, 51:21, 52:6, 54:1, 54:7, 54:8, 56:22, 57:2, 100:23
**Flagler** [1] - 108:1
**Flash** [2] - 3:14, 25:19
**flash** [4] - 25:10, 25:11, 26:2, 32:25
**Floor** [1] - 2:11
**FLORIDA** [4] - 1:1, 105:2, 106:3, 107:2
**Florida** [15] - 1:18, 1:22, 2:5, 2:12, 4:3, 24:2, 49:5, 49:16, 50:22, 50:24, 105:18, 106:18, 107:20, 108:2, 108:6
**flowing** [1] - 99:23
**focused** [1] - 43:22
**follow** [4] - 7:23, 13:4, 13:6, 14:19
**follows** [1] - 4:9
**force** [1] - 61:11
**foregoing** [3] - 105:5, 107:7, 109:20
**forgot** [2] - 18:13, 56:8
**form** [23] - 16:7, 30:12, 31:11, 34:24, 46:24, 59:5, 61:24, 62:24, 63:14, 66:11, 68:7, 70:23, 71:5, 76:2, 76:8, 80:12, 85:8, 85:21, 89:1, 91:23, 97:10, 100:11, 109:2
**formal** [2] - 10:3, 11:9
**formally** [3] - 6:13, 11:24, 12:2
**formula** [1] - 43:1
**forth** [1] - 107:10
**forward** [9] - 46:8, 46:21, 47:10, 81:11, 82:19, 86:18, 88:13, 88:22, 88:24
**foundation** [1] - 66:12
**four** [2] - 22:9, 57:2
**FOWLER** [1] - 2:10
**Fowler** [1] - 4:13
**Friday** [1] - 1:15
**front** [3] - 28:2, 57:17, 83:4
**full** [5] - 4:19, 20:14, 20:15, 23:15, 49:10
**full-time** [2] - 20:15, 49:10
**fully** [3] - 69:22, 84:21, 91:3
**functional** [2] - 11:10, 69:22
**functionality** [1] - 76:25
**functioning** [1] - 36:12
**functions** [1] - 59:11
**future** [2] - 13:17, 102:20

## G

**Gables** [1] - 5:23
**game** [1] - 95:6
**gas** [1] - 33:7
**gather** [1] - 69:4
**gender** [2] - 39:2, 43:10
**gender-related** [1] - 39:2
**general** [5] - 39:5, 39:15, 39:22, 42:19, 43:11
**generalize** [1] - 49:17
**generally** [4] - 5:25, 14:5, 44:16, 49:17
**genetics** [1] - 7:3
**GEORGE** [1] - 2:10
**George** [2] - 4:13, 67:16
**george** [1] - 63:16
**Georgia** [5] - 24:9, 50:8, 50:21, 50:23, 51:3
**gerson** [3] - 28:17, 34:8, 53:1
**GERSON** [54] - 2:4, 2:4, 10:4, 16:7, 26:24, 28:23, 30:12, 31:11, 31:19, 31:23, 33:17, 34:1, 34:5, 34:24, 39:19, 40:15, 40:20, 46:24, 52:19, 53:5, 53:8, 54:15, 56:4, 59:5, 61:24, 62:24, 63:14, 63:16, 64:2, 65:5, 66:11, 66:18, 67:16, 67:19, 68:7, 68:19, 68:23, 69:4, 76:1, 76:7, 80:12, 85:8, 85:21, 89:1, 91:23, 97:10, 100:11, 100:25, 101:5, 101:10, 103:1, 103:18, 103:22, 108:5
**Gerson** [16] - 28:18, 34:11, 34:16, 52:16, 52:19, 53:14, 55:3, 55:21, 56:25, 57:11, 64:22, 64:25, 65:4, 67:5, 67:9, 103:17
**gerson's** [1] - 26:18
**GG** [1] - 105:18
**given** [10] - 25:16, 26:2, 63:21, 65:17, 69:19, 78:1, 87:1, 101:10, 109:4, 109:21
**gkoonce@fowler** [1] - 2:13
**gkoonce@fowler-white.com** [1] - 2:13
**go-around** [1] - 5:12
**graduate** [1] - 10:10
**greater** [1] - 17:20
**Guerlin** [3] - 1:22, 4:1, 108:24
**GUERLIN** [2] - 105:17, 106:18
**guess** [5] - 35:4, 37:18, 40:16, 94:15, 95:8
**guest** [1] - 76:15

## H

**half** [5] - 15:24, 16:3, 45:21, 52:3, 60:12
**hand** [4] - 7:21, 29:6, 105:12, 106:9
**handled** [1] - 37:4
**hang** [3] - 41:2, 44:2,

100:18
hard [1] - 36:21
harmful [1] - 93:13
head [2] - 20:2, 20:6
heading [1] - 79:24
heal [1] - 82:23
health [2] - 92:20, 94:1
healthcare [2] - 82:6, 84:19
hear [2] - 54:9, 97:14
Heart [1] - 12:16
heart [10] - 14:5, 16:10, 16:18, 18:2, 21:15, 36:25, 37:1, 37:2, 39:8, 96:10
help [4] - 67:22, 68:5, 85:16, 87:3
helped [1] - 92:21
helpful [3] - 29:20, 69:25, 93:12
hence [1] - 5:13
hereby [3] - 105:4, 107:6, 109:19
herein [1] - 109:23
hereof [1] - 105:7
hereto [1] - 107:10
hereunto [1] - 105:11
high [1] - 18:3
higher [1] - 16:13
highly [1] - 95:14
history [2] - 37:6, 69:18
hold [3] - 20:17, 20:24, 21:1
Holter [3] - 21:15, 22:11, 23:16
home [7] - 22:16, 36:10, 47:19, 54:12, 54:18, 69:18, 69:20
hospital [9] - 7:23, 58:6, 72:18, 73:10, 73:11, 73:12, 80:7, 81:12
Hospital [8] - 1:17, 5:21, 5:22, 6:6, 7:17, 20:21, 68:14, 79:14
hospitals [3] - 20:23, 21:2, 72:16
hour [2] - 53:17, 54:4
hours [12] - 22:6, 22:10, 22:15, 54:1, 54:6, 54:8, 54:21, 55:6, 55:9, 55:14, 55:15, 78:23
husband [8] - 17:11, 30:1, 30:14, 30:22, 35:19, 70:12, 78:16, 94:2
hypothetically [1] - 89:2
Hyzy [1] - 28:11

I

ICU [1] - 10:1
idea [5] - 30:9, 30:13, 83:5, 84:9, 85:6
identification [4] - 19:22, 25:20, 27:8, 62:20
identified [2] - 4:16, 18:2
identifying [2] - 28:24, 28:25
III [65] - 2:10, 3:4, 4:11, 10:5, 16:15, 19:23, 25:23, 27:1, 27:3, 27:9, 27:25, 28:4, 28:25, 29:2, 30:18, 31:13, 31:15, 31:21, 31:24, 34:6, 35:6, 39:24, 40:17, 40:21, 44:10, 46:25, 52:17, 52:21, 53:10, 54:17, 56:7, 59:14, 62:4, 62:21, 63:2, 63:23, 64:13, 65:3, 65:20, 65:21, 66:15, 66:21, 67:18, 67:24, 68:11, 68:20, 69:1, 69:8, 76:5, 76:9, 76:11, 80:18, 85:10, 86:1, 89:8, 92:7, 97:21, 100:14, 101:3, 101:8, 101:13, 101:14, 103:2, 103:15, 103:19
ill [1] - 82:10
immediate [1] - 74:14
immediately [2] - 80:10, 80:15
important [4] - 82:6, 92:24, 93:22, 98:4
impression [1] - 80:14
improved [4] - 69:21, 70:12, 96:17, 98:14
improvement [1] - 95:17
IN [3] - 105:11, 108:8, 109:2
inaccurate [1] - 89:2
inactive [2] - 24:4, 24:7
inappropriate [2] - 57:13, 87:17
incident [3] - 40:19, 41:15, 69:18
incidents [3] - 39:14, 44:17, 69:24
include [3] - 17:10, 52:12, 54:20
included [3] - 24:16, 45:8, 53:20
includes [1] - 54:5
including [2] - 14:5, 85:15
income [1] - 47:22
increase [2] - 14:1, 16:4
increased [2] - 15:7, 15:12
independent [1] - 45:4
indicated [1] - 58:13
individual [2] - 40:4, 42:15
individuals [3] - 13:24, 39:3, 42:23
induces [1] - 96:7
infection [10] - 17:19, 18:6, 36:8, 69:19, 70:5, 82:23, 92:25, 93:17, 94:25, 96:10
influenza [1] - 17:20
inform [2] - 64:25, 97:5
informal [2] - 6:18, 23:23
informally [1] - 6:15
information [16] - 35:15, 65:16, 77:14, 78:5, 83:23, 86:16, 87:1, 91:10, 91:12, 93:14, 93:25, 97:16, 97:17, 98:4, 98:12, 99:23
informed [1] - 87:24
initial [3] - 5:11, 5:14, 35:20
initiate [1] - 12:8
inpatient [4] - 7:5, 21:9, 21:14, 23:3
input [1] - 64:6
inside [1] - 10:17
insinuate [1] - 31:22
instance [1] - 13:14
institutions [1] - 21:5
intent [1] - 58:5
interaction [4] - 62:1, 88:1, 96:9, 97:8
interest [1] - 11:4
interested [1] - 105:10
internal [1] - 5:4
internet [1] - 43:8
intubate [1] - 71:8
invitation [2] - 83:10, 83:13
invited [1] - 63:11
invites [1] - 62:16
involved [7] - 25:3, 35:14, 40:9, 45:3, 45:6, 53:3, 102:15
isolated [1] - 45:2
issue [15] - 41:6, 41:7, 41:10, 42:2, 70:16, 80:16, 83:22, 92:25, 94:11, 94:16, 96:15, 96:21, 98:12
issues [4] - 11:11, 13:16, 14:17, 16:6
items [1] - 27:4
itself [3] - 15:25, 63:1, 78:6

J

Jackson [25] - 1:17, 5:21, 6:1, 6:2, 6:9, 6:12, 7:20, 12:4, 17:10, 20:20, 21:13, 22:24, 26:12, 27:11, 30:11, 31:1, 35:18, 36:24, 37:4, 60:6, 68:13, 71:8, 77:17, 79:14
JAM [1] - 25:12
JEANNIE [1] - 108:1
Johnson [2] - 41:18, 48:16
journal [3] - 39:17, 45:6, 94:18
Juanita [2] - 28:20, 63:22
judge [3] - 41:11, 41:22, 48:21
Julio [1] - 26:13
July [9] - 1:15, 26:12, 28:18, 28:19, 33:20, 105:12, 106:10, 108:13, 109:21
JURAT [1] - 107:1

K

KAREN [2] - 1:5, 108:9
Kazer [1] - 41:5
keep [5] - 47:8, 58:7, 74:19, 75:10, 98:13
Kelly [3] - 1:22, 4:1, 108:24
KELLY [2] - 105:17, 106:18
kept [1] - 78:8
key [1] - 80:21
kidneys [1] - 13:11
kind [9] - 25:9, 26:1, 26:25, 42:1, 43:1, 47:8, 73:5, 97:7, 97:8
knowing [1] - 45:2
knowledge [14] - 37:6, 40:3, 41:24, 42:21, 60:25, 69:7, 77:6, 84:7, 84:25, 85:18, 95:3, 95:8, 99:9, 99:18
knowledgeable [3] - 83:25, 84:14, 84:18
known [1] - 98:9
Koonce [1] - 4:13
KOONCE [65] - 2:10, 3:4, 4:11, 10:5, 16:15, 19:23, 25:23, 27:1, 27:3, 27:9, 27:25, 28:4, 28:25, 29:2, 30:18, 31:13, 31:15, 31:21, 31:24, 34:6, 35:6, 39:24, 40:17, 40:21, 44:10, 46:25, 52:17, 52:21, 53:10, 54:17, 56:7, 59:14, 62:4, 62:21, 63:2, 63:23, 64:13, 65:3, 65:20, 65:21, 66:15, 66:21, 67:18, 67:24, 68:11, 68:20, 69:1, 69:8, 76:5, 76:9, 76:11, 80:18, 85:10, 86:1, 89:8, 92:7, 97:21, 100:14, 101:3, 101:8, 101:13, 101:14, 103:2, 103:15, 103:19

L

labeled [1] - 11:2
lack [2] - 6:8, 39:13
Large [2] - 4:3, 107:20
last [15] - 7:10, 12:19, 33:18, 33:24, 36:13, 44:11, 48:6, 51:20, 52:6, 62:25, 64:7, 72:9, 81:8, 82:12, 85:18
late [1] - 37:17
Law [1] - 4:13
law [3] - 40:6, 40:14, 105:8
layout [1] - 74:3
lead [1] - 71:16
learned [1] - 97:13
least [2] - 83:7, 96:3
leave [2] - 100:21,

100:23
lectures [1] - 8:4
led [2] - 84:9, 87:6
left [3] - 58:6, 75:17, 78:3
legal [4] - 34:25, 47:15, 81:15, 83:20
length [1] - 71:19
Lennar [6] - 5:23, 6:6, 7:14, 12:3, 20:22, 21:10
Leonard [1] - 28:20
less [1] - 65:8
level [2] - 81:24, 81:25
license [1] - 24:1
licensed [1] - 24:7
licenses [3] - 24:1, 24:5, 24:12
licensing [1] - 24:8
life [38] - 12:9, 12:10, 12:16, 12:17, 12:21, 12:22, 35:10, 36:17, 36:22, 37:5, 37:12, 37:17, 37:22, 38:13, 38:14, 38:16, 38:23, 38:24, 39:3, 40:6, 40:8, 42:5, 42:7, 42:9, 42:16, 42:22, 42:25, 43:11, 43:19, 44:18, 44:22, 45:7, 60:2, 100:17, 101:23, 102:2, 102:5, 102:15
Life [3] - 38:25, 39:22
life-limiting [1] - 38:13
likely [2] - 72:1, 93:21
limit [1] - 5:10
limitation [1] - 49:8
limitations [1] - 20:11
limited [10] - 5:15, 6:4, 7:6, 14:20, 31:2, 34:22, 40:23, 41:20, 45:15, 67:20
limiting [2] - 37:5, 38:13
line [2] - 18:24, 19:2
Line [4] - 4:15, 31:9, 31:12, 96:14
Lines [1] - 81:23
lines [1] - 19:7
LINES [2] - 1:9, 108:10
list [6] - 26:7, 48:1, 48:4, 52:8, 52:9, 52:10
literature [4] - 94:17, 94:22, 95:4, 96:23
live [1] - 37:13
living [1] - 38:16
local [1] - 58:6
located [1] - 73:22
location [1] - 74:1
locations [1] - 5:21
look [7] - 41:14, 42:13, 43:5, 55:11, 74:17, 76:22, 85:25
looked [2] - 17:10, 42:14
looking [2] - 51:20, 97:19
Louis [3] - 41:12, 41:13, 48:16
Louisiana [1] - 24:8
low [1] - 18:4
lung [7] - 14:11, 16:21, 17:16, 38:20, 61:2, 61:5
lungs [2] - 13:10, 96:10

## M

M.D [6] - 1:13, 3:3, 4:6, 105:6, 106:7, 109:25
mail [1] - 28:17
mails [1] - 28:17
main [3] - 5:20, 7:4, 7:14
Maine [2] - 41:17, 41:21
maintain [3] - 48:4, 72:15, 92:4
maintained [1] - 96:18
major [2] - 80:16
majority [5] - 22:20, 23:9, 49:20, 49:24, 49:25
malpractice [2] - 24:15, 24:20
manageable [1] - 72:8
management [1] - 13:19
mandatory [2] - 8:16, 8:20
manner [1] - 87:4
Marble [1] - 28:21
March [3] - 34:2, 34:4, 34:5
mark [4] - 19:18, 25:17, 27:4, 62:15
marked [4] - 19:22, 25:20, 27:7, 62:20
markedly [1] - 14:12
Maryland [1] - 24:9
material [4] - 26:22, 26:23, 36:1, 68:17
materials [3] - 17:9, 63:9, 64:24
matter [2] - 32:16, 108:15
mean [10] - 8:3, 22:14, 23:15, 25:4, 31:21, 55:25, 58:22, 79:23, 89:23, 95:11
meaning [1] - 35:24
means [4] - 70:25, 73:1, 73:2, 91:17
mechanism [1] - 95:14
Medical [2] - 29:17, 31:6
medical [66] - 10:11, 19:2, 23:25, 24:1, 24:20, 30:5, 30:10, 30:16, 31:2, 31:12, 31:16, 31:22, 34:25, 38:5, 38:8, 44:15, 47:15, 49:5, 49:14, 50:2, 61:14, 61:22, 62:1, 62:6, 62:7, 63:13, 65:23, 65:24, 66:4, 66:9, 66:14, 67:13, 67:23, 68:4, 68:13, 69:6, 72:13, 75:1, 75:7, 75:17, 76:15, 77:24, 78:4, 78:13, 78:14, 83:4, 84:4, 84:7, 84:15, 84:25, 85:5, 85:16, 85:20, 85:22, 86:14, 86:23, 90:11, 90:15, 90:19, 94:5, 94:10, 98:5, 99:22, 100:9, 100:10, 100:12
medically [2] - 83:24, 84:14
Medicare [2] - 39:1, 43:6
Medicine [1] - 4:22
medicine [5] - 5:5, 10:17, 19:25, 20:8, 22:7
meet [1] - 89:21
meeting [1] - 8:5
Melissa [1] - 28:20
member [3] - 15:22, 80:10, 86:23
members [2] - 60:1, 76:14
Memorial [3] - 1:17, 5:21, 68:14
mention [2] - 26:12, 81:2
mentioned [4] - 58:2, 73:7, 80:20, 81:2
methodology [3] - 40:23, 42:10, 42:25
MIAMI [1] - 1:2
Miami [19] - 1:18, 2:5, 2:12, 4:22, 5:22, 6:6, 7:15, 7:17, 20:1, 20:9, 20:21, 26:11, 49:9, 54:13, 54:16, 80:7, 91:19, 108:2, 108:6
Miami-Dade [2] - 26:11, 54:13
Michigan [1] - 29:18
mid [1] - 37:24
might [5] - 15:24, 23:6, 65:1, 81:15, 81:16
mind [1] - 55:23
minimally [2] - 39:7, 69:16
minimum [1] - 53:25
minute [2] - 50:9, 74:20
minutes [2] - 35:8, 100:23
missed [1] - 101:25
Missouri [2] - 51:1, 51:5
mixture [1] - 16:23
modulated [1] - 44:19
monitors [4] - 21:15, 22:11, 23:16
month [4] - 8:9, 10:9, 51:22, 52:7
months [2] - 33:24, 51:24
morning [3] - 4:12, 67:21, 78:23
most [7] - 6:5, 13:10, 17:14, 19:16, 77:6, 92:24, 93:22
mother [3] - 61:23, 68:6, 76:16
move [5] - 67:22, 75:10, 76:23, 82:19, 91:23
moved [2] - 74:21, 87:24
moving [1] - 86:18
MR [115] - 3:4, 4:11, 10:4, 10:5, 16:7, 16:15, 19:23, 25:23, 26:24, 27:1, 27:3, 27:9, 27:25, 28:4, 28:23, 28:25, 29:2, 30:12, 30:18, 31:11, 31:13, 31:15, 31:19, 31:21, 31:23, 31:24, 33:17, 34:1, 34:5, 34:6, 34:24, 35:6, 39:19, 39:24, 40:15, 40:17, 40:20, 40:21, 44:10, 46:24, 46:25, 52:17, 52:19, 52:21, 53:5, 53:8, 53:10, 54:15, 54:17, 56:4, 56:7, 59:5, 59:14, 61:24, 62:4, 62:21, 62:24, 63:2, 63:14, 63:16, 63:23, 64:2, 64:13, 65:3, 65:5, 65:20, 65:21, 66:11, 66:15, 66:18, 66:21, 67:16, 67:18, 67:19, 67:24, 68:7, 68:11, 68:19, 68:20, 68:23, 69:1, 69:4, 69:8, 76:1, 76:5, 76:7, 76:9, 76:11, 80:12, 80:18, 85:8, 85:10, 85:21, 86:1, 89:1, 89:8, 91:23, 92:7, 97:10, 97:21, 100:11, 100:14, 100:25, 101:3, 101:5, 101:8, 101:10, 101:13, 101:14, 103:1, 103:2, 103:15, 103:18, 103:19, 103:22
MYERBURG [9] - 1:13, 3:3, 4:6, 105:6, 106:7, 107:14, 108:5, 108:11, 109:25
Myerburg [4] - 4:12, 4:21, 64:15, 103:22

## N

name [6] - 4:12, 4:20, 40:25, 50:13, 50:14, 50:16
named [3] - 24:17, 24:24, 25:6
narrow [1] - 95:4
nature [7] - 9:23, 11:1, 19:24, 23:23, 69:24, 82:14, 96:24
necessary [1] - 72:15
need [9] - 7:20, 11:11, 22:23, 23:7, 74:14, 87:25, 97:14, 101:3, 102:12
needed [5] - 86:18, 88:13, 88:22, 88:23, 89:19
needing [2] - 86:15
needs [1] - 98:20
neglected [1] - 32:8
never [5] - 19:10, 21:20, 72:25, 73:1,

98:11
new [1] - 73:9
New [1] - 24:8
next [2] - 62:15, 81:24
night [3] - 9:16, 70:13, 78:8
NO [2] - 1:3, 108:10
none [1] - 68:24
NONE [1] - 3:9
nonmedical [1] - 72:13
noon [33] - 15:4, 15:23, 22:25, 25:14, 26:14, 30:6, 35:11, 42:11, 58:3, 59:16, 59:20, 60:15, 61:20, 62:17, 63:10, 63:11, 68:2, 68:15, 69:14, 74:25, 75:18, 78:2, 78:6, 78:21, 83:10, 85:18, 86:22, 87:2, 87:25, 88:20, 88:23, 92:12, 99:3
NOON [4] - 1:4, 1:5, 108:8, 108:9
Noon [17] - 4:17, 15:22, 28:6, 28:20, 28:21, 61:21, 77:16, 83:15, 86:14, 87:24, 88:12, 88:21, 89:17, 89:20, 90:10, 90:18, 90:24
noon's [10] - 4:17, 29:8, 30:22, 58:5, 64:17, 77:25, 78:14, 91:7, 98:10, 99:24
normal [2] - 38:16, 54:4
normally [1] - 36:12
north [2] - 49:16, 50:22
North [1] - 4:22
Northwest [1] - 1:18
Notary [5] - 1:22, 4:2, 105:18, 106:18, 107:20
notations [2] - 31:17, 31:25
note [1] - 27:25
nothing [4] - 57:10, 63:8, 96:23, 103:16
notice [1] - 108:20
noticed [4] - 74:16, 85:24, 86:4
noticing [1] - 86:8
notion [1] - 27:21
number [13] - 9:15, 36:21, 37:11, 37:15, 39:4, 39:5, 39:6, 39:10, 42:15, 42:19, 42:20, 54:21, 55:6
Number [3] - 19:18, 25:17, 27:5
numbers [2] - 49:25, 52:5
Nurse [3] - 32:11, 62:15, 66:23
nurse [1] - 32:1
nurses [1] - 31:17

O

O2 [1] - 77:10
OAT [1] - 3:5
oath [1] - 108:13
OATH [1] - 106:1
object [18] - 30:12, 31:11, 34:24, 46:24, 59:5, 61:24, 62:24, 63:14, 66:11, 68:7, 76:1, 76:7, 80:12, 85:8, 85:21, 89:1, 91:23, 100:11
objected [2] - 76:5, 76:10
objection [2] - 10:4, 39:19
objective [2] - 77:24, 77:25
obligation [1] - 72:12
obstruction [1] - 61:3
obstructive [2] - 60:22, 69:15
obviously [8] - 8:21, 10:14, 13:21, 41:1, 41:8, 64:15, 64:25, 101:20
occasion [1] - 83:8
occasionally [1] - 18:20
occurred [4] - 34:20, 72:25, 73:1, 73:2
October [1] - 105:19
OF [13] - 1:1, 1:13, 3:2, 3:5, 3:5, 105:1, 105:2, 105:3, 106:1, 106:3, 106:4, 107:2, 107:3
offered [3] - 62:9, 62:23, 80:10
offering [2] - 37:22, 38:3
office [9] - 6:4, 6:16, 19:15, 22:20, 23:10, 23:11, 26:18, 105:12, 108:16
office-based [1] - 22:20
officer [2] - 33:4, 109:3
official [2] - 105:12, 106:9
often [2] - 6:15, 61:3
older [1] - 37:14
on-call [1] - 9:22
onboard [1] - 103:6
once [8] - 17:22, 36:10, 64:17, 64:19, 65:11, 71:17, 91:17, 92:2
one [44] - 5:21, 8:25, 11:3, 15:16, 23:15, 24:1, 24:22, 25:6, 28:6, 28:18, 30:25, 36:21, 41:2, 41:8, 41:21, 42:1, 50:22, 57:15, 58:3, 58:25, 59:13, 65:17, 68:24, 71:6, 72:17, 74:15, 74:16, 74:17, 76:14, 77:3, 80:21, 83:8, 88:3, 99:2, 99:9, 99:14, 99:17, 100:6, 100:7, 102:12, 102:13
ones [2] - 46:7, 56:1
onshore [1] - 74:12
opinion [23] - 6:17, 37:23, 38:4, 38:23, 39:23, 40:1, 40:22, 41:20, 42:7, 42:8, 43:18, 48:18, 49:1, 72:6, 72:24, 73:4, 80:23, 81:21, 92:17, 93:20, 94:19, 95:10, 101:23
opinions [15] - 18:21, 34:20, 35:8, 35:10, 39:18, 43:19, 48:13, 64:20, 65:2, 65:12, 69:10, 69:12, 69:13, 80:22, 101:17
opportunity [1] - 42:6
opposed [2] - 14:10, 90:16
opposing [1] - 53:6
order [2] - 47:19, 57:3
organ [1] - 13:9
original [3] - 26:9, 44:21, 108:19
originally [1] - 33:20
originate [1] - 83:19
Orwick [2] - 26:13, 28:5
otherwise [1] - 105:10
outlined [1] - 10:18
outpatient [4] - 7:5, 20:21, 21:11, 21:13
outside [4] - 10:25, 77:2, 89:21, 98:23
overall [3] - 30:3, 37:14, 38:24
overlap [2] - 11:7, 13:12
own [1] - 6:24
oximeter [2] - 99:2, 99:5
oximetry [1] - 99:14
oxygen [94] - 17:3, 18:4, 18:10, 36:10, 36:15, 37:10, 58:7, 58:24, 59:7, 59:16, 62:2, 62:5, 63:21, 65:24, 66:2, 66:10, 67:12, 68:9, 69:20, 69:25, 70:10, 70:11, 70:14, 70:18, 71:9, 71:14, 71:15, 72:1, 72:8, 72:21, 72:22, 73:8, 73:10, 74:6, 74:19, 75:1, 75:11, 76:20, 76:22, 76:25, 77:11, 77:15, 77:25, 78:15, 78:25, 79:1, 79:21, 80:17, 82:9, 82:14, 82:17, 82:21, 83:8, 84:3, 84:10, 84:12, 86:6, 86:11, 86:12, 86:15, 86:16, 86:25, 87:7, 87:10, 87:13, 87:21, 87:24, 88:8, 88:13, 88:22, 89:12, 89:18, 90:12, 90:19, 90:20, 91:6, 93:2, 93:18, 93:19, 93:21, 95:1, 95:16, 95:20, 96:2, 96:12, 96:16, 98:13, 99:10, 99:13, 99:19, 99:20, 99:25, 100:2
oxygenate [1] - 72:24
oxygenation [1] - 96:19
oxygent [1] - 58:13

P

P.A [3] - 2:4, 2:10, 108:5
pack [3] - 15:24, 16:3, 60:12
packs [1] - 60:8
PAGE [2] - 3:2, 107:1
page [8] - 57:17, 57:22, 57:23, 58:1, 100:16, 103:12, 107:10, 109:3
Page [2] - 3:8, 3:12
PAGE/LINE [1] - 109:6
pages [4] - 25:14, 69:3, 105:5, 107:7
Panamanian [2] - 1:9, 108:10
papers [1] - 57:19
paragraph [1] - 58:3
pardon [2] - 53:12, 67:7
PART [1] - 109:2
part [5] - 5:1, 11:5, 12:13, 44:21, 49:8
particular [2] - 32:3, 93:8
particularly [1] - 15:17
parties [2] - 105:10, 108:20
party [2] - 53:6, 108:20
passed [2] - 17:22, 87:2
passengers [2] - 76:3, 76:4
past [5] - 6:3, 9:14, 24:7, 36:9, 84:9
patient [15] - 13:14, 14:19, 16:24, 61:11, 61:13, 83:23, 84:24, 85:11, 86:18, 88:17, 95:16, 97:2, 97:23, 97:24
patients [25] - 7:23, 8:6, 8:25, 9:2, 9:5, 13:2, 13:5, 13:6, 14:20, 14:24, 15:1, 42:22, 43:19, 44:23, 45:7, 61:7, 66:10, 74:13, 97:2, 97:13, 102:16, 102:17, 102:18
pattern [3] - 6:25, 84:8, 99:6
people [13] - 12:11, 46:10, 46:18, 71:7, 72:13, 74:12, 74:18, 75:6, 75:9, 75:21, 85:16, 85:17, 93:3
per [2] - 53:17, 99:17
percent [7] - 23:11, 46:4, 47:10, 47:12, 47:20, 95:19
percentage [9] - 45:22, 46:1, 46:2, 46:17, 46:19, 47:1, 47:2, 47:14, 47:21
perception [4] - 31:3, 35:17, 35:21, 36:13
percolating [1] - 50:19
perfectly [1] - 36:12
period [6] - 36:10, 83:2, 83:3, 95:9,

99:15
**permanent** [1] - 14:15
**person** [2] - 39:7, 94:24
**personal** [1] - 96:23
**Personal** [2] - 1:4, 108:8
**personally** [1] - 106:7
**personnel** [3] - 68:5, 83:4, 96:2
**pertaining** [1] - 30:5
**pgerson@gslawusa.com** [1] - 2:6
**PHILIP** [1] - 2:4
**phone** [8] - 76:4, 90:4, 102:25, 103:3, 103:4, 103:5, 103:6, 103:8
**phones** [5] - 90:1, 90:2, 91:15, 91:19, 91:22
**phonetic** [4] - 28:12, 28:21, 41:6, 52:22
**physical** [1] - 74:2
**physician** [8] - 18:16, 18:24, 25:4, 61:14, 62:1, 62:10, 62:17, 63:12
**physicians** [3] - 24:25, 30:24, 49:11
**physics** [1] - 22:1
**pick** [1] - 39:4
**picture** [1] - 29:25
**place** [3] - 18:3, 84:11, 105:6
**placed** [1] - 16:10
**plaintiff** [12] - 46:1, 46:5, 47:2, 47:12, 47:16, 49:4, 49:10, 49:15, 49:20, 50:20, 51:6, 51:14
**Plaintiff** [2] - 1:6, 2:3
**plaintiff's** [1] - 46:10
**PLAINTIFF'S** [1] - 3:7
**plugged** [1] - 59:2
**plus** [1] - 23:19
**pneumonia** [2] - 36:8, 93:5
**point** [28] - 9:19, 14:16, 27:22, 30:25, 33:21, 37:16, 39:10, 40:24, 58:18, 67:19, 70:10, 71:9, 76:19, 81:16, 82:17, 86:5, 86:8, 87:7, 87:8, 87:22, 88:8, 89:20, 90:1, 90:11, 91:21, 92:1, 92:5, 94:19
**pointed** [2] - 81:8, 94:7
**pointing** [1] - 64:3
**points** [2] - 78:6, 80:21
**police** [6] - 25:22, 26:11, 27:14, 33:3, 79:11
**policies** [2] - 33:6, 90:14
**policy** [2] - 75:6, 94:17
**poor** [1] - 10:21
**pop** [1] - 23:6
**population** [5] - 37:14, 39:15, 40:4, 42:22, 43:11
**Port** [2] - 80:7, 91:19
**port** [2] - 91:18, 99:12
**portability** [1] - 76:25
**portable** [2] - 59:2, 74:7
**portal** [4] - 54:11, 54:24
**portion** [1] - 62:7
**Ports** [2] - 41:19, 48:16
**positive** [1] - 36:22
**possession** [1] - 91:7
**possibility** [3] - 75:3, 75:5, 75:8
**possible** [5] - 64:6, 74:25, 75:13, 76:13, 76:18
**possibly** [1] - 69:23
**postulate** [1] - 79:17
**potential** [1] - 46:12
**powered** [3] - 98:21, 98:25
**practice** [10] - 5:20, 6:25, 13:5, 22:6, 22:19, 22:20, 23:10, 23:11, 95:9
**practicing** [2] - 8:20, 22:7
**pre** [1] - 37:1
**precisely** [3] - 33:16, 78:24, 80:4
**predisposing** [2] - 37:1, 37:3
**predominantly** [1] - 35:5
**preparation** [1] - 42:14
**present** [3] - 6:16, 67:11, 100:9
**presented** [2] - 8:6, 102:23
**pressure** [1] - 71:1
**pretty** [4] - 29:25, 47:9, 91:18, 99:6
**prevent** [1] - 38:15
**prevented** [6] - 90:21, 90:25, 91:7, 91:21, 92:1, 93:23
**preventing** [3] - 90:10, 91:2, 93:22
**prevention** [1] - 92:9
**preventive** [1] - 95:19
**previous** [1] - 71:12
**previously** [3] - 40:7, 46:11, 48:1
**primarily** [3] - 13:4, 13:19, 15:14
**privilege** [2] - 21:7, 26:25
**privileged** [1] - 21:6
**privileges** [7] - 20:17, 20:18, 20:20, 20:22, 20:24, 21:2
**problem** [16] - 13:7, 14:4, 17:16, 27:24, 36:4, 37:10, 41:4, 44:3, 44:6, 49:7, 56:6, 71:23, 72:7, 92:22, 93:15, 96:24
**problems** [7] - 16:21, 24:12, 36:5, 46:8, 71:13, 96:11, 97:5
**procedure** [1] - 94:18
**procedures** [1] - 90:15
**proceed** [2] - 45:21, 108:19
**production** [1] - 33:8
**productive** [1] - 64:5
**professional** [2] - 4:20, 47:18
**professor** [5] - 8:12, 8:14, 19:25, 20:8, 20:12
**progressed** [1] - 79:2
**progression** [1] - 79:25
**progressive** [1] - 82:13
**progressively** [1] - 82:12
**project** [1] - 102:18
**projects** [1] - 44:22
**prominently** [1] - 13:10
**prompted** [1] - 86:9
**promptly** [1] - 79:2
**proper** [1] - 95:2
**properly** [1] - 81:11
**protect** [1] - 82:19
**provide** [11] - 29:10, 41:16, 48:6, 56:4, 61:16, 64:9, 65:9, 65:16, 66:10, 72:14, 72:15
**provided** [14] - 26:17, 29:14, 47:25, 64:16, 65:24, 66:2, 66:3, 67:5, 67:8, 67:12, 87:1, 87:23, 96:16, 99:18
**provider** [3] - 61:15, 78:14, 98:5
**providers** [5] - 30:24, 31:5, 49:6, 50:2, 84:25
**PROVIDES** [1] - 109:2
**providing** [2] - 64:6, 93:21
**prudent** [5] - 82:2, 82:4, 82:18, 96:21, 98:16
**Pruett** [3] - 41:12, 41:13, 48:15
**PRUETT** [1] - 41:13
**Public** [5] - 1:22, 4:2, 105:18, 106:18, 107:20
**publications** [1] - 44:1
**Puentes** [1] - 26:14
**pulmonary** [12] - 14:10, 14:17, 17:21, 36:5, 60:22, 61:2, 69:15, 71:2, 71:16, 71:22, 95:11, 96:11
**pulmonology** [2] - 11:1, 11:13
**pulse** [4] - 71:1, 99:2, 99:5, 99:14
**pulseless** [2] - 70:24, 71:4
**put** [9] - 17:6, 27:16, 32:8, 36:16, 36:18, 39:12, 51:24, 66:22, 71:12
**putting** [3] - 36:20, 37:11, 102:18

**Q**

**questioned** [1] - 24:21
**questions** [6] - 18:13, 38:11, 56:13, 62:25, 96:4, 103:18
**quick** [1] - 13:23
**quickly** [2] - 70:20, 75:10
**quite** [4] - 33:17, 54:9, 71:1, 84:1

**R**

**RANDALL** [2] - 1:4, 108:8
**Randall** [2] - 28:6, 63:22
**range** [3] - 42:16, 55:18, 80:3
**rapidly** [2] - 79:3, 92:3
**rate** [1] - 54:4
**re** [1] - 10:20
**RE** [1] - 108:8
**re-ask** [1] - 10:20
**read** [9] - 28:8, 28:15, 41:1, 41:8, 61:19, 103:23, 103:25, 107:6, 109:20
**reading** [6] - 22:11, 23:17, 23:18, 26:8, 104:2, 108:18
**readings** [2] - 99:2, 99:15
**ready** [1] - 75:18
**real** [1] - 87:6
**really** [1] - 81:18
**reason** [1] - 67:14
**REASON** [1] - 109:6
**reasonable** [7] - 46:14, 76:21, 82:1, 82:4, 82:18, 96:1, 96:21
**reasonably** [1] - 17:22
**reasons** [1] - 109:4
**receive** [3] - 75:18, 82:20, 90:11
**received** [3] - 29:22, 75:1, 94:8
**recent** [2] - 26:15, 94:22
**recently** [2] - 36:2, 81:19
**recognition** [1] - 82:5
**recognizing** [1] - 83:25
**recollection** [1] - 60:7
**recommend** [2] - 14:24, 15:1
**recontacted** [1] - 33:23
**Record** [1] - 108:25
**record** [15] - 15:10, 17:23, 27:12, 28:1, 29:1, 30:17, 30:24, 44:8, 69:6, 77:24, 78:4, 78:13, 90:18, 99:8, 102:24
**records** [44] - 16:17, 17:11, 22:24, 23:7, 25:13, 25:14, 26:12, 27:17, 28:1, 29:8, 29:11, 29:14, 29:20, 30:5, 31:1, 31:5, 31:9, 31:12, 31:16, 31:17, 31:22, 32:12, 33:2, 33:21, 34:18, 35:18, 38:5, 38:9,

45:22, 55:20, 55:25, 58:12, 60:3, 60:6, 60:7, 68:13, 70:22, 75:25, 77:17, 94:6, 94:11
**reduce** [2] - 18:9, 40:2
**reduced** [2] - 14:12, 39:9
**reduction** [2] - 39:11, 42:21
**refer** [4] - 17:17, 36:4, 43:3, 46:14
**reference** [3] - 36:7, 94:19, 108:12
**references** [1] - 31:1
**referring** [2] - 58:2, 76:2
**reflect** [1] - 16:18
**regarding** [17] - 23:2, 31:25, 33:7, 33:14, 34:11, 35:10, 38:23, 57:1, 57:6, 57:12, 60:8, 68:18, 77:14, 78:14, 94:11, 99:10, 99:24
**regards** [46] - 7:12, 7:13, 13:2, 13:20, 13:24, 14:18, 21:4, 22:5, 22:18, 23:25, 25:8, 33:2, 42:4, 42:8, 42:24, 45:25, 48:11, 49:3, 51:19, 53:16, 53:22, 54:10, 56:12, 56:13, 57:14, 58:24, 59:20, 60:5, 65:22, 69:9, 73:6, 74:4, 74:5, 76:12, 77:8, 80:19, 82:25, 84:13, 87:20, 91:5, 93:3, 94:14, 95:7, 97:1, 100:15, 101:15
**relate** [1] - 46:10
**related** [6] - 11:5, 13:9, 13:16, 39:2, 61:3
**relates** [1] - 44:24
**relation** [1] - 13:18
**relationship** [2] - 6:2, 73:22
**relatively** [1] - 39:11
**relevant** [1] - 65:11
**rely** [4] - 39:22, 41:22, 41:23, 48:23
**relying** [2] - 43:2, 48:22
**remember** [8] - 33:15, 33:16, 42:3, 43:6, 50:7, 50:24, 51:3, 51:7
**removal** [1] - 87:20
**remove** [1] - 87:17
**removed** [7] - 78:10, 87:7, 87:11, 87:13, 89:18, 90:20, 96:20
**renewed** [1] - 12:20
**rephrase** [5] - 30:19, 31:14, 78:11, 91:4, 99:7
**report** [28] - 17:17, 25:22, 26:9, 26:11, 27:10, 28:6, 28:11, 35:9, 36:6, 55:22, 56:13, 56:14, 56:18, 57:5, 57:8, 57:12, 57:14, 57:17, 57:23, 58:1, 69:11, 79:8, 79:11, 100:16, 101:24, 102:4, 102:6
**Reported** [1] - 1:21
**REPORTER** [2] - 3:5, 105:1
**Reporter** [3] - 1:22, 4:2, 105:17
**REPORTING** [1] - 108:1
**reports** [5] - 25:12, 27:14, 27:15, 30:2, 101:21
**represent** [1] - 69:2
**Representative** [2] - 1:5, 108:9
**representing** [1] - 4:14
**request** [2] - 29:11, 82:8
**requested** [3] - 58:7, 67:1, 83:9
**requesting** [1] - 68:9
**require** [1] - 24:8
**required** [2] - 36:9, 58:18
**requirement** [1] - 8:21
**requirements** [1] - 59:8
**rescue** [4] - 25:12, 26:11, 72:23, 74:19
**research** [7] - 43:22, 44:21, 45:4, 95:25, 102:15, 102:20
**residency** [3] - 11:13, 11:16, 11:19
**resident** [1] - 6:22
**residents** [2] - 6:11, 6:20
**resource** [5] - 84:25, 85:7, 85:12, 85:17, 88:17
**respiratory** [2] - 70:5, 82:14
**respond** [1] - 84:8
**responded** [4] - 36:14, 76:20, 84:2, 84:16
**responds** [2] - 37:10, 95:16
**response** [6] - 71:14, 78:8, 79:7, 79:10, 93:1, 96:17
**responsibility** [8] - 35:3, 81:17, 81:22, 82:4, 83:18, 94:15, 96:1, 98:3
**responsible** [2] - 10:7, 97:7
**rest** [1] - 22:10
**restore** [1] - 71:17
**resuscitation** [3] - 11:23, 12:3, 74:1
**retain** [1] - 56:16
**retained** [7] - 47:1, 47:2, 52:15, 53:1, 53:5, 53:13, 56:18
**retired** [1] - 8:22
**retirement** [1] - 8:17
**return** [3] - 70:17, 71:10, 72:22
**returned** [1] - 82:15
**reveal** [2] - 36:24, 70:23
**reversed** [1] - 93:18
**reversible** [4] - 71:7, 71:16, 71:23, 95:15
**review** [11] - 34:18, 46:1, 51:20, 51:22, 52:4, 60:6, 64:19, 67:1, 68:13, 75:24
**reviewed** [21] - 26:3, 26:6, 26:10, 28:14, 29:3, 29:8, 30:5, 32:10, 33:11, 36:2, 45:16, 61:19, 62:13, 63:9, 66:23, 68:15, 68:17, 69:3, 94:5, 94:10
**reviewing** [6] - 34:17, 38:4, 45:12, 45:22, 51:3, 67:25
**revisions** [1] - 57:5
**rhythm** [1] - 21:15
**risk** [16] - 14:7, 14:12, 14:15, 14:17, 15:6, 15:12, 15:18, 16:4, 16:11, 16:12, 16:20, 17:21, 18:3, 38:21, 40:4
**risks** [3] - 43:24, 45:7, 102:19
**Robert** [1] - 4:21
**ROBERT** [9] - 1:13, 3:3, 4:6, 105:6, 106:7, 107:14, 108:5, 108:11, 109:25
**room** [4] - 18:16, 18:17, 72:23, 77:2
**Room** [1] - 1:17
**roughly** [5] - 37:18, 52:4, 52:6, 55:7, 79:6
**rounds** [1] - 8:5
**Royal** [1] - 52:23
**RULE** [1] - 109:2
**run** [3] - 12:2, 23:21, 23:22
**running** [2] - 11:22, 54:3

**S**

**safe** [2] - 6:7, 87:4
**sat** [1] - 33:23
**saturation** [2] - 77:10, 99:10
**saw** [2] - 88:15, 98:11
**scenario** [3] - 74:15, 74:24, 74:25
**schedule** [1] - 65:7
**scheduled** [1] - 65:7
**School** [1] - 4:22
**school** [1] - 10:11
**SCHWARTZ** [2] - 2:4, 108:5
**science** [1] - 43:23
**seal** [2] - 105:12, 106:9
**second** [9] - 25:24, 41:2, 41:8, 44:2, 44:4, 45:10, 81:1, 100:18, 102:12
**secondary** [1] - 71:22
**section** [1] - 69:12
**Security** [3] - 39:2, 43:6, 43:7
**see** [22] - 8:24, 9:5, 18:22, 23:7, 26:23, 27:14, 29:21, 32:7, 32:24, 58:5, 60:3, 62:9, 68:14, 68:25, 76:19, 78:25, 80:13, 87:17, 91:8, 92:15, 96:3, 102:4
**seeing** [2] - 90:18, 90:23
**seek** [5] - 61:10, 61:21, 61:25, 62:2, 85:19
**send** [1] - 19:20
**sending** [1] - 45:21
**SENSATION** [1] - 19:9
**SENSATION's** [1] - 63:13
**sense** [9] - 10:3, 10:8, 11:2, 11:10, 12:5, 12:7, 36:22, 68:9
**sent** [2] - 19:15, 28:21
**separate** [2] - 47:7, 109:3
**separated** [1] - 47:23
**September** [1] - 108:18
**serve** [1] - 11:24
**served** [1] - 18:23
**services** [4] - 56:10, 76:15, 85:5, 85:16
**session** [1] - 9:6
**sessions** [2] - 9:3, 9:7
**set** [2] - 105:11, 107:9
**setting** [1] - 95:2
**seven** [2] - 6:3, 72:10
**several** [2] - 81:9, 82:25
**severity** [1] - 35:22
**shall** [3] - 108:18, 108:19, 109:3
**SHEET** [1] - 109:1
**shifts** [1] - 6:9
**ship** [51] - 18:7, 36:14, 58:6, 59:17, 61:22, 65:23, 66:9, 67:13, 68:6, 70:2, 70:3, 70:7, 70:17, 73:9, 73:16, 73:22, 74:1, 74:12, 74:18, 75:1, 75:2, 75:8, 75:17, 75:21, 75:22, 76:3, 76:15, 76:17, 78:3, 86:19, 87:3, 88:14, 89:12, 89:21, 89:23, 89:24, 90:7, 90:14, 91:11, 92:2, 92:6, 92:13, 94:12, 94:25, 96:19, 98:18, 98:21, 99:11, 103:7, 103:9
**shipboard** [1] - 68:5
**ships** [1] - 74:12
**shore** [2] - 75:9, 90:16
**short** [2] - 70:8, 101:2
**SHORTHAND** [1] - 105:1
**shortly** [1] - 79:21
**show** [1] - 12:9
**shuffled** [1] - 57:19
**shuttle** [2] - 80:11, 80:14
**side** [1] - 46:20
**sided** [2] - 27:17, 28:1
**sign** [4] - 34:13, 95:17, 99:17, 103:23
**signature** [1] - 108:14
**signing** [2] - 104:2,

108:19
signs [1] - 99:18
similar [1] - 69:24
simpler [1] - 64:15
simply [2] - 65:14, 98:2
Sincerely [1] - 108:21
single [1] - 93:22
sit [4] - 5:16, 8:5, 89:11, 98:17
sit-down [1] - 8:5
sitting [1] - 34:8
situation [1] - 18:5
six [2] - 7:11, 72:10
skipping [1] - 41:9
sleeping [1] - 54:25
slept [2] - 70:13, 78:9
slightly [1] - 95:22
small [2] - 19:6, 39:11
smoke [5] - 15:23, 16:4, 17:2, 92:12, 92:18
smoked [1] - 60:9
smoker [8] - 13:25, 15:4, 15:8, 15:10, 15:11, 15:13, 38:21, 59:21
smokers [2] - 13:25, 14:16
smoking [25] - 14:4, 14:7, 14:9, 14:10, 14:13, 14:25, 15:2, 15:12, 16:2, 16:12, 16:14, 16:23, 18:9, 18:11, 38:13, 60:1, 60:8, 92:23, 93:5, 93:7, 93:8, 93:14, 94:1, 97:4
Social [3] - 39:1, 43:6, 43:7
someone [3] - 17:1, 83:10, 91:1
sometimes [1] - 61:5
somewhat [1] - 39:9
somewhere [2] - 29:17, 101:24
sorry [8] - 20:4, 50:5, 51:4, 54:13, 55:13, 56:8, 66:1, 68:1
sort [2] - 33:22, 97:18
sounded [1] - 70:4
sounds [3] - 17:23, 46:14, 79:20
source [7] - 73:10, 74:8, 77:20, 83:22, 89:18, 97:15
SOUTHERN [1] - 1:1
Sparrow [2] - 29:17, 31:5
speaks [1] - 62:25
special [1] - 9:9
specialties [4] - 10:16, 10:25, 11:3, 13:14
specialty [2] - 5:2, 10:23
specific [16] - 17:6, 34:19, 39:6, 39:16, 40:1, 42:9, 42:20, 44:2, 44:15, 59:7, 59:13, 94:17, 94:23, 95:8, 95:9, 95:14
specifically [6] - 13:7, 38:23, 39:21, 42:13, 63:24, 94:18
specifics [1] - 48:22
spend [2] - 22:6, 47:14
spoken [1] - 56:25
spontaneous [1] - 71:10
sports [1] - 7:3
spread [1] - 86:17
SS [2] - 105:3, 107:2
stability [2] - 72:16, 93:16
stable [6] - 17:15, 17:23, 35:25, 37:8, 70:1, 92:24
staff [10] - 83:4, 85:5, 85:15, 85:16, 85:22, 86:15, 86:23, 98:9, 100:10, 100:12
standpoint [2] - 14:20, 14:21
stands [1] - 60:21
start [1] - 45:12
started [3] - 57:16, 58:1, 97:4
starts [1] - 58:3
stat [1] - 32:7
STATE [3] - 105:2, 106:3, 107:2
state [10] - 17:7, 36:1, 49:5, 49:18, 49:21, 50:21, 51:1, 51:5, 51:8, 51:17
State [5] - 1:22, 4:2, 105:18, 106:18, 107:20
statement [3] - 91:24, 94:20, 109:4
statements [2] - 30:23, 63:5
States [3] - 38:25, 42:17, 43:12
STATES [1] - 1:1
statistical [2] - 39:10, 43:24
statistically [1] - 38:19
statistics [2] - 41:22, 48:23
status [4] - 17:22, 30:3, 31:2, 35:25
stay [1] - 6:7
still [10] - 6:4, 15:11, 16:3, 18:20, 20:14, 20:19, 38:21, 59:10, 65:5, 71:21
stop [3] - 14:13, 14:25, 15:1
stopped [1] - 73:16
story [1] - 92:10
Street [1] - 108:1
stretch [1] - 17:5
strictly [1] - 21:10
strike [7] - 75:15, 77:23, 79:5, 84:23, 91:24, 101:16, 102:21
strikes [1] - 24:12
strongly [2] - 71:11, 71:15
structural [1] - 18:2
structure [2] - 61:2
studied [1] - 95:6
studies [2] - 22:2, 45:6
study [1] - 39:17
stuff [1] - 46:19
styled [1] - 108:13
subject [1] - 24:18
subjective [1] - 77:19
submit [1] - 55:21
submitted [1] - 69:11
subscribed [1] - 107:17
subsequently [1] - 97:17
subspecialties [1] - 11:8
subspecialty [1] - 5:8
substance [1] - 109:2
sudden [1] - 11:6
sued [1] - 24:14
suffered [1] - 15:8
suffering [2] - 14:19, 93:4
sufficient [1] - 71:19
suggest [1] - 108:16
suggestions [1] - 57:12
suit [1] - 24:18
suitable [1] - 108:17
Suite [1] - 108:2
summaries [9] - 17:12, 26:16, 26:21, 28:22, 29:3, 30:15, 35:19, 61:19, 68:2
summarized [1] - 63:18
summary [6] - 26:14, 28:8, 28:19, 63:10, 69:13, 73:4
superimposed [8] - 17:16, 36:4, 37:9, 69:20, 71:13, 82:23, 93:17, 96:10
supervise [3] - 6:11, 7:22, 10:1
supplemental [1] - 36:9
supplementation [2] - 70:11, 95:1
supply [4] - 17:3, 71:9, 86:12, 86:16
support [17] - 12:9, 12:10, 12:16, 12:17, 12:21, 12:22, 39:18, 62:3, 62:6, 72:15, 80:17, 82:18, 82:21, 85:5, 85:16, 88:11, 94:16
supposed [2] - 5:16, 88:23
surgery [2] - 21:18, 21:20
survival [1] - 71:17
survived [1] - 71:24
survivors [1] - 13:18
sworn [3] - 4:7, 105:8, 106:8
Sworn [1] - 107:17
symptom [1] - 99:5
symptomatic [3] - 17:24, 39:7, 69:16
symptomology [1] - 39:14
symptoms [5] - 70:4, 71:12, 95:17, 100:3, 100:7
system [4] - 13:10, 20:24, 84:20, 86:17

T

table [2] - 37:5, 49:15
tables [4] - 42:13, 42:15, 43:3, 43:7
Tables [3] - 38:25, 39:1, 39:22
taxi [2] - 73:25, 80:11
teaching [2] - 8:2, 8:4
team [3] - 11:24, 12:5, 12:13
technical [5] - 41:10, 42:2, 57:7, 67:21, 91:1
technician [1] - 59:1
telephone [2] - 89:20, 108:16
telephoned [1] - 68:4
ten [8] - 15:25, 24:23, 45:20, 48:7, 51:25, 55:12, 55:14, 55:15
tend [1] - 49:17
tenure [1] - 8:14
term [3] - 6:8, 42:25, 81:15
terminology [1] - 58:19
terms [10] - 11:4, 11:22, 16:23, 22:15, 34:17, 36:20, 43:21, 44:14, 84:18, 84:19
terrible [1] - 17:24
testified [7] - 4:8, 30:22, 40:8, 40:14, 40:15, 50:1, 51:5
testimony [15] - 15:22, 41:24, 45:12, 53:23, 53:24, 63:17, 64:11, 64:16, 64:21, 65:10, 75:12, 77:15, 78:6, 78:16, 79:20
text [2] - 39:17, 43:2
THE [27] - 16:8, 25:21, 30:13, 33:15, 33:19, 34:3, 35:2, 39:21, 40:18, 44:9, 52:20, 53:7, 59:6, 61:25, 63:15, 66:20, 68:8, 69:7, 80:13, 85:9, 85:22, 89:4, 91:25, 97:11, 100:12, 103:21, 103:25
them.. [1] - 109:4
therapy [1] - 95:18
thereby [1] - 73:21
therefore [6] - 17:1, 61:10, 72:2, 72:3, 81:20, 88:20
thereof [1] - 105:10
Thereupon [3] - 4:5, 44:7, 104:1
they've [1] - 14:22
third [1] - 58:2
thousand [1] - 69:3
three [14] - 5:20, 7:4, 8:25, 9:2, 9:3, 9:4, 9:5, 9:6, 9:7, 9:11, 20:18, 21:4, 22:9, 103:16
throughout [1] - 86:17
TO [1] - 108:5
today [11] - 4:15, 25:18, 39:18, 42:14, 46:18, 55:10, 55:20, 64:5, 69:10, 102:8, 102:24

**together** [3] - 36:16, 71:13, 109:22
**took** [3] - 7:10, 88:7, 108:20
**topic** [2] - 13:7, 44:1
**total** [1] - 47:18
**town** [1] - 54:23
**trained** [2] - 43:14, 46:11
**training** [4] - 10:19, 24:9, 43:17, 95:24
**transcribed** [3] - 64:9, 64:17, 108:14
**transcript** [10] - 64:4, 64:16, 65:19, 68:2, 103:24, 105:5, 107:7, 108:14, 108:20, 109:20
**transcription** [1] - 105:5
**transcripts** [1] - 26:19
**transfer** [14] - 72:11, 73:6, 74:5, 74:13, 74:23, 75:22, 80:20, 81:3, 81:10, 82:5, 92:6, 94:23, 95:2, 98:24
**transferred** [1] - 81:24
**transferring** [1] - 72:14
**transfers** [1] - 81:13
**transient** [3] - 69:24, 71:22, 72:7
**transiently** [1] - 87:17
**transition** [3] - 72:21, 87:9, 89:14
**transitions** [1] - 75:22
**translate** [1] - 40:3
**transport** [2] - 73:19, 80:6
**travel** [1] - 54:11
**traveling** [1] - 54:23
**treat** [1] - 22:25
**treated** [3] - 29:17, 31:6, 61:7
**treating** [2] - 24:24, 25:4
**treatment** [5] - 29:9, 29:22, 61:11, 61:14, 97:2
**trial** [7] - 40:14, 45:23, 47:5, 47:11, 53:23, 53:24, 68:1
**trials** [2] - 47:8, 52:13
**tried** [2] - 50:24, 73:25
**triggered** [1] - 82:3
**trip** [1] - 82:13
**trips** [1] - 19:7
**true** [5] - 5:25, 16:2, 105:5, 107:8, 109:23
**trying** [6] - 40:18, 48:22, 64:4, 65:6, 65:14, 83:17
**two** [26] - 8:25, 9:2, 9:4, 9:5, 9:6, 9:7, 9:10, 12:20, 17:12, 26:15, 28:17, 30:2, 30:15, 33:24, 35:19, 39:12, 41:16, 41:19, 51:16, 58:15, 58:17, 62:25, 64:8, 74:20, 96:3
**type** [7] - 13:5, 36:9, 54:19, 59:16, 72:17, 79:14, 102:15
**Type** [1] - 102:19
**types** [1] - 10:7
**typical** [1] - 71:2

U

**U-R-S-U-A** [1] - 32:14
**ultimate** [1] - 71:20
**UM/Jackson** [1] - 20:24
**UMH** [3] - 12:3, 20:20, 21:13
**uncertain** [1] - 36:19
**uncommon** [1] - 70:6
**under** [4] - 25:6, 69:17, 96:22, 108:13
**underlying** [4] - 16:10, 16:18, 16:21, 36:25
**undersigned** [2] - 105:4, 106:6
**unfamiliar** [1] - 59:15
**uniformly** [1] - 71:5
**unit** [4] - 10:1, 10:2, 59:2, 72:17
**United** [3] - 38:25, 42:17, 43:12
**UNITED** [1] - 1:1
**units** [1] - 10:7
**university** [3] - 24:17, 24:24, 49:18
**University** [10] - 4:22, 5:22, 6:1, 6:5, 7:15, 7:17, 20:1, 20:9, 20:21, 49:9
**unless** [5] - 7:23, 22:16, 60:3, 95:15
**unstable** [3] - 15:17, 17:15, 79:24
**up** [20] - 12:9, 18:14, 23:6, 23:21, 26:1, 31:5, 37:19, 38:2, 41:17, 45:23, 50:23, 55:10, 55:11, 64:24, 70:20, 71:9, 73:6, 78:2, 82:23, 99:11
**upper** [1] - 70:5
**Ursua** [2] - 32:11, 62:15
**Usura** [1] - 66:23
**Utah** [1] - 51:17

V

**valid** [1] - 48:23
**van** [3] - 73:19, 80:6, 80:11
**variety** [1] - 59:7
**various** [2] - 11:7, 40:9
**vast** [2] - 49:20, 49:24
**version** [1] - 56:14
**versions** [1] - 56:18
**versus** [8] - 39:8, 41:5, 41:12, 41:13, 41:19, 48:15, 48:16, 52:23
**video** [1] - 33:3
**view** [4] - 14:16, 39:11, 58:18, 81:16
**viral** [6] - 17:19, 18:6, 36:8, 70:5, 92:25, 94:25
**virtually** [2] - 36:3, 95:19
**vital** [2] - 99:17, 99:18
**voluminous** [1] - 22:24
**voluntarily** [2] - 56:5, 61:13
**vs** [1] - 1:7

W

**wait** [4] - 50:9, 51:2, 80:11, 98:23
**waiting** [4] - 73:9, 80:6, 98:23, 101:2
**waive** [1] - 103:24
**waived** [2] - 104:3, 108:19
**walked** [1] - 84:15
**wall** [1] - 59:3
**wants** [2] - 49:18, 109:3
**ward** [1] - 21:8
**Washington** [1] - 51:9
**week** [9] - 9:1, 9:4, 9:5, 9:6, 9:7, 9:11, 22:6, 22:9, 23:16
**weekend** [1] - 9:17
**weekly** [1] - 21:16
**weight** [1] - 39:13
**West** [1] - 108:1
**WHEREOF** [1] - 105:11
**WHITE** [1] - 2:10
**White** [1] - 4:13
**white.com** [1] - 2:13
**whole** [2] - 92:10, 95:5
**wife** [2] - 19:6, 22:16
**willing** [1] - 49:19
**withdrawal** [1] - 80:17
**WITNESS** [29] - 16:8, 25:21, 30:13, 33:15, 33:19, 34:3, 35:2, 39:21, 40:18, 44:9, 52:20, 53:7, 59:6, 61:25, 63:15, 66:20, 68:8, 69:7, 80:13, 85:9, 85:22, 89:4, 91:25, 97:11, 100:12, 103:21, 103:25, 105:11, 106:9
**witness** [10] - 35:1, 63:19, 63:24, 64:7, 65:9, 65:16, 69:2, 105:8, 109:3, 109:4
**woman** [2] - 37:12, 42:17
**workup** [2] - 36:23, 37:4
**worse** [2] - 37:9, 82:12
**writing** [2] - 5:11, 5:18

Y

**year** [9] - 10:11, 12:22, 12:23, 33:18, 39:12, 45:21, 51:25, 52:1
**years** [25] - 5:13, 6:3, 7:11, 18:18, 21:25, 24:23, 37:15, 37:18, 37:23, 39:3, 39:10, 40:2, 42:11, 42:12, 42:16, 43:10, 48:7, 51:21, 52:6, 72:10, 81:9, 94:22, 96:8, 96:9, 97:12
**yesterday** [2] - 63:17, 65:18
**York** [1] - 24:8
**YOURSELF** [1] - 108:12
**yourself** [1] - 44:20