UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 18-CV-23181-WILLIAMS/TORRES

RANDALL NOON, as Personal
Representative of the Estate of
KAREN NOON, Deceased,

Plaintiff(s),

v.

CARNIVAL CORPORATION, a Panamanian
Corporation d/b/a CARNIVAL CRUISE LINES,

Defendant(s).
_______________________________________________/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW (DE 50)**

Plaintiff Randall Noon, as Personal Representative of the Estate of Karen Noon, Deceased, responds to the Motion for Final Summary Judgment and Supporting Memorandum of Law filed by Defendant Carnival Corporation d/b/a Carnival Cruise Lines on August 23, 2019 (DE 50).[1] Carnival has overlooked key testimony demonstrating that it had actual knowledge of Ms. Noon's critical medical condition in time for effective intervention yet failed to implement any of the reasonably available measures to save her life.

**Despite Having Actual Knowledge of Karen Noon's Medical Condition and its Emergency Nature, Carnival through its Crewmembers Failed to Summon Emergency Services or to**

[1] Since Carnival has filed a supporting Statement of Material Facts (DE 51) as a document separate from its motion and memorandum, the Plaintiff will respond separately to Carnival's Statement of Material Facts.

**Take any Substitute Action to Preserve her Life, Thereby Breaching both the Duty of Reasonable Care under Maritime Law and Undertaken Duties**

Carnival overlooks key testimony from Ms. Noon's daughter Juanita Noon, who accompanied her parents on the cruise. At approximately 7:00 A.M. on the morning the vessel arrived in port in Miami, the Noon family received a telephone call in their cabin from an unidentified Carnival crewmember. This crewmember spoke with Ms. (Juanita) Noon and advised her that Carnival needed to retrieve the oxygen concentrator the ship's medical center had given her mother, Ms. (Karen) Noon late the previous evening to assist with her breathing. The unidentified crewmember told Ms. Juanita Noon that "they had to have it [the oxygen concentrator] back" and were "sending somebody" to retrieve it "because they had to account for all their equipment." (DE 52, Deposition of Juanita Noon, July 25, 2019 at 76:20-77:5). Juanita Noon then had the following conversation with the crewmember:

> Then I asked them okay, so what are we supposed to do, do you have the portable ones. They said they don't have any that could leave the ship. I said okay, then I guess we're going to go to the ER as soon as we get off the ship, and it wasn't much longer somebody was back or at the door because the door was open because we were packing.
>
> (DE 52, Juanita Noon at 77:6-12).

Ms. Noon thus made three critical statements to the crewmember with whom she was speaking over the telephone. First, she expressly requested use of a portable oxygen concentrator or other supplemental oxygen system for her mother. She was advised in response that Carnival either did not have a portable oxygen system available at all or that Carnival's policy would not allow the Noon family to take a potentially available portable oxygen system off the ship; Ms. Noon's

rendition of the crewmember's statement is ambiguous as to which alternative the crewmember was referring. In any event, it was clear that Carnival either could not or would not give the Noon family a portable oxygen system to substitute for the attached system Carnival was retrieving.

Secondly, Ms. Noon asked rhetorically "what are we supposed to do," thereby emphasizing her mother's urgent need for continued oxygen support. Thirdly, she expressly stated that the Noon family was going to "go to the ER as soon as we get off the ship," emphasizing further that the Noon family perceived Ms. Noon's medical condition as an emergency and her condition as critical enough to warrant emergency intervention.

Even assuming for the sake of argument that the crewmember with whom Juanita Noon spoke was too obtuse or inattentive to understand (without being expressly told) that someone using an oxygen concentrator was relying on it to sustain breathing and would urgently require a substitute oxygen supplementation system and further emergency assistance once the concentrator was retrieved, Juanita Noon did expressly inform the crewmember of these facts. She did expressly inform the crewmember that her mother continued to require oxygen supplementation and that her mother's situation appeared to the Noon family to be a medical emergency. Carnival, through the crewmember with whom Juanita Noon was speaking if not otherwise, had actual knowledge as of approximately 7:00 A.M. on the morning the ship arrived in port that it was dealing with a medical emergency calling for an emergency response.

Carnival argues that the first Carnival non-medical crewmember to be made aware of Karen Noon's condition was the guest services clerk who closed out the Noon family's financial account during checkout, whom Juanita Noon did also advise of the Noon family's urgent need

to disembark in order to go to an emergency room. (DE 50, Defendant's Motion at Page 6; DE 52, Juanita Noon at 82:9-13). Since the crewmember with whom Juanita Noon spoke earlier, at approximately 7:00 A.M., is unidentified, it is unclear whether that crewmember was calling from the medical center itself or worked for a non-medical department dealing with ship's equipment, such as guest services. Indeed, since Carnival's policy was to have passengers request assistive devices by contacting the guest services department, which would then pass the request on to the medical center, the crewmember who called to retrieve the concentrator may well have worked in the guest services department rather than the medical center and therefore have been a non-medical crewmember.

Furthermore, Carnival erroneously assumes, as it has in previous filings, that its crewmembers have no duty whatsoever to communicate with each other in order to accomplish necessary tasks. Carnival's own policy regarding assistive equipment, under which the guest services department receives passenger requests for equipment and relays them to the medical center, contradicts its assumption. A duty of efficient internal communication is necessary for any business organization. No such organization can function properly without clear and timely internal communication among employees who are working, or supposed to be working, toward common goals. On board a self contained environment such as an ocean going vessel, internal communication to alert other crewmembers to developing critical situations is even more important, and lack of effective internal communication can have deadly results, as it did in this case. Once the crewmember with whom Juanita Noon spoke, whether that crewmember was from the medical center, the guest services department, or another non-medical department,

learned of Karen Noon's critical condition and the need for emergency action, that crewmember indeed had a duty either to act personally or to pass the information promptly on to those crewmembers who could act.

Under current federal maritime law, and indeed law going back decades, a cruise line has a duty to its apparently sick or injured passengers to "exercise reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances." *Franza v. Royal Caribbean Cruises, Ltd.*, 722 F.3d 1225, 1246 (11th Cir. 2014), *citing Barbetta v. S/S Bermuda Star*, 848 F.2d 1364, 1371 (5th Cir. 1988). This duty of reasonable care includes a duty to evacuate passengers requiring medical care off the ship, if evacuation is reasonable and necessary under the circumstances. *See Gharfeh v. Carnival Corp.*, 309 F.Supp.3d 1317, 1330-31 (S.D. Fla. 2018); *Wohlford v. Carnival Corp.*, 2017 U.S. Dist. LEXIS 72901 at ** 11-12 (S.D. Fla. 1:17-cv-20703-UU, May 11, 2017); *Franza*, 722 F.3d at 1254. The existence and scope of the duty of medical evacuation in turn depends on what is reasonably required under the circumstances, taking into consideration all relevant factors. These include the nature and seriousness of the medical emergency, the location of the ship, and the availability and accessibility of the nearest reasonably adequate medical care off the ship. *See Gharfeh*, 309 F.Supp.3d at 1330-31(discussing factors relevant when determining the existence and scope of a duty to evacuate).

In this case, Carnival retrieved its oxygen concentrator when the ship had already returned to port in Miami, Florida. At that point summoning local emergency services would have been a readily available option, and land based emergency services would have been five


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

minutes or less away if timely summoned, according to Carnival's corporate representative. Carnival had actual knowledge of the need for emergency response through Juanita Noon's comments if not otherwise. The duties of aid, assistance and reasonably required emergency evacuation as described in *Barbetta* and *Gharfeh* required Carnival to respond to the emergency situation of which it actually knew by summoning the readily available land based emergency services promptly. According to Carnival's corporate representative, Carnival also had portable oxygen tanks available for emergency use until the land based emergency responders could arrive.

In addition to the duties imposed by law, such as those described in *Barbetta* and *Gharfeh*, a cruise line must perform duties it has assumed, including duties relating to treatment of medically distressed passengers. As Carnival acknowledges, federal maritime law recognizes the doctrine of assumption or undertaking of duty, as summarized in Section 323 of the Restatement (2d) of Torts (1965). *See* DE 50 at 7-8; *Disler v. Royal Caribbean Cruises, Ltd.*, 2018 U.S. Dist. LEXIS 67797, 2018 WL 1916614 at **10-11 (S.D. Fla. Case No. 17-23874-CIV-MORENO, April 23, 2018), *citing Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Sexton v. Carnival Corp.*, 2018 U.S. Dist. LEXIS 116131, 2018 WL 3405246 at **5-7 (S.D. Fla. Case No. 18-20629-CIV-MORENO, July 12, 2018). Section 323 provides that

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

(b) the harm is suffered because of the other's reliance upon the undertaking.

*See Disler* at ** 9-10.

In this case Carnival undertook a duty of care, (in addition to the duties of reasonable care it had in any event under *Barbetta*, *Franza*, and *Gharfeh*,) when it provided the Noon family with an oxygen concentrator at their request and with the actual knowledge, provided by the Noon family, that Karen Noon required oxygen supplementation to assist with her breathing. The undertaken duty was to monitor Ms. Noon's condition and to take appropriate action upon being advised of its necessity as Juanita Noon in fact advised the crewmember with whom she spoke the next morning. *Cf. San Antonio Extended Medical Care, Inc. v. Vasquez*, 327 S.W.3d 193, 198-200 (Tex. App. 2010)(company licensed to provide supplemental oxygen and oxygen equipment to home health care patients was a health care provider for purposes of Texas law). Carnival accomplished this undertaking vicariously through the crewmember from whom the Noon family requested the concentrator and the crewmember in the ship's medical center who provided the Noon family with the concentrator, nurse Rosel Ursua.

Karen Noon relied upon Carnival's undertaking through its crewmembers by using the concentrator overnight, with empirical success. Carnival breached its undertaking when it retrieved the concentrator despite Juanita Noon's protestations, thereby knowingly depriving Karen Noon of its use, without providing an adequate substitute emergency oxygen system, timely summoning emergency services, or both. At that point Carnival ignored Karen Noon, requiring her family to go through its self-created processes before shore side medical assistance could be obtained. Since Carnival controlled the disembarkation process, including coordination

with Customs officials and communication with its port agent or land based services as required, the Noon family could not simply bypass Carnival's bureaucratic systems and summon emergency services on their own. Unlike any land based environment, on board a cruise ship, passengers are subject to the process and control of the cruise line. Passengers cannot take matters into their own hands until disembarked. The Noon family necessarily relied on Carnival to coordinate the emergency response, and Karen Noon was placed in a worse position by Carnival's unwarranted delay in summoning aid and assistance. Carnival's failure to continue supplemental oxygen support to Karen Noon, either through its own portable systems or through prompt summoning of the emergency responders only five minutes away, more likely than not led to her cardiopulmonary arrest and subsequent brain damage, as Plaintiff's expert cardiologist Robert Myerburg, M.D. has indicated. (DE 58-1, Report of Robert Myerburg, M.D. at 10).

Thus, notwithstanding Carnival's apparent confusion as to the nature of its undertaking, it undertook its duty to monitor Karen Noon's condition on the evening before the ship arrived in port. Carnival breached its undertaken duty the next morning, at approximately 7:00 A.M., when Carnival through its crewmembers retrieved the oxygen concentrator upon which it knew Karen Noon was relying, without providing either substitute oxygen supplementation or summoning a prompt and timely emergency response. Carnival prioritized inventory control for its medical equipment over the known urgent medical needs of its passenger.

Through a series of previous motions to dismiss and amended complaints, the pleadings have been clarified to make a point that should in any event be obvious - the Plaintiff is seeking to hold Carnival vicariously liable for the actions and inactions of its crewmembers, both

medical and non-medical, in dealing with Karen Noon's known medical emergency. (See DE 1, 7, 8, 9, 12, 14, 17, 19, 22, 23, 24, 30, 33, 34). Carnival argues that the current state of the pleadings, the result of its own previous motion practice, creates some pleading trap preventing the Plaintiff from proceeding, since in Carnival's view the Plaintiff should have pled a cause of action for direct rather than vicarious liability. (DE 50, Defendant's Motion at Pages 5-6). No such pleading trap exists; Carnival's liability in this case is clearly vicarious, just as the Plaintiff has pled. It is apparent from all the pleading and evidence in the case there was no high level corporate decision which caused the death of Karen Noon. It undeniably was the operational acts and failures of Carnival crew members which were the cause.

The limited case law explaining the distinction between a vessel operator's vicarious and direct liability makes it clear that "vicarious" liability exists where crewmembers have negligently acted (or negligently failed to act) while in the "furtherance of the vessel owner's business ... ." *Zuniga v. TMF, Inc.*, 261 F. Supp 2d 518, 524 (E.D. Va. 2003). Since most of the crewmembers' duties inherently deal with furthering one aspect or another of the "vessel owner's business," and most negligence actions against vessel owners arise out of some act or default of one or more crewmembers acting in the course of those duties, most negligence actions against vessel operators do implicate the operator's potential vicarious liability for the crewmembers' acts or omissions. A corporate vessel operator such as Carnival, like any other corporation, can act or fail to act only through its employees.

An action for "direct" liability refers to the much rarer situation in which a problem arises at a high managerial level of the vessel operator, rather than through the crewmembers' attempts

to perform their duties or neglect of those duties. "Direct" liability may exist, for example, when the vessel operator has negligently selected or trained its crew or negligently designed its vessel, or when the operator's policies themselves are flawed. *See, e.g, Zuniga*, 261 F. Supp 2d at 524(distinguishing claims for "direct negligence" through "negligent hiring" of crew or "the manner that it managed the vessel or crew," such as an alleged failure to enforce the ship's drug use policy, from "vicarious liability" for torts committed by a crewmember acting "in furtherance of the vessel owner's business ... ."); *Grant v. Entertainment Cruises, Inc.*, 308 F.Supp.3d 338, 341-42 (D.D.C. 2018)(distinguishing a vessel owner's "direct" liability for failing to provide safe working conditions from owner's "vicarious" liability for a tort committed by the captain in furtherance of ship's business, in that case docking the vessel).

Since the great majority of actions against cruise lines inherently deal with the vessel operator's vicarious liability for the negligent operational acts or omissions of various crewmembers, there is usually no need to address the distinction between vicarious and direct liability. There is hence no need for opinions to focus on this distinction.

In the case of *K.T. v. Royal Caribbean Cruises, Ltd.*, No. 17-14237, 2019 WL 3312530 (11th Cir. 2019), for example, cited by Carnival in its motion, the issues were the foreseeability of the onboard sexual assault on K.T. and the negligent failure of Royal Caribbean's crewmembers to prevent other passengers from incapacitating and sexually assaulting K.T. Since it was obvious and undisputed that, if Royal Caribbean were negligent at all, its negligence would arise from acts or omissions of its crewmembers in furthering ship's business, i.e. providing for the safety of passengers, there was no need in the *K.T.* opinion to address or focus


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

on the distinctions between vicarious and direct liability. The Court in *K.T.* made it clear that the liability alleged in that case was that "Royal Caribbean's crewmembers did nothing to prevent the large group of men from plying K.T. with enough alcohol to incapacitate her and did nothing to stop those men from leading her away to a private cabin," and that as a result of this failure by "Royal Caribbean's crewmembers" "***Royal Caribbean*** breached the duty of ordinary care it owed her." (DE 50, Defendant's Motion at Page 5, *quoting K.T.*, 2019 WL 3312530 at *3)(emphasis in Defendant's Motion). It is thus clear from the very quote upon which Carnival relies that Royal Caribbean's liability as pled in *K.T.* arose from a failure to act by its "crewmembers," that K.T. had alleged the vicarious liability of Royal Caribbean for the neglect of its crewmembers, and that when the Eleventh Circuit stated that "Royal Caribbean breached the duty of ordinary care it owed [K.T.]," this was simply a shorthand way of saying that Royal Caribbean was vicariously liable for its crewmembers' breach of their duty of ordinary care. *See also K.T.*, 2019 WL 3312530 at *6 ("that foreseeable and known danger imposed on Royal Caribbean *and its crew* a duty of ordinary reasonable care .... The allegations are that Royal Caribbean *and its crew* breached that duty ....")(emphasis added). Royal Caribbean breached its duty of reasonable care in *K.T.* through its vicarious liability for failures to exercise reasonable care by its crewmembers, the only individuals through whom it could act.

In this case, as in *K.T.* and most actions against cruise lines, the Plaintiff has alleged and intends at trial to prove breaches of the duty of reasonable care of the defendant cruise line, in this case Carnival, through the various failures of its crewmembers to exercise reasonable care as described above. Since Carnival in this case, like Royal Caribbean in *K.T.*, could act only


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

through its crewmembers, Carnival in this case, like Royal Caribbean in *K.T.*, is vicariously liable for the negligent failure to act of its crewmembers operating in furtherance of the vessel's business. This is what the Plaintiff has alleged and the evidence shows. Carnival's request for summary judgment based on its strained interpretation of the distinctions between vicarious and direct liability is pure sophistry.

**Randall Noon Testified to the Economic Damages Caused by his Wife's Death, Including Loss of Services**

Carnival devotes a substantial portion of its Motion to challenging the Plaintiff's evidence of economic losses, such as loss of support and services. Randall Noon testified when asked as to the services Karen Noon formerly provided him and which he must now provide for himself or through other means, such as laundry, cleaning, cooking, paying household bills, and handling household finances. He also testified that after his wife died, he "had to" sell his home, presumably because he was unable to afford the mortgage payments without his late wife's income. (DE 54, Deposition of Randall Noon, May 3, 2019 at 18:6-19:5; 72:13-25; 79:12-22; 80:16-21). There is no conflicting evidence in the record. The economic damage amounts are at least a jury question if not an unrefuted finding in favor of Plaintiff.

**Punitive Damages are Available in this Case due to Carnival's Failure to Act Despite Actual Knowledge of Karen Noon's Emergency Medical Condition**

The United States Supreme Court has ruled that punitive damages are available in cases of wrongful deprivation of maintenance and cure in cases where a vessel operator's conduct was willful, wanton and reckless, not merely in cases where the vessel operator had acted


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

intentionally. *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404 (2009). The Court reasoned that "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct" and that the Court "has also found the award of punitive damages to be authorized as a matter of common-law doctrine." Furthermore, the "general rule that punitive damages were available at common law extended to claims arising under federal maritime law." *Atlantic Sounding*, 557 U.S. at 409, 410, 411. The Court summarized the law as follows:

> The settled legal principles discussed above establish three points central to resolving this case. First, punitive damages have long been available at common law. Second, the common-law tradition of punitive damages extends to maritime claims. And third, there is no evidence that claims for maintenance and cure were excluded from this general admiralty rule. Instead, the pre-Jones Act evidence indicates that punitive damages remain available for such claims under the appropriate factual circumstances. As a result, respondent is entitled to pursue punitive damages unless Congress has enacted legislation departing from this common-law understanding. As explained below, it has not.
>
> *Atlantic Sounding*, 557 U.S. at 414. *See also Exxon Shipping Co. v. Baker*, 554 U.S. 471,492 (2008)(noting availability of punitive damages under maritime law for conduct that is "outrageous, owing to gross negligence, willful, wanton and reckless indifference for the rights of others, or behavior even more deplorable.")(internal citations omitted); *but cf. Dutra Group v. Batterton*, 139 S.Ct. 2275 (2019)(punitive damages not available at all for crewmembers' claims of unseaworthiness).

The majority of recent cases in this district have followed *Atlantic Sounding* as to the standard for awarding punitive damages in cases where they are available, and have recognized that punitive damages are generally available under federal maritime law for all willful and wanton torts against cruise ship passengers. Various orders explicitly hold that the appropriate standard for recovery is whether the Defendant's conduct was willful, wanton, or outrageous,

even if not necessarily intentional as was required by previous Eleventh Circuit case law. *See, e.g., Lobegeiger v. Celebrity Cruises, Inc.*, 2011 U.S. Dist. LEXIS 93933 at *19-20 (S.D. Fla. Case No. 11-21620-CIV-Altonaga-Simonton, August 23, 2011)(noting that the "opinion in *Atlantic Sounding II* indicates punitive damages are available as damages in all actions under general maritime law unless specifically limited by Congress" that "Congress has not enacted any legislation to limit a passenger's right to recover punitive damages in a personal injury action under general maritime law" and that "*Amtrak* [*In re Amtrak "Sunset Limited" Train Crash*, 121 F. 3d 1421 (11th Cir. 1997)], to the extent that it foreclosed a plaintiff's right to seek punitive damages under general maritime law, is clearly inconsistent with *Atlantic Sounding II* and is no longer the correct rule of decision in the Eleventh Circuit." ); *Doe v. Royal Caribbean Cruises, Ltd.*, 2012 U.S. Dist. LEXIS 36274 at *9 (S.D. Fla. Case No. 11-23323-GOODMAN, March 19, 2012)("Consequently, the exceedingly narrow standard for punitive damages enunciated in *Amtrack* … is no longer viable in light of the broad reasoning in *Atlantic Sounding* that, as a rule, common law remedies extend to federal maritime actions. Following *Atlantic Sounding*, punitive damages are therefore available in a maritime personal injury action, as at common law, for 'wanton, willful or outrageous conduct.'"); *J.G. v. Carnival Corp*, 2013 U.S. Dist. LEXIS 28878 at *8 (S.D. Fla. Case No. 12-21089-CIV-Rosenbaum/Seltzer, March 4, 2013)("a plaintiff may recover punitive damages under general maritime law, consistent with the common-law rule, where the plaintiff's injury was due to the defendant's 'wanton, willful or outrageous conduct.'"); *Ure v. Oceania Cruises, Inc.*, 2014 U.S. Dist. LEXIS 154818 at *13 (S.D. Fla. Case No. 14-21340-CIV-GAYLES/TURNOFF, October 31, 2014)("*Townsend*

established that punitive damages are available under federal maritime law for 'wanton, willful or outrageous conduct. '"); *Vairma v. Carnival Corp.*, 2015 U.S. Dist. LEXIS 188952 at *4 (S.D. Fla. Case No. 15-20724-CIV-SEITZ/TURNOFF, May 27, 2015)("While the courts in this district have not all read *Atlantic Sounding* to have such a broad reach, the majority have."); *Brown v. Oceania Cruises, Inc.*, 2017 U.S. Dist. LEXIS 192626 at *21 (S.D. Fla. Case No. 17-22645-CIV-ALTONAGA/GOODMAN, November 20, 2017)("Punitive damages are available in maritime personal injury actions for wanton, willful, or outrageous conduct."); *but cf. Bodner v. Royal Caribbean Cruises, Ltd.*, 2018 WL 4047119(S.D. Case No. 17-20260-CIV-LENARD/GOODMAN, May 8, 2018)(holding *Amtrack* still binding). Thus, the majority, albeit not all, of the trial judges in this district have read *Atlantic Sounding* to establish willful and wanton conduct as the generally applicable standard for awarding punitive damages in maritime cases where punitive damages are potentially available, including actions brought by injured cruise ship passengers.

The recent opinion in *Dutra* does not overrule *Atlantic Sounding*. The *Dutra* Court merely held that, due to the particular history of unseaworthiness claims under maritime law, punitive damages were not available, under any standard, in unseaworthiness cases brought by injured crewmembers. The *Dutra* opinion did not suggest that punitive damages were unavailable in actions brought by injured passengers under general maritime law, such as the present action. The *Dutra* Court also did not address the applicable standard for awarding punitive damages in maritime cases where they were available, and on this point did not recede from, challenge or question *Atlantic Sounding*.

The recent opinions in *Petersen v. NCL (Bahamas) Ltd.*, 748 Fed. Appx. 246, (11th Cir. 2018) and *Eslinger v. Celebrity Cruises, Inc.*, 772 Fed. Appx. 872 (11th Cir. 2019), upon which Carnival relies, addressed the availability of a consortium claim in maritime law. The *Petersen* and *Eslinger* courts concluded that consortium claims were generally not available under maritime law and that on this point, *Amtrack* remained binding. *Petersen*, 748 Fed. Appx. at 251; *Eslinger*, 772 Fed. Appx. at 872-73. No claims for punitive damages were at issue in *Petersen* and *Eslinger*, so these cases did not need to address the availability of punitive damages under maritime law or the standard for awarding such damages. On this point the law remains as stated above; *Atlantic Sounding* allows claims for punitive damages for willful or wanton conduct, and on this point the majority of courts in this district to date, though not all, have ruled that on the issue of the standard for awarding punitive damages in passenger cases *Atlantic Sounding* supersedes *Amtrack*.

In any event, Magistrate Judge Torres found the allegations in the Second Amended Complaint sufficient to support an award of punitive damages even under the more restrictive intentional tort standard of *Amtrack*. (DE 45 at 32-33). While not every detail alleged in the Second Amended Complaint has been borne out in discovery, the material ultimate facts upon which Magistrate Judge Torres relied have been. Carnival through Juanita Noon's statements or otherwise did actually know when it deprived its passenger Karen Noon of the oxygen concentrator upon which she was relying to breathe that she required assistance with breathing, that her condition was urgent, and that she required either a prompt emergency response or substitute oxygen support, neither of which Carnival provided. Carnival did deliberately


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

privilege inventory control for the ship's equipment and the ship's normal bureaucratic disembarkation procedures over the actually known urgent medical needs of its passenger, and thereby acted intentionally, not merely negligently.

## Conclusion

As of 7:00 A.M. on the morning Carnival's vessel arrived in port, Carnival through its crewmembers actually knew that Karen Noon was relying on oxygen supplementation provided by Carnival to assist in her breathing and would suffer a medical emergency should that oxygen supplementation be withdrawn without a substitute system or prompt emergency response. Nonetheless, Carnival prioritized inventory control for its equipment over the known urgent medical need of its passenger, deprived Karen Noon of necessary oxygen supplementation, and failed to summon the emergency response made necessary by its withdrawal of oxygen. In so doing, Carnival through its crewmembers deliberately breached both its duty of reasonable care under federal maritime law and its undertaken duties. The motion for final summary judgment, both as to liability and as to the claim for punitive damages, should be denied.


GERSON & SCHWARTZ, P.A. • 1980 Coral Way • Miami, Florida 33145-2624
Dade (305) 371-6000 •Broward (954) 845-0535 • Fax (305) 371-5749 •Toll Free (877) 475-2905
www.injuryattorneyfla.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 6, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I ALSO CERTIFY that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

**s/PHILIP M. GERSON**
PHILIP M. GERSON
Florida Bar No. 127290
pgerson@gslawusa.com
filing@gslawusa.com
cbenedi@gslawusa.com
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, FL 33145-2624
Telephone: (305) 371-6000
Facsimile: (305) 371-5749
Attorneys for Plaintiffs

**SERVICE LIST**

Philip M. Gerson, Esq.
Florida Bar # 127290
E-mail: pgerson@gslawusa.com
Nicholas I. Gerson, Esq.
Florida Bar # 20899
E-mail: ngerson@gslawusa.com
Edward S. Schwartz, Esq.
Florida Bar # 346721
E-mail: eschwartz@gslawusa.com
Attorneys for Plaintiff
GERSON & SCHWARTZ, P.A.
1980 Coral Way
Miami, Florida 33145

Marc J. Schleir
Florida Bar # 389064
E-mail: MSchleir@fowler-white.com
E-mail: Mjs@fowler-white.com
Christopher Knight
Florida Bar # 607363
E-mail: Cknight @fowler-white.com
Amanda A. Kessler
Florida Bar # 60885
E-mail: akessler@fowler-white.com
Andrew Garrett Tuttle
E-mail: atuttle@fowler-white.com
Katina M. Hardee
E-mail: KHardee@fowler-white.com
Attorneys for CARNIVAL CORPORATION
FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131