525 Woodgrove Dr.
Ann Arbor, MI 48103
July 14, 2019

Mr. George M.Koonce, III
Brickell Arch
1395 Brickell Avenue
14th Floor
Miami, Florida 33131

**Re: Noon v. CCL**

Dear Mr. Koonce

I am a Professor of Internal Medicine in the Division of Pulmonary and Critical Care Medicine at University of Michigan Hospital where I serve as the Medical Director of the Critical Care Medicine Unit. I spend over 50% of my time in clinical medicine directly caring for patients or supervising house officer physicians, nurses and medical students. In preparation for the opinions rendered herein I reviewed the materials:

- Case materials
    - Second amended complaint
    - Sparrow Medical Group 05.11.81-12.07.15
    - P006 – Special Needs Guest Management of Medical Oxygen
    - Med 1805 medical gases – CCL Specific instructions
    - Med 1805 medical gases
    - Incident report
    - Medical records notebook 1&2
    - Dominguez, Inez G._2017-07-08-09-42.AVI
- Depositions of
    - Randall Noon
    - Daniel Patten
    - Stacy Patten
- Report of Robert J. Myerburg, MD

Case summary –

Findings - Karen Noon was a 56-year-old woman with a history of diabetes, migraine headaches, and cervical radiculopathy who was s/p cervical fusion. Ms. Noon was a cigarette smoker of less than a pack of day. Her husband stated she had a history of COPD and used an inhaler. In June of 2014 she was treated for a bronchitis, at which time her saturation was recorded as both 87% and 91%. At other times (p. 541) her saturation was recorded as 93%.

In July of 2017 Karen and Randall Noon, along with several family members travelled from their home in Michigan to Miami to embark on a Carnival cruise. The ship left Miami July 3, 2017. After around 2-3 days at sea (p. 36) Ms. Noon developed shortness of breath, manifested by having to catch her breath after climbing a flight of stairs. Mr. Noon was unconcerned (p. 37). However, by July 7th their daughter Melissa was concerned enough to obtain a wheelchair. Mr. Noon could not recall (p. 39) whether it had been brought to their stateroom or whether Melissa went to obtain it herself. Although relatively comfortable at rest, Ms. Noon had significant dyspnea on exertion. The family also obtained an electric oxygen concentrator for Ms. Noon to use as Melissa had stated that her this was the problem and she needed it (p 42).

Mr. Noon stated Melissa had called the medical center specifically requesting oxygen for use. Additionally, he testified (p. 48) they had not considered having Ms. Noon be seen in the medical center because they, "didn't think she was that bad." Ms. Noon rested somewhat better with the oxygen. The next morning at approximately 7 am someone from the ship called and spoke with Melissa, requesting that the oxygen be returned. Melissa requested portable oxygen to use to disembark that day but was informed they could not leave with the oxygen as it had to stay onboard ship.

On the evening of July 7, 2017 Ms. Noon experienced shortness of breath and was taken back to her stateroom in a wheelchair provided by Carnival cruise line. Mr. Noon contacted the ship's medical center requesting oxygen, which was provided to him when he went to the medical center to pick it up. They were provided with an oxygen which required that it be plugged into an electric outlet. Subsequently two male porters from the ship, described only as not white, came to pick up the oxygen. By the time the men had arrived Mr. Noon had pushed the concentrator out of the room and down the hall. Neither Mr. Noon, nor Karen nor Juanita conversed with the men and did not ask to keep the oxygen at that point.

Sometime later that morning Ms. Noon was noted to be profusely sweating and having trouble catching her breath while seated in the wheelchair (p. 57). The ship docked in Miami on July 8, 2017. Subsequently, the family left the stateroom and went to an area in order to wait to disembark. A Carnival cruise desk clerk commented that Ms. Noon didn't look very good. Mr. Noon responded (p. 58), "we need to get her off the boat so we can take her to the doctor or to the hospital." At no point did the family request that Ms. Noon be seen at the medical center (p. 60). Additionally, the Mr. Noon acknowledged he did not request that an ambulance be called (p. 62). The family waited until a Carnival representative, who had been radioed by the Carnival clerk, wheeled Ms. Noon off of the ship.

The family had planned to get to their parked car by a shuttle and drive Ms. Noon to a hospital. However, after leaving the ship Ms. Noon left the wheelchair and sat on a bench. Shortly thereafter, at approximately 9.00 am the patient went into cardiac arrest. Ms. Noon received cardiopulmonary resuscitation first by a nearby policeman. I Dominguez, who had originally thought the patient was seizing, and bystanders. CPR was continued after the arrival of Miami-Dade Fire Rescue #39, Lt. Obregon and Capt. Guerra, assisted by Rescue #21,who then transported her to Jackson Memorial Hospital where she was admitted. After return of spontaneous circulation the patient was determined to be severely anoxia and life support was withdrawn. Karen Noon was pronounced dead at Jackson Memorial Hospital on July 9, 2017.

Findings – Karen Noon suffered a respiratory and then cardiac arrest due to an untreated COPD exacerbation. At no point did she or her family seek medical attention by a medical provider in the ship medical center. At her daughter's request Ms. Noon did receive supplemental oxygen from the medical center. Many Carnival cruise participants use supplemental oxygen on board ship. Hence the mere fact of obtaining oxygen --- without requesting medical care, did not obligate Carnival to medically treat Ms. Noon. No physician patient encounter occurred and as such no instance of medical malpractice could be possible under such circumstances.

Patients cannot be treated without their consent as this would violate the principle of autonomy, a cornerstone of medical ethics. Certainly Carnival employees such as porters and clerks represent the Cruise line from a customer satisfaction perspective. However, in encountering such medically untrained individuals Carnival clients do not enter into a medical relationship. Hence, neither malpractice nor medical negligence can occur under such circumstances. Although lay personnel are frequently trained to perform cardiopulmonary resuscitation, this very limited and specific training and qualification does not qualify anyone to act as a medical decision maker outside of that limited scope.

In sum, Karen Noon was provided oxygen as a medical courtesy, a technical and not a clinical event. At no time did she or her family request medical attention. At no time did Ms. Noon enter into a medical relationship with any qualified medical provider while onboard ship during the July 2017 cruise. Medical negligence can only occur in the context of a medical relationship and did not occur in this instance for that reason.

I hold all of these opinions to a reasonable degree of medical certainty. The opinions rendered in this matter are my own and subject to modification should additional information become available.

Sincerely,

Robert Hyzy

Robert C. Hyzy, MD