UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-23181-Civ-WILLIAMS/TORRES

RANDALL NOON, as Personal
Representative of the Estate of
KAREN NOON, deceased,

      Plaintiff,

v.

CARNIVAL CORPORATION,
a Panamanian Corporation d/b/a
CARNIVAL CRUISE LINES,

      Defendant.

_____/

## ORDER ON DEFENDANT'S *DAUBERT* MOTION

This matter is before the Court on Carnival Corporation's ("Defendant" or "Carnival") *Daubert* motion to exclude the testimony of Dr. Robert Myerburg's ("Dr. Myerburg") opinion as to the life expectancy of Karen Noon ("Mrs. Noon"). [D.E. 58]. Plaintiff responded on September 6, 2019 [D.E. 63] to which Defendant replied on September 13, 2019. [D.E. 64]. Therefore, Defendant's motion is now ripe for disposition. After careful review of the motion, response, reply, relevant authority, and for the reasons discussed below, Defendant's *Daubert* motion is **GRANTED**.[1]

---

[1] On October 16, 2019, the Honorable Kathleen Williams referred Defendant's *Daubert* motion to the undersigned Magistrate Judge for disposition. [D.E. 70].

1

## I. BACKGROUND

Plaintiff filed this wrongful death action on behalf of his wife, Mrs. Noon, on August 3, 2018 because of the negligence of Defendant's medical and non-medical personnel. [D.E. 1]. Plaintiff alleges that, on July 7, 2017, Mrs. Noon started to experience shortness of breath and respiratory distress. Mrs. Noon was then taken to her stateroom in a wheelchair that Carnival provided. Once Mrs. Noon returned to her stateroom, her family members called the ship's medical center and informed them that Mrs. Noon was having difficulty breathing. The medical staff informed the family that an oxygen tank could be provided at a cost of $300.00. The medical center provided the tank but without an examination of Mrs. Noon, either in the medical center or in her stateroom. Instead, Mr. Noon picked up the oxygen tank[2] and took it back to the stateroom.

Mrs. Noon used the oxygen tank during the remainder of the evening of July 7, 2017 until the early morning of July 8, 2017. At approximately 7:00 a.m. on July 8, 2017 (when the ship was docked in Miami, Florida), the ship's medical center staff contacted Mr. and Mrs. Noon in their stateroom and informed them that they had to return the oxygen tank because it was time to disembark the ship. Plaintiff alleges that, shortly thereafter, two crewmembers came to the stateroom and retrieved the oxygen tank without any examination of Mrs. Noon or any notification to the ship's medical personnel that a professional medical examination may be necessary.

---

[2] The oxygen tank required connection to an electric outlet to be used and therefore was not portable off the ship or outside of the stateroom.

After the ship was docked in port, Mr. Noon and his family members expressed a desire to keep the oxygen tank until they were transported to a land-based hospital. Plaintiff alleges that Carnival's non-medical crewmembers supervising the disembarkation procedures refused to allow Mrs. Noon to keep the oxygen tank or to provide a substitute tank. Mrs. Noon's family then requested that Carnival's crewmembers arrange for transportation to a land-based hospital or medical facility. But, Plaintiff claims that Carnival's crewmembers failed to contact any emergency service providers. Plaintiff further alleges that crewmembers refused to allow Mrs. Noon or her husband to contact any emergency service providers on their own.

After Mrs. Noon disembarked the ship – unaccompanied by any of Carnival's crewmembers or any other medical personnel – she went into respiratory arrest. Emergency responders arrived and found Mrs. Noon unresponsive in cardiopulmonary arrest with no respirations. The Miami-Dade Fire Rescue Department transported Mrs. Noon to Jackson Memorial Hospital, where she was pronounced dead on July 9, 2017.

In Plaintiff's second amended complaint, Plaintiff asserts four vicarious liability claims against Carnival: (1) vicarious liability for negligence breach of a nonmedical crewmember's duty to provide aid or assistance to a sick or injured passenger, (2) negligent breach of an assumed or undertaken duty to obtain medical care by nonmedical crewmembers, (3) negligent breach of an assumed or undertaken duty to obtain medical care by medical crewmembers with actual

3

authority, and (4) negligent breach of an assumed or undertaken duty to obtain medical care by the medical crew with apparent authority. Plaintiff limits the negligence allegations against Defendant to the time period after the ship reached port in Miami, Florida. Plaintiff also seeks compensatory damages under the Florida Wrongful Death Act (and alternatively under Michigan's wrongful death and survival statutes), including punitive damages in each count.

## II. APPLICABLE PRINCIPLES AND LAW

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702. The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova,*

*Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589).[3] The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as "gatekeeper," its duty is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa*, 158 F.3d 548, 562 (11th Cir. 1998) (citations omitted). The Eleventh Circuit refers to the aforementioned requirements as the "qualification," "reliability," and "helpfulness" prongs and while they "remain distinct concepts"; "the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

---

[3] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

5

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). The aforementioned factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking but admissible evidence." *Daubert*, 509 U.S. at 580; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

### III. ANALYSIS

Defendant's *Daubert* motion seeks to exclude Plaintiff's expert, Dr. Myerburg, because he is unreliable and unhelpful. Plaintiff produced Dr. Myerburg's expert report on June 25, 2019. Dr. Myerburg did not opine on Mrs. Noon's life expectancy in his report, but he stated that he had the right to do so based on any new or additional information. On July 26, 2019, Defendant took Dr. Myerburg's deposition where Dr. Myerburg opined on the life expectancy of Mrs. Noon. Dr. Myerburg testified that, after reviewing "the Jackson records and the deposition of [Mrs. Noon's husband] and two summaries of depositions of [Mrs. Noon's] daughters," that Mrs. Noon, as a 54-year-old woman, was expected to live into her

late 70s or early 80s.[4] [D.E. 58-2 at 35]. Dr. Myerburg also testified that his estimation "comes from experience and knowledge about the reduction in life expectancy for a population of patients and individuals who have [chronic obstructive pulmonary disease ("COPD")]." *Id.* at 42.

Defendant takes issue with Dr. Myerburg's opinions because he failed to review any of Mrs. Noon's medical records or her medical history. If Dr. Myerburg had reviewed these materials, Defendant claims that Dr. Myerburg would have realized that Mrs. Noon suffered from hyperlipidemia, Type 2 diabetes, migraines, COPD, asthma, and tobacco use. Defendant also suggests that Dr. Myerburg failed to account for Mrs. Noon's 20 plus years of tobacco use and that he failed to conduct any studies, publish any articles, or perform any other research to determine the life expectancy of Mrs. Noon. Instead, Defendant alleges that Dr. Myerburg relied primarily on life expectancy tables[5] that lack any foundation to form a reliable opinion that a woman with Mrs. Noon's health condition could be expected to live another 25 years. Because Dr. Myerburg's conclusion lacks any reliability and fails to consider any other facts or data, Defendant concludes that Dr. Myerburg's opinions must be excluded.

### A. *Whether Dr. Myerburg's Opinion is Reliable*

The primary reason Defendant seeks to strike Dr. Myerburg is because his opinion on Mrs. Noon's life expectancy lacks any reliability. Plaintiff opposes

---

[4] Mrs. Noon was 56 years old at the time of her death.

[5] The United States Government produces these life expectancy tables as part of their Medicare and Social Security programs.

8

Defendant's motion because Dr. Myerburg based his opinion on an unquestionable source of data – the Government's life expectancy tables. Plaintiff claims that Dr. Myerburg is a board-certified cardiologist who practices at Jackson Memorial Hospital and that he relied on Mrs. Noon's medical records (including her family's depositions) to conclude that her medical conditions were stable. Indeed, Dr. Myerburg determined that Mrs. Noon's condition only required a modest reduction of "a year or two difference," and that the tables relied upon are an accurate measure of her life expectancy. [D.E. 58-2 at 39]. While Plaintiff concedes that there may be weaknesses in Dr. Myerburg's opinion, Plaintiff argues that cross-examination – as opposed to wholesale exclusion – is the more appropriate relief. *See, e.g.*, *Myers-Clark v. Frahler Elec. Co.*, 2007 WL 189248, at *1 (W.D. Wash. Jan. 22, 2007) ("The issue of decedents alleged smoking and drug use habits are fair matters for cross-examination, but not fatal to Dr. Bassett testifying as an expert on life expectancy issues."). Accordingly, Plaintiff concludes that Dr. Myerburg's opinion is reliable and that Defendant's motion must be denied.

"The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to 'scientific . . . knowledge,' since the adjective 'scientific' implies a grounding in science's methods and procedures, while the word 'knowledge' connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds." *Daubert*, 509 U.S. at 580. This entails an assessment of whether the "methodology underlying the testimony is scientifically

9

valid." *Id.* at 592. The four non-exhaustive factors used to evaluate the reliability of a scientific expert opinion include the following:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Frazier*, 387 F.3d at 1262 (citations omitted).

Here, Defendant's motion is well taken because Dr. Myerburg's opinion is based on insufficient facts and data. There is no dispute that Dr. Myerburg relied on life expectancy tables, Mr. Noon's deposition, and the deposition summaries of Mrs. Noon's daughters. The problem is that Plaintiff claims that Dr. Myerburg also relied on Mrs. Noon's medical records when Dr. Myerburg specifically testified that he did not review any part of Mrs. Noon's medical file. [D.E. 58-2] ("Well, I do have an idea based on the deposition of her husband and the summaries of the deposition of the two daughters. What I don't have is medical record confirmation of that."). Instead, Dr. Myerburg reviewed an unspecified set of records from Jackson Memorial Hospital that "contained references to [Mrs. Noon's] prior medical status," and only "to a limited extent." [D.E. 58-2 at 31]. This means that, based on Dr. Myerburg's own testimony, his opinion – that Mrs. Noon was expected to live another 25 years – relies solely on life expectancy tables, depositions, and a vague set of records that reference Mrs. Noon's medical status.

In light of that, Dr. Myerburg's reliance on these items is insufficient to meet *Daubert's* reliability requirement because the party offering an expert "has the

10

burden of demonstrating that the testimony is 'relevant to the task at hand' and 'logically advances a material aspect' of its case." *Boca Raton Community Hospital, Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009). If an expert opinion does not have "a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'" *Id.* Hence, Plaintiff bears the burden of establishing that Dr. Myerburg meets these requirements to testify as an expert.

Dr. Myerburg falls far short of these requirements because it is entirely unclear how the depositions of other lay witnesses, vague records from Jackson Memorial Hospital, and life expectancy tables support an opinion that a woman of Mrs. Noon's age and medical condition could have lived another 25 years. A case that directly answers the question presented is Judge Seitz's decision in *Rinker v. Carnival Corp.*, 2012 WL 37381, at *1 (S.D. Fla. Jan. 6, 2012). In that case, the plaintiff proffered an expert who opined that a 62-year-old woman was expected to live for several years. The Court excluded the plaintiff's expert, however, because the expert based that opinion on the life expectancy tables of a healthy 62-year-old woman. Importantly, the Court determined that the expert's opinion was unreliable because the medical evidence indicated that the plaintiff was not a healthy 62-year-old woman but that the plaintiff suffered from stage three colon cancer. The Court therefore excluded the expert because the conclusions lacked fit with the facts of the case. *See id.* ("Dr. Lessne has not provided any reasoning or methodology to support his future medical care needs projections for Plaintiff. It appears that his estimates are nothing more than his own *ipse dixit*.") (citing *Cook*

*ex rel, Estate of Tessier v. Sheriff if Monroe County, Fla.,* 402 F.3d 1092, 10 (11th Cir. 2005) (stating that a district court may exclude expert testimony when its factual basis is not adequately explained).

The same reasoning applies here because there is nothing in the record to support Dr. Myerburg's opinion on Mrs. Noon's life expectancy. Plaintiff argues that the weaknesses identified should be subjected to cross-examination and that Defendant has not otherwise shown that the number of years proffered is unreliable. This contention fails, however, because the burden is on Plaintiff to show that Dr. Myerburg meets *Daubert* and Federal Rule of Civil Procedure 702.

Putting that aside, Plaintiff' argument fails for an entirely different reason. Dr. Myerburg undermined his own testimony when he stated that Mrs. Noon's life expectancy is "easily accessible on the internet," and that government tables "would give [Defendant] everything," in determining the number of years Mrs. Noon was expected to live. [D.E. 58-2 at 43]. We agree with Dr. Myerburg because the medical charts that he relied upon are easily accessible on the internet. We disagree, however, that the use of these charts enables an individual to render an expert opinion. Indeed, expert testimony is only "admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." *Frazier*, 387 F.3d at 1262-63 (citations omitted). If a layperson need only download a chart to reach a conclusion as to how many years an individual is expected to live, that does not render that person an expert nor does it prove helpful to the trier of fact.

Undeterred, Plaintiff contends that Dr. Myerburg's opinion goes farther than a simple lay witness because he used his medical experience to determine that Mrs. Noon's life expectancy should only be reduced by a year or two in comparison to a generic patient with COPD. But, Dr. Myerburg never explains how his experience led him to that conclusion. Dr. Myerburg failed to review, for example, any of Mrs. Noon's medical records, conduct any studies, publish any articles, or perform any other independent research with respect to patients with COPD.[6] If Dr. Myerburg had done so, he would have learned that Mrs. Noon had been diagnosed with tobacco abuse, hyperlipidemia, Type 2 diabetes, migraines, and asthma. Dr. Myerburg could have then incorporated those limitations into an opinion that is tailored to Mrs. Noon and relies on evidence as to the number of years she was expected to live.

As the opinion stands now, it is devoid of any evidence that Mrs. Noon's condition matches that of a COPD patient in their mid-fifties. And it is entirely speculative that Mrs. Noon's life expectancy would have been reduced by only one or two years when Dr. Myerburg failed to consider any of her medical history. Because the core of Dr. Myerburg's opinion consists of life expectancy tables, depositions, and vague references to items from Jackson Memorial Hospital – without any other evidence that relates directly to Mrs. Noon – Plaintiff has failed to show that Dr. Myerburg's opinion is reliable or that he will be helpful to the trier of fact. For

---

[6] Dr. Myerburg's failure to consider Mrs. Noon's medical records is fatal because her medical file from Sparrow Medical Center spans over 30 years. Without any consideration as to any of this evidence, Dr. Myerburg's opinion lacks any reliable foundation.

these reasons, Defendant's motion to exclude Dr. Myerburg on his opinion of Mrs. Noon's life expectancy must be **GRANTED**.

### *IV. CONCLUSION*

For the foregoing reasons, Defendant's *Daubert* motion to exclude Dr. Myerburg's life expectancy opinion is **GRANTED**. [D.E. 58].

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of November, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge