**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 18-23181-Civ-WILLIAMS/TORRES

RANDALL NOON, as Personal
Representative of the Estate of
KAREN NOON, deceased,

Plaintiff,

v.

CARNIVAL CORPORATION,
a Panamanian Corporation d/b/a
CARNIVAL CRUISE LINES,

Defendant.

______________________________________/

**REPORT AND RECOMMENDATION**
**ON CARNIVAL'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Carnival Corporation's ("Defendant" or "Carnival") motion for summary judgment against Randall Noon ("Mr. Noon" or "Plaintiff"). [D.E. 50]. Plaintiff responded to Defendant's motion on September 6, 2019 [D.E. 61] to which Plaintiff replied on September 13, 2019. [D.E. 65]. Therefore, Carnival's motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant authority, and for the reasons discussed below, Carnival's motion for summary judgment should be **GRANTED in part** and **DENIED in part**.[1]

---

1 On October 16, 2019, the Honorable Kathleen Williams referred Carnival's motion to the undersigned Magistrate Judge for disposition. [D.E. 70].

## *I. BACKGROUND*

Plaintiff filed this wrongful death action on behalf of his wife, Mrs. Noon, on August 3, 2018 because of the negligence of Carnival's medical and non-medical personnel. [D.E. 1]. Plaintiff alleges that, on July 7, 2017, Mrs. Noon started to experience shortness of breath and respiratory distress. Mrs. Noon was then taken to her stateroom in a wheelchair that Carnival provided. Once Mrs. Noon returned to her stateroom, her family members called the ship's medical center and informed them that Mrs. Noon was having difficulty breathing. The medical staff informed the family that an oxygen tank could be provided at a cost of $300.00. The medical center provided the tank but without an examination of Mrs. Noon, either in the medical center or in her stateroom. Instead, Mr. Noon picked up the oxygen tank[2] and took it back to the stateroom.

Mrs. Noon used the oxygen tank during the remainder of the evening of July 7, 2017 until the early morning of July 8, 2017. At approximately 7:00 a.m. on July 8, 2017 (when the ship was docked in Miami, Florida), the ship's medical center staff contacted Mr. and Mrs. Noon in their stateroom and informed them that they had to return the oxygen tank because it was time to disembark the ship. Plaintiff alleges that, shortly thereafter, two crewmembers came to the stateroom and retrieved the oxygen tank without any examination of Mrs. Noon or any notification to the ship's medical personnel that a professional medical examination may be necessary.

---

[2] The oxygen tank required a connection to an electric outlet and therefore was not portable off the ship or outside of the stateroom.

After the ship was docked in port, Mr. Noon and his family members expressed a desire to keep the oxygen tank until they were transported to a land-based hospital. Plaintiff alleges that Carnival's non-medical crewmembers supervising the disembarkation procedures refused to allow Mrs. Noon to keep the oxygen tank or to provide a substitute tank. Mrs. Noon's family then requested that Carnival's crewmembers arrange for transportation to a land-based hospital or medical facility. But, Plaintiff claims that Carnival's crewmembers failed to contact any emergency service providers. Plaintiff further alleges that crewmembers refused to allow Mrs. Noon or her husband to contact any emergency service providers on their own.

After Mrs. Noon disembarked the ship – unaccompanied by any of Carnival's crewmembers or any other medical personnel – she went into respiratory arrest. Emergency responders arrived and found Mrs. Noon unresponsive in cardiopulmonary arrest with no respirations. The Miami-Dade Fire Rescue Department transported Mrs. Noon to Jackson Memorial Hospital, where she was pronounced dead on July 9, 2017.

In Plaintiff's second amended complaint, Plaintiff asserts four vicarious liability claims against Carnival: (1) vicarious liability for negligence breach of a nonmedical crewmember's duty to provide aid or assistance to a sick or injured passenger, (2) negligent breach of an assumed or undertaken duty to obtain medical care by nonmedical crewmembers, (3) negligent breach of an assumed or undertaken duty to obtain medical care by medical crewmembers with actual

authority, and (4) negligent breach of an assumed or undertaken duty to obtain medical care by the medical crew with apparent authority. Plaintiff limits the negligence allegations against Carnival to the time period after the ship reached port in Miami, Florida. Plaintiff also seeks compensatory damages under the Florida Wrongful Death Act (and alternatively under Michigan's wrongful death and survival statutes), including punitive damages in each count.

## *II. APPLICABLE PRINCIPLES AND LAW*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

323–24 (1986). The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592–94)).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## *III. ANALYSIS*

Carnival's motion seeks summary judgment on all four counts included in Plaintiff's second amended complaint. Alternatively, if any count survives, Carnival argues that it should be entitled to summary judgment on Plaintiff's demand for punitive and economic damages. Plaintiff's request for economic damages includes:

(1) the loss of Mrs. Noon's earning capacity, (2) the actual loss of those earnings, (3) the loss of support and services, (4) the loss of net accumulations, and (5) funeral expenses. Plaintiff opposes Carnival's motion, at every turn, because there is ample evidence in the record that Carnival's crewmembers knew of Mrs. Noon's medical condition and prioritized inventory control over the urgent needs of a passenger. We will discuss each argument in turn.

### ***A. Principles of General Maritime Law***

As a sea carrier, Carnival does not serve as strict liability insurer to its passengers, meaning it can only be liable for negligence. *See Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1334 (11th Cir. 1984); *Keefe v. Bahama Cruise Line, Inc.,* 867 F.2d 1318, 1322 (11th Cir. 1989). "Generally, to prevail in a negligence action the plaintiff must show that: (1) the defendant owed plaintiff a duty; (2) the defendant breached that duty; (3) the defendant's breach was the proximate cause of plaintiff's injuries; and (4) the plaintiff suffered damages." *Weiner v. Carnival Cruise Lines*, 2012 WL 5199604, at *2 (S.D. Fla. Oct. 22, 2012) (citing *Isbell v. Carnival Corp.,* 462 F. Supp. 2d 1232, 1236 (S.D. Fla. 2006)). Because the accident in this case occurred aboard a cruise ship, the aforementioned elements must be evaluated in connection with federal maritime law. *See Smolnokar v. Royal Caribbean Cruises Ltd.,* 787 F. Supp. 2d 1308, 1315 (S.D. Fla. 2011) ("Federal maritime law applies to actions arising from alleged torts 'committed aboard a ship sailing in navigable waters.'"). Each element is ordinarily essential to a negligence claim and, at this stage of the proceedings, it is established

that a "[p]laintiff cannot rest on the allegations of her complaint in making a sufficient showing on each element for the purposes of defeating summary judgment." *Isbell*, 462 F. Supp. 2d at 1236–37 (citing *Tipton v. Bergrohr GMBH-Siegen,* 965 F.2d 994, 999 (11th Cir. 1992)); *Taiariol v. MSC Crociere, S.A.*, 2016 WL 1428942, at *3 (S.D. Fla. Apr. 12, 2016), *aff'd*, 677 F. App'x 599 (11th Cir. 2017) ("The failure to show sufficient evidence of each element is fatal to a plaintiff's negligence cause of action.").

It is also settled law "that a shipowner owes passengers the duty of exercising reasonable care under the circumstances." *Isbell*, 462 F. Supp. 2d at 1237 (citations omitted). In meeting that standard of care, it "requires, as a prerequisite to imposing liability, that the carrier have actual or constructive notice of the risk-creating condition." *See Keefe,* 867 F.2d at 1322. "This duty includes a duty to warn passengers of dangers the cruise line knows or reasonably should have known." *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F. Supp. 2d 1308, 1322 (S.D. Fla. 2011) (citing *Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. 3d DCA 1985) (cruise line owners have a duty to warn that "encompasses only dangers of which the carrier knows, or reasonably should have known"); *Goldbach v. NCL (Bahamas) Ltd.,* 2006 WL 3780705, at *2 (S.D. Fla. Dec. 20, 2006) (same)). However, this duty only extends to "those dangers which are not apparent and obvious to the passenger." *Luby v. Carnival Cruise Lines, Inc.*, 633 F. Supp. 40, 41 (S.D. Fla. 1986) (citing *N.V. Stoomvaart Maatschappij Nederland v. Throner,* 345 F.2d 472 (5th Cir. 1965)); *see also Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351,

1357 (S.D. Fla. 2013) ("[T]here is no duty to warn of dangers that [are] of an obvious and apparent nature.") (internal quotation marks omitted).

***B. Count 1: Negligent Breach to Provide Aid (Non-Medical)***

Carnival's leading argument is that it should be entitled to summary judgment on count one of Plaintiff's second amended complaint because no non-medical crewmember owed a duty to provide aid or assistance to Mrs. Noon. Carnival also argues that Plaintiff has not alleged a direct negligence claim and that Plaintiff has merely decided to proceed on a claim for vicarious liability. While Carnival does not dispute that a shipowner has a general duty of reasonable care to its passengers, Carnival believes that this duty does not extend to a shipowner's employees. This means that – without a direct negligence claim – count one must fail because Plaintiff has only alleged that Carnival's crewmembers breached their *own* duties of care. Accordingly, Carnival concludes that vicarious liability cannot attach under these circumstances because crewmembers do not owe a duty of care to passengers under general maritime law.

Alternatively, Carnival argues that, even if the Court disagrees and construes Plaintiff's allegations as imposing a duty on Carnival, count one fails because there is no evidence to support Plaintiff's claim. Plaintiff alleges that when the porters retrieved Mrs. Noon's oxygen tank, she was already suffering from respiratory distress. Plaintiff also alleges that the porters observed and commented on Mrs. Noon's distressed state yet did nothing to aid her. Carnival argues that the evidence now shows that Plaintiff's allegations lack any merit because Mrs. Noon

was not distressed when the porters arrived, nor did the porters observe Mrs. Noon's condition. Instead, Carnival claims that, when the porters arrived, Mr. Noon pushed the oxygen tank out the door and no member of the Noon family asked the porters to leave the tank or to seek any other medical assistance. Carnival also contends that there is no evidence of any other communications or interactions between the porters and the family members. Because the porters lacked medical training and never had any communications with Mrs. Noon's family related to her medical condition, Carnival concludes that there is no evidence supporting Plaintiff's allegation that the porters breached a duty of care.

Plaintiff's response is that there is an issue of fact because Mrs. Noon's daughter, Juanita Noon ("Juanita"), testified that at approximately 7:00 a.m. on the morning the vessel arrived in Miami an unidentified Carnival crewmember called Mrs. Noon's stateroom. The crewmember advised Juanita that Carnival needed to retrieve the oxygen tank for inventory purposes. Juanita then asked the crewmember whether a portable oxygen tank was available, and the crewmember told Juanita that none were available. Juanita concluded the conversation with a statement that the family was going to visit the emergency room immediately after disembarking the vessel:

> Then I asked them okay, so what are we supposed to do, do you have the portable ones. They said they don't have any that could leave the ship. I said Okay, then I guess we're going to go to the ER as soon as we get off the ship, and it wasn't much longer somebody was back or at the door because the door was open because we were packing.

[D.E. 52 at 77].

Plaintiff suggests that Juanita's deposition testimony defeats Carnival's motion for summary judgment because it is unclear who Juanita spoke to and whether that individual breached a duty of care. Carnival takes issue with Plaintiff's response because it presents a new theory of liability that was never presented in Plaintiff's second amended complaint. Carnival argues, for instance, that the alleged negligence in count one is directed solely at the porters and the non-medical crewmembers conducting and supervising the disembarkation procedures – not some unidentified phone caller. Carnival also maintains that Plaintiff (who had three opportunities to perfect his pleading at the motion to dismiss stage) cannot amend his complaint at this stage of the case and in response to a motion for summary judgment. *See, e.g.*, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Gilmour may not raise a contractual claim in her opposition to Gates' summary judgment motion. Gates had no notice of a contract claim based on the tort claims set forth in the complaint."). Therefore, Carnival concludes that the Court need not reach the merits of count one because Plaintiff's new theory of liability is omitted in the second amended complaint.

Alternatively, even if the Court considers Plaintiff's new theory of liability, Carnival argues that the disposition of the motion remains the same because there is insufficient evidence that the caller breached a duty of care to Mrs. Noon. Carnival argues that a guest representative called Mrs. Noon's stateroom to advise Juanita that the oxygen tank needed to be retrieved. While the identity of the caller remains unclear, Carnival suggests that it is ultimately irrelevant because

there is zero evidence that Juanita advised the caller that Mrs. Noon was in respiratory distress. Carnival relies, in part, on Mr. Noon's testimony that his wife was feeling fine at the time of the phone call and that she only had trouble breathing after she left the stateroom. Carnival also contends that there is no evidence that (1) Juanita told the caller to obtain medical assistance, (2) that Juanita made a request for Mrs. Noon to be allowed to disembark the vessel immediately, or (3) that Juanita advised anyone that Mrs. Noon was in danger of serious injury or death. For these reasons, Carnival concludes that, even if the unknown caller was a non-medical crewmember, there is no evidence that anyone was negligent.

Carnival's arguments are unpersuasive because there is an issue of fact as to the identity of the caller and whether he or she was negligent in rendering aid to Mrs. Noon. Carnival claims that there is no evidence that this caller could have been negligent, but Juanita's deposition testimony undercuts that view. Juanita questioned the caller on what the family was going to do if Carnival took the oxygen tank away and Juanita told the caller that the family would visit the emergency room immediately after disembarking the ship. Carnival argues that Juanita merely presented a rhetorical question to the caller on what the family was planning to do. But, there is nothing in the record to support that inference.

Carnival then claims that Juanita's statement, about the family needing to visit the emergency room as soon as the family disembarks the ship, did not reasonably communicate to the caller that there was an emergency. This

contention is unavailing because, if there were questions as to how the family would proceed without the availability of an oxygen tank and there were communications that the family needed to visit an emergency room immediately after exiting the vessel, a reasonable juror could find that Mrs. Noon needed immediate medical attention. Carnival attempts to undermine this conclusion with evidence that Mrs. Noon's family members – including two home healthcare aides – did not believe that Mrs. Noon was in an emergency situation at the time of the phone call. Carnival's argument is again unpersuasive because it is immaterial as to what two home healthcare aides thought – what matters is the notice that was given to a Carnival crewmember that a passenger needed immediate medical attention. While Juanita may not have used the exact words that Mrs. Noon was in "respiratory distress," or that Mrs. Noon's medical condition was "life-threating," there is sufficient evidence in the record to find that the unknown caller breached a duty of care to Mrs. Noon.

Undeterred, Carnival claims that the Court should *not* consider any of the evidence presented because Plaintiff alleged in count one a theory of liability that was premised on the conduct of porters and non-medical crewmembers conducting and supervising disembarkation procedures – not an unidentified phone caller. Carnival's argument is misplaced because the record is unclear as to who called Mrs. Noon's stateroom. Carnival suggests that the caller was not involved in the disembarkation procedures because he or she merely sought to retrieve the oxygen tank. But, the evidence is inconclusive because neither party knows who called Mrs. Noon's stateroom to retrieve the tank. It is also unclear as to what role that

person may have had in connection with the disembarkation procedures. It is entirely possible, for example, that the reason the person called to retrieve the tank is because he or she works with Carnival's porters or other crewmembers to follow standard disembarkation procedures. The caller may also have been an employee who works alongside Carnival's employees to carry out non-medical duties. While it appears that the porters who physically retrieved the tank may not have witnessed Mrs. Noon in respiratory distress, the actions of the caller go hand in hand with the allegations presented. Accordingly, the evidence shows that the Carnival employee who spoke to Juanita may have acted negligently and – along with the porters who retrieved the tank – contributed to the death of Mrs. Noon.

Carnival's next argument as to count one is that Plaintiff only filed a vicarious liability claim – as opposed to a claim for direct negligence – and that this requires an entry of summary judgment. Carnival contends that liability cannot attach because – although a shipowner owes passengers a duty of reasonable care – this duty does not extend to a shipowner's employees. Put differently, Plaintiff's failure to allege a direct negligence count against Carnival purportedly means that Plaintiff cannot hold Carnival liable on a claim of vicarious liability. Carnival therefore reasons that, absent a direct negligence claim against the shipowner, summary judgment must be granted as to count one.

The Court need not give much consideration to this argument because it is circular and devoid of any relevant legal authority. Putting that aside, Carnival's argument is unpersuasive because – if a shipowner's employees commit negligent

acts in an agency relationship – the negligence of the employees may be imputed to the shipowner. *See, e.g., United States v. Habersham Properties, Inc.*, 319 F. Supp. 2d 1366, 1375 (N.D. Ga. 2003) ("It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment.") (citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 756 (1998) ("An employer may be liable for both negligent and intentional torts committed by an employee within the scope of his or her employment"); *New Orleans, M., & C.R. Co. v. Hanning,* 15 Wall. 649, 657 (1873) ("The principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of")).

The thrust of Carnival's argument is that Plaintiff failed to allege a direct negligence count against Carnival and that the vicarious liability[3] claim is tied – *not* to Carnival's negligence – but to the actions of Carnival's employees. Carnival's argument is a clever form of legal gymnastics because, although Plaintiff never filed a separate count of direct negligence against Carnival, there is no mistake that count one implies negligence to the shipowner. Count one would otherwise make little sense because Plaintiff's allegations would be directed solely at the

---

3 To prevail under a theory of vicarious liability, Plaintiff need only show that the negligent conduct was within the scope of an employee's employment, which is "established if: '(1) the conduct is of the kind he was employed to perform; (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed; and (3) the conduct is activated at least in part to serve the employer." *Brown v. Zaveri*, 164 F. Supp. 2d 1354, 1361 (S.D. Fla. 2001) (quoting *Degitz v. Southern Mgmt. Servs., Inc.,* 996 F. Supp. 1451, 1462 (M.D. Fla. 1998)).

crewmembers with no connection to Carnival. This would constitute a contorted reading of the complaint because Plaintiff has alleged all the required elements to state a claim for both negligence and vicarious liability. Carnival's argument is also repetitive as Carnival presented it before in its objections to the final Report and Recommendation ("R&R") on the motion to dismiss. The problem is that this argument has no more merit today than it did when Carnival first presented it. Accordingly, Carnival's motion for summary judgment as to count one should be **DENIED**.

### *C. <u>Count 2: Negligent Breach of Undertaken Duty (Non-Medical)</u>*

Carnival's next argument is that summary judgment should be entered as to count two because there is no evidence that any non-medical crewmember undertook a duty to render aid or assistance to Mrs. Noon. Count two relies on allegations that the ship's porters failed to undertake a duty when they retrieved the oxygen tank. Carnival argues that discovery has now revealed that the porters never had any communications with Mrs. Noon, let alone made any promise that they would render assistance to her. Carnival also contends that there is no evidence that Mrs. Noon was in respiratory distress when the porters arrived or that they observed her in respiratory distress. Instead, Carnival states that the porters merely retrieved the tank and that its crewmembers cannot be held liable when no aid was promised or delivered to Mrs. Noon. Because Plaintiff has failed to adduce any evidence that any other non-medical crewmember promised any aid, Plaintiff concludes that summary judgment should be granted as to count two.

Carnival's argument can be denied for the same reasons set forth above because – if Juanita had a phone call with a Carnival employee who attempted to retrieve the oxygen tank for inventory purposes and Juanita put Carnival on notice of an emergency – Carnival had a duty to undertake medical assistance because of the special relationship that exists between a common carrier and a passenger. To circumvent this issue, Carnival argues that it had no duty to assist Mrs. Noon in the first instance. Carnival takes issue with the undersigned's reliance in the prior R&R on the Second Restatement of Torts. Carnival claims that the Court's analysis was misplaced and that the Second Restatement has no bearing on whether a voluntarily assumed duty was undertaken.

Carnival's argument is mistaken for the same reasons already discussed. If this case did not present a special relationship between a common carrier and a passenger, Carnival's position would be well taken. That is, the undertaker doctrine generally would not apply if an individual failed to undertake any duty. *See, e.g., L.A. Fitness Int'l, LLC v. Mayer,* 980 So. 2d 550, 561 (Fla. 4th DCA 2008) (rejecting application of undertaker doctrine where "appellee did not allege or establish that [defendant] worsened [victim's] condition or caused him any affirmative injury. Appellee also failed to assert or establish that [defendant's] assessment . . . caused others to 'rest on their oars' and refrain from rendering aid in reliance on [that] undertaking.").

But, this case is an admiralty action involving a cruise line, a common carrier, and its passenger. And the Eleventh Circuit, like many other courts, has

decreed that under these circumstances a "special relationship" exists between the carrier and its passengers. *See Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1334 (11th Cir. 1984) ("A ship, as a common carrier, owes a special duty to its passengers."); *see also Doe v. Celebrity Cruises, Inc.,* 394 F.3d 891, 908, 913 (11th Cir. 2004) (citing Restatement (Second) of Agency and holding cruise line strictly liable for crew member intentional assaults on passengers; "The case precedent establishes that, due to the special carrier-passenger relationship, the defendants had a non-delegable duty to protect and safely transport Doe during the cruise."); *Tullis v. Fid. & Cas. Co. of New York,* 397 F.2d 22, 23 (5th Cir. 1968) (negligence was the applicable liability standard for slip and fall cases; "The liability basis is negligence with the only apparent exception being the unconditional responsibility of the carrier for the misconduct of the crew toward the passengers.")).

Indeed, section § 314A of the Second Restatement provides that certain special relations give rise to a duty to aid or protect:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> . . .
>
> (4) One who is required by law or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

The comments to the Restatement also shed light on the extent of a common carrier's liability to undertake a duty of care such as this one:

> The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained.

Despite the Court's lengthy analysis on how a special relationship applies to the facts of this case, Carnival has not presented any other authority to conclude otherwise. Instead, Carnival references decisions outside the Eleventh Circuit while also failing to resolve the issues of fact as to how the non-medical crewmembers may have been negligent in their duties to Mrs. Noon. Because Carnival has not presented any other legal authority and there is evidence that Carnival was on notice (or at least should have been) when the non-medical crewmembers retrieved the oxygen tank, Carnival's motion for summary judgment as to count two should be **DENIED**.

### *D. Counts 3 and 4: Negligent Breach of Undertaken Duty (Medical)*

Carnival argues that summary judgment should be entered as to counts three and four because there is no evidence that medical crewmembers failed to undertake a duty to render aid to Mrs. Noon. Carnival claims that the only interaction between Mrs. Noon's family and any medical crewmember was when her husband and daughter visited the medical center to borrow an oxygen tank. Carnival suggests that a nurse advised the family to bring Mrs. Noon to the medical

center to have a doctor's consultation for a proper medical assessment and evaluation. But, Carnival contends that Mr. Noon and Juanita declined to do so and advised the medical center that Mrs. Noon's distress occurred on prior occasions and that Mrs. Noon only needed oxygen.[4] Carnival then states that the nurse advised Mr. Noon and Juanita to call 911 if medical assistance was needed. The next morning, an unidentified Carnival employee contacted the Noon family to advise them that the tank needed to be retrieved prior to disembarkation. Juanita asked if there was a portable tank that could leave the ship and Carnival advised the family that there were none.

Carnival argues that summary judgment should be entered as to counts three and four because the Noon family failed to inform any medical crewmember that Mrs. Noon was in respiratory distress or that she needed medical attention. There is apparently no evidence, for example, that anyone at the medical center ever had knowledge of Mrs. Noon's medical condition or that she needed oxygen to leave the ship. While Carnival concedes that allowing Mrs. Noon to borrow the oxygen tank arguably gave rise to an assumed duty to ensure that the tank was operational, there was no independent duty to render any aid. Indeed, Carnival claims that there is no evidence that the nurse at the medical center promised to monitor or assist Mrs. Noon in any way. Carnival therefore concludes that there was no assumed duty because neither Mr. Noon nor Juanita had any expectation that any medical crewmember would render aid given their representations that Mrs. Noon

---

[4] This representation is based on the nurse who noted in his medical log that he advised the Noon family to bring Mrs. Noon to the medical center for evaluation.

merely needed an oxygen tank and nothing else.

Carnival's argument lacks merit because Juanita testified that, when she and Mr. Noon visited the medical center, they told Carnival that Mrs. Noon was having trouble breathing. Juanita also testified that Mrs. Noon never refused to be seen, in part, because Carnival failed to recommend that she visit the medical center:

> Q: Did they suggest that you bring your mom down?
> A: Nuh-huh.
> Q: Did you tell them that she was having difficulty?
> A: Yeah. I said she was having problems breathing, did they have any oxygen.
> Q: Okay. Did you tell them that she didn't want to be seen?
> A: No. They never asked.

[D.E. 52 at 70].

Mr. Noon also testified that, when he visited the medical center, the crewmember who provided the oxygen tank did not ask about Mrs. Noon's condition. The crewmember merely provided the oxygen tank:

> Q: Okay. Did you have a conversation with him?
> A: Other than here's your thing and here's the hose that you need to hook to it.
> Q: Did you tell him what was going on with Karen?
> A: He didn't ask. He just said, here you go.

[D.E. 54 at 46].

Given the testimony of Juanita and Mr. Noon, there is an issue of fact as to whether Carnival's medical crewmembers failed to undertake a duty to render aid to Mrs. Noon. Carnival argues, on one hand, that the nurse made a notation in his medical log that he advised the Noon family to bring Mrs. Noon to the medical center for a proper evaluation but that she declined. On the other hand, Mr. Noon

and Juanita testified that the family's interaction with the nurse was limited and that medical personnel never requested to see Mrs. Noon despite knowledge that she was having trouble breathing. Because there is an issue of fact as to how Carnival's medical crewmembers responded to Mrs. Noon's condition, Carnival's motion for summary judgment as to counts three and four should be **DENIED**.[5]

Carnival's next argument is that – even if its medical personnel had a duty to render aid to Mrs. Noon – Plaintiff cannot prove that any duty was breached. Carnival contends that expert testimony is required to establish that a medical provider deviated from the required standard of care and that Plaintiff's expert never opined on this issue. Accordingly, Carnival requests that summary judgment be entered as to counts three and four.

Carnival relies for support on the Eleventh Circuit's decision in *Lambert v. United States*, 198 F. App'x 835, 839 (11th Cir. 2006), where the Court found that, under Florida law and in medical malpractice cases, the appropriate standard of

[5] Carnival mentions, in passing, that it should be entitled to summary judgment on count four because there is no evidence establishing that any medical crewmember was Carnival's apparent agent. We disagree, however, because the Noon family spoke with the nurse at the medical center. Carnival suggests, however, that the nurse never made any representation to cause the Noon family to reasonably believe that the nurse had apparent authority to act on behalf of the shipowner. This is a fanciful argument as it is unclear as to how a nurse who communicates with passengers about a medical issue at the ship's medical center is not an apparent agent of the shipowner. Carnival then argues that there is no evidence that Mrs. Noon relied on or changed her position with respect to any communication between the Noon family and Carnival's medical personnel. This is also unsupported in the record because the Noon family specifically testified that they communicated to Carnival crewmembers Mrs. Noon's distress and that Carnival did nothing further. If Carnival believes that the Noon family did not rely on the failure of Carnival's medical personnel to assist Mrs. Noon in any way, then that's a theory that Carnival should tell to the jury.

care is determined through expert testimony. *See* Fla. Stat. § 766.102(1) ("[T]he claimant shall have the burden of proving by the greater weight of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider."); *see also Cruz v. United States*, 2013 WL 395460, at *4 (S.D. Fla. Jan. 31, 2013) ("As the case law indicates, Florida law requires expert testimony to establish the standard of care in medical malpractice cases.") (citing *Lambert,* 198 Fed. App'x at 839). Because Plaintiff failed to present an expert to opine on the required level of care, Carnival suggests that the Court need go no further in the disposition of counts three and four. *See Cruz*, 2013 WL 395460, at *4 ("Because Cruz did not, and now cannot, produce an expert witness, he cannot establish an essential element of his claim and thus cannot survive a motion for summary judgment.") (citing *Wheeler v. United States*, 2007 WL 3306639, at *2 (N.D. Fla. Nov. 6, 2007)).

This means that the determinative question is whether Plaintiff's complaint arises under ordinary negligence, or medical malpractice. "To be a malpractice claim, a wrongful act must be directly related to the improper application of medical services and the use of professional judgment or skill." *Quintanilla v. Coral Gables Hosp., Inc.*, 941 So. 2d 468, 469 (Fla. 3rd DCA 2006) (citing *Lynn v. Mount Sinai Med. Ctr., Inc.,* 692 So. 2d 1002, 1003 (Fla. 3d DCA 1997)). "The injury must [also] be a direct result of *receiving* medical care or treatment by the healthcare provider." *Quintanilla*, 941 So. 2d at 469 (emphasis added) (citing *Goldman v. Halifax Med. Ctr., Inc.,* 662 So. 2d 367, 371 (Fla. 5th DCA 1995)). Therefore, "where the

underlying conduct complained of is medical in nature, the claim asserted is one of medical negligence and subject to the . . . requirements of chapter 766." *Pettinga v. Metabolic Research Inst., Inc.* 2014 WL 12452443, at *3 (S.D. Fla. May 6, 2014) (applying Florida law) (internal quotation mark omitted).[6]

Plaintiff alleges that Carnival failed to do anything to assist Mrs. Noon despite knowledge of her respiratory distress and the need for an oxygen tank. Carnival argues, on the other hand, that Plaintiff's complaint is premised on medical malpractice and that Plaintiff is required to produce an expert to opine on the duty of care that Carnival breached. *See Torres v. Sullivan,* 903 So. 2d 1064, 1067 (Fla. 2nd DCA 2005) ("To prevail in a medical malpractice action, a plaintiff must identify the standard of care owed by the physician, produce evidence the physician breached the duty to render medical care in accordance with the requisite standard of care, and establish that the breach proximately caused the injury alleged."); *see also Cagle v. United States*, 2017 WL 6368249, at *3 (M.D. Fla. Aug. 3, 2017), *aff'd*, 738 F. App'x 633 (11th Cir. 2018) ("Generally, the standard of care in medical malpractice cases must be determined by consideration of expert testimony.") (citing *Sweet v. Sheehan,* 932 So. 2d 365, 368 (Fla. 2nd DCA 2006)).

---

6 We turn to Florida law because where, as here, general maritime law fails to address a specific legal question, courts may apply state law "provided that the application of state law does not frustrate national interests in having uniformity in admiralty law." *Coastal Fuels Marketing, Inc. v. Fla. Exp. Shipping Co., Inc.,* 207 F.3d 1247, 1251 (11th Cir. 2000) (internal citation omitted); *see also Gandhi v. Carnival Corp.,* 2014 WL 1028940, at *1 (S.D. Fla. March 14, 2014) ("In the absence of a well-defined body of maritime law relating to a particular claim, general maritime law is supplemented by either state law or general common law principles").

Carnival's argument is unpersuasive for at least two reasons. First, Carnival's argument is incomplete as it never provides the Court with any distinctions between ordinary negligence and medical malpractice. Carnival also never presents any substantive reasons as to why this case constitutes medical malpractice. All that we are left with is a conclusory assertion that this is a medical malpractice case and that it requires an expert to opine on the standard of care to survive summary judgment. Carnival's argument is conclusory as the reasons in support of its position are noticeably absent. Because we have no obligation to do the work that Carnival should have done in the first instance, Carnival's motion for summary judgment should be **DENIED**.

Second, the record shows that Plaintiff's complaint arises under ordinary negligence – not medical malpractice. A case that is instructive is the decision in *Cagle*, 2017 WL 6368249, at *3. There, the plaintiff filed suit against the Government on behalf of her deceased husband because the Department of Veteran Affairs (the "VA") failed to adequately treat her husband's substance abuse and psychiatric conditions that led to his overdose and death.[7] More specifically, the plaintiff alleged that the VA failed to treat her husband's psychological issues, unresolved pain, heart disease, and interactions with prescription drugs – all of which involved the application of medical services and professional judgment or skill. The Government moved for summary judgment – just as Carnival does here –

[7] The plaintiff's husband was a disabled veteran of the Vietnam War and his experiences in Vietnam inflicted on him a terrible physical and mental toll.

because the plaintiff failed to produce an expert to prevail on a claim for medical negligence.

The Court considered the differences between ordinary negligence and medical malpractice and concluded that the allegations of wrongdoing concerned procedures for diagnosis and treatment. The Court then found that the allegations were not "so obvious that common sense and ordinary judgment suffice[d] to determine whether the VA breached its duty of care." *Cagle*, 2017 WL 6368249, at *3 (citing *Stepien v. Bay Mem'l Med. Ctr.,* 397 So. 2d 333, 334 (Fla. 1st DCA 1981)). The Court therefore concluded that it was not obvious what duty, if any, the VA owed the deceased in preventing his overdose and untimely death.

Here, the allegations presented are far different than the ones in *Cagle*. Mr. Noon's allegation is that his wife was under respiratory distress and that Carnival's medical personnel failed to do anything to prevent his wife's untimely death:

> The failures of [Carnival's] medically trained crewmembers to contact, observe, or examine Mrs. [Noon] after [the] retrieval of the oxygen tank, to offer or provide her a substitute tank or supplemental oxygen, or to contact or summon emergency responder services to transport her to a land based medical facility were breaches of their undertaken or assumed duty to support Mrs. [Noon's] respiration pending her transfer to a land based medical facility.

[D.E. 24 at ¶ 82]. Mr. Noon does not allege that Carnival failed to provide a specific diagnosis or treatment nor does he claim that Carnival failed to do anything "well beyond the jury's expertise," that is not a matter "within the comprehension of laymen." *Thomas v. Berrios,* 348 So. 2d 905, 908–09 (Fla. 2d DCA 1977).

Instead, Mr. Noon's allegations are quite simple. He claims that Carnival should have allowed his wife to keep the oxygen tank, that Carnival should have either contacted or observed Mrs. Noon's condition, and that Carnival should have contacted emergency responders to assist with Mrs. Noon's transportation to a land-based facility. None of Carnival's alleged failures involve a question as to whether Carnival's medial crewmembers accurately diagnosed or treated Mrs. Noon. *See, e.g.*, *Cagle*, 2017 WL 6368249, at *3 (M.D. Fla. Aug. 3, 2017) (finding a medical malpractice exists when wife's "allegations of wrongdoing all concern the procedures for the diagnosis and treatment of a long-suffering veteran"). *Torres*, 903 So. 2d at 1068 ("[T]he question of whether Dr. Sullivan employed the correct procedures for the diagnosis and treatment of Mrs. Torres and her child cannot be answered without expert testimony.") (citing *Thomas,* 348 So. 2d at 908 (stating that expert testimony is required to prove a case based on an incorrect diagnosis or the adoption of the wrong method of treatment)); *see also Pettinga*, 2014 WL 12452443, at *3 (finding that a case constitutes medical malpractice when a defendant negligently misdiagnoses a plaintiff's side effects).

Indeed, Plaintiff does not challenge Carnival's diagnosis or method of treatment. Plaintiff only challenges Carnival's failure to do anything while having knowledge that a passenger was in respiratory distress. The underlying conduct is therefore *not* medical in nature but a complete failure to observe Mrs. Noon's condition or assist her with any emergency services. As such, Carnival's motion for summary judgment as to counts three and four should be **DENIED** because the

question of whether Carnival breached its duty of care does not require any expert testimony. *See Stepien v. Bay Mem'l Med. Ctr.*, 397 So. 2d 333, 334 (Fla. 1st DCA 1981) (reversing an entry of directed verdict because a hospital's failure to respond to a patient's call for help was a factual – not medical – issue that "the jury could have determined without the aid of expert testimony").

### ***E. Punitive Damages***

The next issue is whether Carnival is entitled to summary judgment on Plaintiff's demand for punitive damages. Plaintiff repeats an argument that it presented at the motion to dismiss stage in that punitive damages are available under general maritime law where a tortfeasor's conduct is willful wanton, or reckless – not merely where there is intentional misconduct. Plaintiff's argument is again unavailing for the same reasons as discussed before because – while there has been a split[8] among district courts in the Eleventh Circuit as to the appropriate standard of liability for a claim of punitive damages – the Eleventh Circuit has held that punitive damages are unavailable in personal injury actions brought under general maritime law "except in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman, intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of

---

8 *Compare Lobegeiger v. Celebrity Cruises, Inc*., 2012 A.M.C. 202, 214 (S.D. Fla. 2011) and *Doe v. Royal Caribbean Cruises, Ltd*., 2012 WL 920675, at *4 (S.D. Fla. Mar. 19, 2012) (finding that *Atlantic Sounding* abrogated Amtrak and that punitive damages are available in maritime personal injury actions for willful, wanton, or outrageous conduct), *with Bonnell v. Carnival Corp*., 2014 WL 12580433, at *3 (S.D. Fla. Oct. 23, 2014) and *Gener*, 2011 WL 13223518, at *2 (finding that while *Atlantic Sounding's* "reasoning may be at odds with *Amtrack* [sic], its holding is not, and the mere reasoning of the Supreme Court is no basis for this Court to depart from clear circuit precedent").

intentional wrongdoing." *In re Amtrak Sunset Ltd. Train Crash in Bayou Canot, Ala. On Sept. 22, 1993*, 121 F.3d 1421, 1429 (11th Cir. 1997)).

Plaintiff seeks to relitigate this question and relies again on the U.S. Supreme Court's decision in *Atlantic Sounding* when the Court held that punitive damages are available under general maritime law for a shipowner's willful breach of the obligation to pay maintenance and cure to an injured seaman. *See Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 424 (2009). The Court found (1) that punitive damages were traditionally available at common law, (2) that the common law tradition of punitive damages extends to maritime claim, and (3) that there is no evidence that claims for maintenance and cure were excluded from the general maritime rule by the Jones Act (or otherwise). *See id*. at 414-15.

The reasoning in *Atlantic Sounding* – that punitive damages have traditionally been available at common law for wanton, willful, or outrageous conduct and that this tradition extends to federal maritime law – appears to be inconsistent, at first blush, with the Eleventh Circuit's holding in *Amtrak* that punitive damage are unavailable in maritime personal injury cases absent intentional wrongdoing. But, a closer reading of the decision shows that the holding in *Atlantic Sounding* did not overrule or cast any doubt on the holding in *Amtrak*. As Judge Williams explained in *Bonnell v. Carnival Corp*., 2014 WL 12580433, at *3 (S.D. Fla. Oct. 23, 2014), the issue is not whether punitive damages are available under general maritime law, but what standard of liability should apply in determining whether they may be recovered:

> The real issue, it appears, is not whether punitive damages are available under general maritime law—they are—but what standard of liability should apply in determining whether punitive damages may be recovered for a particular maritime claim. Plaintiff argues that, under the "broad reasoning" of *Atlantic Sounding*, punitive damages should be available in this action even in the absence of a showing of intentional misconduct. However, the Court believes that *Atlantic Sounding's* statement that "[p]unitive damages have long been an available remedy at common law for wanton, willful or outrageous conduct" was simply a general description of the circumstances in which such damages are available at common law, and was not intended to announce a bright-line standard of liability governing recovery of punitive damages in all maritime tort claims. Again, the Court notes that *Atlantic Sounding* addressed only the availability of punitive damages in a cause of action for maintenance and cure, and did not specifically discuss personal injury claims brought by ship passengers. Given the relatively narrow scope of the issues presented in *Atlantic Sounding*, the Court does not believe that holding should be read so broadly as to find it in conflict with *Amtrak*.

2014 WL 12580433, at *3 (footnote in original).

We agree with the reasoning in *Bonnell* because *Amtrak* did not foreclose the availability of punitive damages – only that they should be available in "exceptional circumstances," such as "those very rare situations of intentional wrongdoing." *Amtrak*, 121 F.3d at 1429. That analysis remains sound after *Atlantic Sounding*, where the Supreme Court addressed a narrower issue as to whether punitive damages were available as a remedy for a breach of the maritime duty of maintenance and cure. And in answering this question, the Court concluded that, because punitive damages were available under general maritime law, they are available for a maintenance and cure claim. *Atlantic Sounding*, 557 at 418-24. This means that *Atlantic Sounding* did not overrule *Amtrak* because (1) the former focused exclusively on the availability of punitive damages in a cause of action for

maintenance and cure, and (2) the former merely announced a generic description as to how punitive damages have been available at common law – *i.e.* for wanton, willful, or outrageous conduct. Nothing in *Atlantic Sounding* delineated a bright-line rule as to how that standard should be applied in all maritime tort claims. Therefore, "*Atlantic Sounding's* holding that punitive damages are available under general maritime law for the arbitrary withholding of maintenance and cure did not overrule, and is not in direct conflict with, *Amtrak's* holding that punitive damages are precluded in maritime personal injury claims 'except in exceptional circumstances such as willful failure to furnish maintenance and cure to a seaman, intentional denial of a vessel owner to furnish a seaworthy vessel to a seaman and in those very rare situations of intentional wrongdoing.'" *Bodner v. Royal Caribbean Cruises, Ltd.*, 2018 WL 4047119, at *5 (S.D. Fla. May 8, 2018) (citing *In re Amtrak,* 121 F.3d at 1429).

In light of these principles, Plaintiff may only recover punitive damages upon a showing of intentional misconduct. To demonstrate "intentional misconduct," a plaintiff must show that "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Mee Indus. v. Dow Chemical* Co., 608 F.3d 1202, 1220 (11th Cir. 2010) (citing Fla. Stat. § 768.72(2)(a)). The Eleventh Circuit has described instances of intentional misconduct as "very rare." *In re Amtrak* 121 F.3d at 1429. That is consistent with how the Supreme Court itself interpreted that

standard in *Exxon*, where the Court defined the threshold for awarding punitive damages as being necessary for retribution and deterrence based on the "enormity" and "outrageousness" of the conduct "owing to 'gross negligence,' 'willful, wanton and reckless indifference for the rights of others,' or behavior even more deplorable. . . ." *Exxon Shipping Co. v. Baker*, 554 U.S. at 493 (citations omitted).

Here, Carnival argues that there is no evidence that it engaged in intentional misconduct. Carnival contends that Plaintiff failed to introduce any evidence that it pursued a course of conduct with actual knowledge of wrongfulness or that there was a high probability that injury or damages would result. Carnival claims, for example, that there is no evidence that it ever refused to treat Mrs. Noon, that it interfered with her ability to obtain medical assistance, or that it actively prevented Mrs. Noon or any other passenger in arranging transportation options off the ship. This means that, if there are factual questions as to whether Carnival was negligent, Plaintiff failed to provide any evidence that Carnival's actions rose to the level of intentional misconduct.

Plaintiff concedes in his response that many of the allegations in the complaint have not borne fruit in discovery. Plaintiff argues, however, that there is still evidence that Carnival knew that Mrs. Noon was relying on an oxygen tank to breathe, that her medical condition was urgent, and that she required emergency attention. Plaintiff then reasons that Carnival engaged in intentional misconduct because Carnival prioritized inventory control over the medical needs of a passenger. For these reasons, Plaintiff concludes that his request for punitive

damages remains viable and that Defendant's motion for summary judgment should be denied.

Carnival's arguments are well taken because Plaintiff has failed to adduce any evidence that Carnival's negligence rises to the level of intentional misconduct. During the motion to dismiss stage, the Court relied on Plaintiff's allegation that Mrs. Noon's family members requested that crewmembers arrange for emergency transportation services to a land-based medical facility, and that Carnival's personnel refused and intentionally prevented the family from arranging their own transportation. The Court found that these allegations – if accepted as true – included gross recklessness that was tantamount to intentional misconduct because the crewmembers not only refused to assist Mrs. Noon, but they also prevented her family members from contacting emergency service providers in a timely basis after Mrs. Noon's oxygen tank had been retrieved. The allegations went well beyond a simple negligence claim and asserted that Carnival intentionally acted in a way to cause Mrs. Noon's death.

As the case has developed, Plaintiff now cannot present any evidence that Carnival's actions rise to the level of intentional misconduct. Plaintiff merely contends – in four conclusory sentences – that many of the allegations were unsubstantiated in the discovery process, but that punitive damages should be preserved because Carnival had notice of Mrs. Noon's condition and did nothing to aid her. That theory is untenable. Without any other evidence, Plaintiff's allegations must fail because there is nothing to support a finding of intentional

misconduct. *See, e.g.*, *Terry v. Carnival Corp.*, 3 F. Supp. 3d 1363, 1371–72 (S.D. Fla. 2014) ("Plaintiffs have failed to demonstrate and the record evidence does not support a finding of intentional misconduct. Accordingly, Defendant's motion is granted. Plaintiffs in this action are precluded from pursuing punitive damages."). The record merely shows that there are issues of fact as to whether Carnival was negligent, and nothing else that it engaged in intentional misconduct. Because Plaintiff has failed to direct the Court to anything in the record that Carnival engaged in intentional misconduct, Carnival's motion for summary judgment as to Plaintiff's request for punitive damages should be **GRANTED**.

### ***F. Economic Damages***

Carnival's final argument is that the Court should grant summary judgment with respect to Plaintiff's request for economic damages.[9] These damages include (1) the loss of Mrs. Noon's earning capacity, (2) the loss of Mrs. Noon's earnings, (3) the loss of support and services, (4) the loss of net accumulations, and (5) funeral expenses. Plaintiff's response is that these damages are viable because Mr. Noon testified during his deposition that he must now provide for himself – without the assistance of Mrs. Noon – and that, since her death, he has had to sell his home to make ends meet. Plaintiff therefore concludes that his request for economic

9 Defendant's request for damages arises under Florida's Wrongful Death Act. The Act "provides for a cause of action that may be brought by a decedent's personal representative when the decedent's death is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person . . . 'and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued.'" *Laizure v. Avante at Leesburg, Inc.,* 109 So. 3d 752, 758 (Fla. 2013) (quoting Fla. Stat. § 768.19).

damages are a jury question and that Defendant's motion for summary judgment should be denied.

The first issue is whether Plaintiff may recover for the loss of Mrs. Noon's earning capacity. Plaintiff never explains how the recovery of a decedent's earning capacity falls under Florida's Wrongful Death Act. Instead, Plaintiff argues that this constitutes a jury question and that it would be premature for the Court to determine whether a decedent's earning capacity is recoverable under Florida law. Plaintiff's argument is misplaced because the question presented is legal – not factual.

There is also nothing in the text of the statute that allows for the recovery of a decedent's earning capacity. Indeed, the few decisions that have considered this question have found that earning capacity is unavailable under the Wrongful Death Act because it is not one of the enumerated damages provided under the statute. *See, e.g.*, *Lifemark Hosps. of Fla., Inc. v. Afonso*, 4 So. 3d 764, 769 (Fla. 3rd DCA 2009) ("[W]rongful death damages do not include lost wages and loss of earning capacity."); *Barlow v. N. Okaloosa Med. Ctr.*, 877 So. 2d 655, 661, n.6 (Fla. 2004) ("In *St. Mary's Hospital,* the plaintiffs were allowed to recover for loss of the decedent's earning capacity, even though they would *not* have been entitled to such a recovery under the Wrongful Death Act.") (emphasis added); *St. Mary's Hosp., Inc. v. Phillipe*, 769 So. 2d 961, 973 (Fla. 2000) (finding that under Florida's Wrongful Death Act, an "estate may recover the decedent's loss of earnings, loss of prospective net accumulations, and medical and funeral expenses," but not a decedent's earning

capacity). Accordingly, Carnival's motion for summary judgment on Mrs. Noon's earning capacity should be **GRANTED**.

Carnival's second argument is that – while the Act allows for a decedent's estate to recover lost earnings – Plaintiff has failed to introduce any evidence of damages. *See* Fla. Stat. § 768.21 ("Loss of earnings of the deceased *from the date of injury to the date of death*, less lost support of survivors excluding contributions in kind, with interest.") (emphasis added). Carnival's argument is well taken because Mrs. Noon was injured on July 8, 2017 and died the following day. Plaintiff claims that the question of damages is for the jury to decide, but Plaintiff fails to direct the Court to any evidence in the record that there were any lost earnings during this one-day time-frame. Plaintiff has also failed to include any computation of lost earnings or otherwise produce any other documents as evidence of Mrs. Noon's lost earnings. Because the record is devoid of any evidence and Plaintiff has failed to direct the Court to any, Carnival's motion for summary judgment on Plaintiff's demand for lost earnings should be **GRANTED**.

Carnival's next argument is that Mrs. Noon's grandchildren may not recover for the loss of support and services because they are not considered "survivors" under the Florida Wrongful Death Act. Survivor is defined as "the decedent's spouse, children, parents, and, when partly or wholly dependent on the decedent for support or services, any blood relatives and adoptive brothers and sisters." Fla. Stat. § 768.18. The statute further provides that "[e]ach survivor may recover the value of lost support and services from the date of the decedent's injury to her or his

death, with interest, and future loss of support and services from the death and reduced to present value." Fla. Stat. § 768.21(1). Alternatively, even if Mrs. Noon's grandchildren qualify as "blood relatives[10]," Carnival contends that there is no evidence that the grandchildren were dependent on Mrs. Noon at the time of her death. For these reasons, Carnival concludes that Mrs. Noon's grandchildren cannot recover for the loss of support and services.

Carnival also argues that Mr. Noon cannot recover for the loss of support and services because there is no evidence that he relied on his wife for financial support. Carnival relies, in part, on an interrogatory where Mr. Noon stated that his grandchildren – as opposed to himself – relied on Mrs. Noon. Carnival therefore concludes that, like the grandchildren, Mr. Noon has failed to establish that Mrs. Noon supported him.

After a careful review, neither Mr. Noon nor his grandchildren may recover for the loss of support and services because – if even if we assume for the sake of argument that Mrs. Noon supported her husband and grandchildren – there is no evidence of any damages. Plaintiff relies primarily on his contention that this constitutes a jury question and that, in the absence of his wife, he must now perform household tasks. But, Plaintiff fails to provide the Court with any way to value the performance of routine tasks that Mr. Noon must now perform around the home. Plaintiff then mentions that, since Mrs. Noon's death, he has "had to" sell his home and that the reason for the sale is "presumably because he was unable to afford the mortgage payments without his late wife's income." [D.E. 61 at 12]. The

10 The term "blood relative" is not defined in the Wrongful Death Act.

problem with this statement is that it relies entirely on speculation as to the reasons for the sale of the home and it omits any valuation as to the home itself.

This is a reoccurring problem in Plaintiff's response with respect to economic damages because Plaintiff fails to reference anything that values the damages he suffered. And without any evidence of Mrs. Noon's contributions to her family or the household, Plaintiff's request for damages is illusory. *See, e.g., Ivy v. Sec. Barge Lines, Inc.*, 585 F.2d 732, 740 (5th Cir. 1978) (finding that the district erred in submitting the issue of loss of services and support to the jury because "[n]o documentary evidence was introduced establishing the amount of [her] financial contributions to the family, nor were [her] services around the house in any way valued"); *see also Matter of Adventure Bound Sports, Inc.*, 858 F. Supp. 1192, 1201 (S.D. Ga. 1994) ("To recover for this pecuniary loss, a claimant must present testimony assigning a value to the services performed by the decedent."). Therefore, we have no choice but to conclude – that without any way to value the loss of support and services – that Carnival's motion for summary judgment should be **GRANTED**.

Carnival's fourth argument is that Plaintiff is not entitled to recover any net accumulations for the death of Mrs. Noon. *See* Fla. Stat. § 768.72(6)(A) (providing that a personal representative may recover for an estate the "[l]oss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value."). Net accumulations are defined as "the part of the decedent's expected net business or

salary income, including pension benefits, that the decedent probably would have retained as savings and left as part of her or his estate if the decedent had lived her or his normal life expectancy." Fla. Stat. § 768.18. "The purpose of allowing a personal representative to recover net accumulations is to award what would have been earned over a decedent's life time, and theoretically was lost by the decedent's untimely death." *Citrus Cty. v. McQuillin*, 840 So. 2d 343, 346 (Fla. 5th DCA 2003) (citing *Wilcox v. Leverock,* 548 So. 2d 1116 (Fla. 1989)). Net accumulations therefore represent "what the decedent's estate would have been worth at death." *McQuillin*, 840 So. 2d at 346.

Here, Plaintiff has failed to provide any method of ascertaining Mrs. Noon's future earnings or any evidence to find that she had a propensity to save at the time of her death. Plaintiff merely states that the question of economic damages is a jury question. While that may be true in some respects, there must be some evidence in the record as to how to calculate Mrs. Noon's net accumulations. Indeed, it is a well-settled principle that "[t]here must be sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Villalobos v. Am. Airlines, Inc.*, 1998 WL 1770592, at *5 (S.D. Fla. Nov. 13, 1998) (citing *Snair v. City of Clearwater,* 817 F. Supp. 108, 113 (M.D. Fla. 1993)); *see also Avril v. Village South Inc.,* 934 F. Supp. 412, 417 (S.D. Fla. 1996) (finding that conjecture or speculation does not satisfy non-moving party's burden in responding to summary judgment). Because Plaintiff has failed to provide any evidence of Mrs. Noon's salary income, her propensity to save, or any other argument that shows how these

damages are applicable to the facts of this case, Carnival's motion for summary judgment as to the recovery of Mrs. Noon's net accumulations should be **GRANTED**. *See, e.g.*, *Villalobos*, 1998 WL 1770592, at *5 (granting summary judgment because the plaintiff came "forward with no other evidence to support a calculation," of the decedent's net accumulations); *see also Snair,* 817 F. Supp. at 113 ("Speculative evidence is insufficient to enable the non-moving party to avoid summary judgment.").

The final category of damages is Plaintiff's demand for funeral expenses. Section § 768.21(6)(b) allows for a decedent's personal representative to recover "medical or funeral expenses due to the decedent's injury or death that have become a charge against her or his estate or that were paid by or on behalf of [the] decedent[.]" Fla. Stat. § 768.21(6)(b). A survivor, on the other hand, may recover only "[m]edical or funeral expenses due to the decedent's injury or death *that the survivor has paid*." Fla. Stat. § 768.21(5) (emphasis added).

Mr. Noon testified that, although he could not remember specifically how much he paid for Mrs. Noon's funeral expenses, the amount was approximately $2,000:

> Q. What about Karen's funeral expenses, did you pay for those?
> A. Uh-huh, yes.
> Q. Do you remember how much you paid?
> A. It seemed like it was, seemed like it was right around $2,000 for the urns, we had her creamed, and death certificates. The exact amount I don't remember. I could not find out. The funeral home is here in Miami that I dealt with.

[D.E. 54 at 71].

Carnival claims that it should be entitled to summary judgment, but Carnival fails to make clear the reasons for its argument. It appears that Carnival is suggesting that Mr. Noon's payment of Mrs. Noon's funeral expenses means that there is no longer a pending charge against Mrs. Noon's estate and that Mr. Noon cannot collect any amount previously paid. But, this contention is misplaced because the statute provides for the recovery of funeral expenses if they are paid *by or on behalf* of the decedent. Because Carnival's argument is unclear and unpersuasive, and "Plaintiff, as the personal representative, is permitted to seek [the] recovery of funeral expenses and other losses on behalf of the estate," Carnival motion for summary judgment for the recovery of funeral expenses should be **DENIED**. *Burks v. Beary*, 713 F. Supp. 2d 1350, 1359 (M.D. Fla. 2010).

## *IV. CONCLUSION*

For the foregoing reasons, the Court **RECOMMENDS** that Carnival's motion for summary judgment be **GRANTED in part** and **DENIED in part** [D.E. 50]:

A. Carnival's motion for summary judgment as to counts 1-4 and Plaintiff's request for the recovery of funeral expenses should be **DENIED**.

B. Carnival's motion for summary judgment as to Plaintiff's demand for punitive damages, lost earnings, earning capacity, net accumulations, and the loss of support and services should be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge. Failure to timely

file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 6th day of November, 2019.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge